No. 23-1641

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC., ET AL.,

Plaintiffs-Appellants,

v.

DELAWARE DEPARTMENT OF SAFETY AND
HOMELAND SECURITY, ET AL.,

Defendants-Appellees.

_____

Appeal from a Judgment of the United States District Court
for the District of Delaware (Andrews, J.)
(Dist. Ct. No. 1:22-cv-00951-RGA)

_____

## OPENING BRIEF OF APPELLANTS
## DELAWARE STATE SPORTSMEN'S ASSOCIATION, ET AL.

_____

Francis G.X. Pileggi, Esquire
Alexander MacMullan, Esquire
Dean Pillarella, Esquire
LEWIS BRISBOIS
    BISGAARD & SMITH LLP
500 Delaware Ave., Suite 700
Wilmington, DE 19801
302-985-6000
Francis.Pileggi@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com
Dean.Pillarella@LewisBrisbois.com

Dated: July 3, 2023

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF RELATED CASES....................................................2

STATEMENT OF THE CASE.................................................................3

    I.     Delaware's Unconstitutional Regulatory Scheme......................................3

    II.    The Regulatory Scheme's Effect on
            Appellants .........................................................................6

    III.   Prior Proceedings...........................................................7

SUMMARY OF THE ARGUMENT ......................................................7

STANDARD OF REVIEW FOR ISSUES ON APPEAL ........................8

ARGUMENT ...........................................................................................9

    I.     The District Court Erred in Concluding Appellants Were
           Unlikely to Succeed on the Merits ...........................................11

        A. The District Court Erred in Failing to Recognize that
            Common Arms Mislabeled as "Assault Pistols" and
            "Copycat Weapons" Banned Under Delaware's
            Regulatory Scheme are in Common Use Today by
            Law-Abiding Persons for Lawful Purposes ........................11

        B. The District Court Erred in Engaging in False
            Historical Tradition Analysis After Determining
            That the Common Arms Banned by
            Delaware's Regulatory Scheme Were Not
            "Dangerous and Unusual"..................................................13

C. The District Court Erred in Concluding that
Delaware's Regulatory Scheme is Consistent
with the Nation's Historical Tradition of
Firearm Regulation ............................................................................... 14

D. The District Court Erred in Concluding that
Delaware's Regulatory Scheme Implicates
"Dramatic Technological Changes" and
"Unprecedented Societal Concerns" ..................................................... 24

II.    The District Court Erred in Concluding that Appellants
Will Not Suffer Irreparable Harm in the Absence of an
Injunction ................................................................................................ 27

III.   The Public Interest and Balance of Hardships Strongly
Favor Appellants ..................................................................................... 29

CONCLUSION .......................................................................................................... 29

# TABLE OF CITATIONS

## CASES

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
   910 F.3d 106, 116 (3d Cir. 2018) ....................................................................10

*Barnett v. Raoul*, No. 3:23-cv-00209-SPM,
   2023 U.S. Dist. LEXIS 74756, at *16 (S.D. Ill. Apr. 28, 2023).......................28

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
   176 A.3d 632, 652 (Del. 2017) ...........................................................................7

*Burwell v. Hobby Lobby Stores, Inc.*,
   134 S.Ct. 2751 (2014)......................................................................................8, 9

*Caetano v. Massachusetts*,
   577 U.S. 411, 416-17 (2016) .........................................................................12, 13

*Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of
   Health & Human Servs.*,
   724 F.3d 377, 382 (3d Cir. 2013) ........................................................................8

*Delaware State Sportsmen's Association, Inc., et al. v. Delaware
   Department of Safety and Homeland Security, et al.*,
   Del. Super., C.A. No. K23C-024 RLG (2023) .................................................2, 7

*Duncan v. Becerra*,
   970 F.3d 1133, 1147 (9th Cir. 2021) .............................................................24, 25

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246, 2257–2258 (2020)...................................................................22

*Ezell v. City of Chicago*,
   651 F.3d 684, 699 (7th Cir. 2011) ......................................................................28

*Friedman v. City of Highland Park, Ill.*,
   577 U.S. 1039, 1042 (2015)..........................................................................11, 18

*Heller v. District of Columbia ("Heller II")*,
   670 F.3d 1244, 1287 (D.C. Cir. 2011)..........................................................passim

*Holland v. Rosen*,
  895 F.3d 272, 285 (3d Cir. 2018) ........................................................9

*K.A. v. Pocono Mountains Sch. Dist.*,
  710 F.3d 99, 114 (3d Cir. 2013).........................................................29

*Kongsberg v. State Bar of Cal.*
  366 U.S. 36, 50 n. 10 (1961)................................................................1

*McDonald v. City of Chicago*,
  561 U.S. 742, 780 (2010).....................................................................28

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)..................................................................passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242, 255 (2d Cir. 2015) .......................................................12

*Range v. AG United States*,
  69 F.4th 96, 112 (3d Cir. 2023)...........................................18, 20, 22

*Rocky Mountain Gun Owners v. The Town of Superior*,
  Civ. Action No. 22-cv-01685-RM (D. Colo. July 22, 2022)............28

*Staples v. United States*,
  511 U.S. 600 612 (1994) ....................................................................11

## <u>STATUTES</u>

11 *Del. C.* §§ 1457 ......................................................................................3

11 *Del. C.* §§ 1464-1467............................................................................3

11 *Del. C.* §§ 1465(2)..................................................................................3

11 *Del. C.* § 1465(5).....................................................................................3

11 *Del. C.* § 1466 (a)(1)—(2) .....................................................................4

11 *Del. C.* § 1466 (c)(3)(a)—(d) ...........................................................4, 5

11 *Del. C.* § 1466 (e) .............................................................................4

11 *Del. C.* §§ 1468—1469A ..................................................................5

11 *Del. C.* § 1469(b)(c) .......................................................................3, 6

11 *Del. C.* §§ 4205 ...............................................................................5

18 U.S.C. § 922(w) ................................................................................26

28 U.S.C. § 1292(a)(1)............................................................................2

28 U.S.C. § 1331 ....................................................................................2

## **OTHER AUTHORITIES**

William English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494 (available at https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494). .....................................................11

*First Conviction under Weapon Law; Judge Foster gives Marino Rossi One Year for Arming himself…*" N.Y. Times (Sept. 28, 1911) at 5 ................19

Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894*, at 128 (1984)..........................................................25

Gramlich, John, *What the data says about gun deaths in the U.S.*, Pew Research Center (2023) https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/ .......................26

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15*, 284 (2022) ......................................................................................12

William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia*, 131 (1823) ............................................19

Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) ................29

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*,
78 Alb. L. Rev. 849, 864 (2015) ......................................................................25

Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault
Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003,
Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004)),*
(available at *https://bit.ly/3wUdGRE*)...............................................................26

*Laws of the State of Delaware*, Chapter 94, Vol. 12,
March 6, 1861, at Section 7 ...............................................................................19

NSSF, *Modern Sporting Rifle Comprehensive Consumer Report*,
available at https://bit.ly/3GLmErS (last accessed Dec. 21, 2022) ....................11

*National Firearms Act: Hearings Before the Committee on Ways and
Means House of Representatives on H.R. 9066*, 73d Cong., 2d sess. 4 (1934)..23

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?:
How Courts Have Defied Heller in Arms-ban Cases—Again*, at 3 (June 2023)
(available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4483206)....17

Stephen B. Tahmassebi, *Gun Control and Racism*,
2 Civil Rights Law Journal 67 (1991) .............................................................19

## **INTRODUCTION**

The United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), mandates that Appellants succeed in their challenge to the State of Delaware's ban on semiautomatic arms and ammunition magazines owned by tens of millions of Americans and commonly used by a multitude of law-abiding Delawareans for lawful purposes. The Governor signed the ban into law just one week after *Bruen* was decided.

In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (citing *Kongsberg v. State Bar of Cal.* 366 U.S. 36, 50 n. 10 (1961)). The State of Delaware did not demonstrate that the bans fall outside the Second Amendment's unqualified command and protection. That is because *Bruen,* and *Heller* before it, made clear that this Nation's historical tradition never supports the outright ban of arms that are commonly possessed by ordinary Americans for lawful purposes. No amount of incorrect purported historical analogues or improper interest-balancing by the State and the District Court can justify the bans under *Heller* and *Bruen*.

126071400.2

1

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the Second Amendment and the Fourteenth Amendment. The District Court denied Appellants' Motion for Preliminary Injunction on March 27, 2023, and Appellants timely filed this appeal on April 6, 2023. This Court has jurisdiction over this appeal of the order of the District Court under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Did the State fail to comply with *Bruen* and *Heller* when it banned the sale, purchase, and possession of firearms and magazines which are commonly possessed by law-abiding Americans for lawful purposes when there is no analogous ban in the Nation's "historical tradition"?

## STATEMENT OF RELATED CASES

Appellants in this matter have also brought a challenge to the State of Delaware's ban of common arms and magazines under Article I, Section 20 of the Delaware Constitution in the Delaware Superior Court at *Delaware State Sportsmen's Association, Inc., et al. v. Delaware Department of Safety and Homeland Security, et al.*, Del. Super., C.A. No. K23C-024 RLG (2023).

## STATEMENT OF THE CASE

### I. DELAWARE'S UNCONSTITUTIONAL REGULATORY SCHEME

**HB 450: Delaware's Semiautomatic Arms Ban**

Delaware's legislature passed the challenged ban shortly before the Supreme Court decided *Bruen*, and the ban was signed into law a week after the Supreme Court decided *Bruen*—without any changes to reflect *Bruen*'s mandate. The ban, in the form of HB 450, outlaws scores of models of common semiautomatic rifles, pistols and so-called "copycat weapons."[1] 11 *Del. C.* §§ 1457, 1464-1467 (2022). The State's limited exceptions to these broad criminal statutes do not allow typical law-abiding citizens to keep and bear common firearms for lawful purposes. *See id.* at §§ 1465(2), 1469(c). This broad prohibition—under penalty of jail time—on transporting, manufacturing, selling, offering to sell, transferring, purchasing, receiving, or possessing any "assault weapon" applies to everyone who does not fall

---

[1] "Copycat weapons" are identified as semiautomatic, centerfire rifles that can accept a detachable magazine with certain enumerated features; semiautomatic centerfire rifles that have an overall length of less than 30 inches; semiautomatic pistols that can accept a detachable magazine and have certain enumerated features; semiautomatic shotguns with a folding or telescoping stock and certain enumerated grip features; semiautomatic shotguns that can accept a detachable magazine; shotguns with revolving cylinders; semiautomatic pistols with a fixed magazine that can accept more than 17 rounds; and semiautomatic, centerfire rifles that have a fixed magazine that can accept more than 17 rounds. *See 11 Del. C.* § 1465(5). In reality, these so-called "copycat weapons" represent a distinction without a difference in comparison to the semiautomatic rifles, shotguns and pistols banned elsewhere, and enumerated and banned by HB 450.

126071400.2

into one of a few narrow categories, primarily on-duty military personnel, law enforcement officers, and certain personnel of the United States government or a unit of that government. *See id.* at § 1466 (a)(1)—(2). Ordinary, law-abiding citizens may not "possess and transport" an "assault weapon" unless they lawfully possessed it prior to June 30, 2022, and then only "[a]t that person's residence, place of business, or other property owned by that person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair."  § 1466 (c)(3)(a)—(d).

If an ordinary, law-abiding citizen keeps or bears an arm that he did not lawfully possess prior to June 30, 2022, or keeps or bears an arm anywhere but the locations enumerated in § 1466 (c)(3)(a)—(d), and HB 450 has dubbed that arm an "assault weapon," then Defendants or their agents may seize and dispose of that arm. *See id.* at § 1466 (e).[2] Moreover, any ordinary, law-abiding citizen who possesses an

---

[2] Proof of ownership prior to June 30, 2022, is placed upon the law-abiding citizen rather than the State.

126071400.2

4

"assault weapon," or transports one into the State, commits a Class D felony offense and is subject to severe criminal sanctions, including imprisonment for up to eight years for the first offense. *Id*. at §§ 4205, 1466(d).

**SS 1 for SB 6: Delaware's Ban on Common Magazines**

Delaware also mislabels scores of common ammunition magazines with a misnomer of "large-capacity magazines"—and bans all of them outright.[3] 11 *Del. C*. §§ 1468—1469A. Delaware's broad ban on transporting, manufacturing, selling, offering to sell, transferring, purchasing, receiving, or possessing any "large-capacity magazine" applies to everyone who does not fall into one of a few narrow categories, primarily on-duty military personnel, law enforcement officers, and certain personnel of the United States government or a unit of that government. *Id*. at § 1469. Worse still, SS 1 for SB 6 contains no provision for owners of "large-capacity magazines" purchased prior to enactment of the ban to retain the "large-capacity magazine" similar to what HB 450 does for banned firearms. Rather, SS 1 for SB 6 mandates confiscation without fair compensation. If an ordinary, law-abiding citizen keeps or bears an ammunition magazine, and SS 1 for SB 6 has dubbed that ammunition magazine a "large-capacity magazine," then the State or its

---

[3] Ammunition magazines larger than the State's arbitrary limit frequently come standard from manufacturers. Thus, the ban is applicable to a "standard capacity" magazine, and the State now only permits "reduced-capacity" magazines.

agents may seize and dispose of that ammunition magazine, without paying fair-market value for it, regardless of whether it is in common use by law-abiding persons for lawful purposes. *Id.* at § 1469(b). Moreover, any ordinary, law-abiding citizen who possesses a "large-capacity magazine," or transports one into the State, is subject to a civil penalty for a first violation, commits a Class B misdemeanor offense for a second violation, and commits Class E felony offense for any further violations. *Id.* Collectively, HB 450 and SS 1 for SB 6 are referred to herein as the "Regulatory Scheme."

## II.    THE REGULATORY SCHEME'S EFFECT ON APPELLANTS

The individual Appellants[4] are ordinary, law-abiding, adult citizens of Delaware. Each wants to acquire banned firearms and ammunition magazines for self-defense and other lawful purposes but has been barred from doing so by Delaware's Regulatory Scheme. The Association Appellants[5] each have numerous members in Delaware, who are otherwise eligible to acquire banned firearms and banned ammunition magazines and would do so—but for the bans. Finally, Appellant Delaware Association of Federal Firearms Licensees is a voluntary unincorporated association consisting of Federal Firearms Licensees.

---

[4] Madonna M. Nedza, Cecil Curtis Clements, James E. Hosfelt Jr., Bruce C. Smith, Vickie Lynn Prickett, and Frank M. Nedza.

[5] Delaware State Sportsmen's Association, Delaware Rifle and Pistol Club and Bridgeville Rifle and Pistol Club, Ltd.

126071400.2

## III.   PRIOR PROCEEDINGS

On July 20, 2022, Appellants filed this action for declaratory and injunctive relief in the U.S. District Court for the District of Delaware ("the District Court") to challenge HB 450. On September 9, 2022, Appellants filed an Amended Complaint adding a challenge to SS 1 for SB 6.[6] On November 15, 2022, Appellants filed a Motion for Preliminary Injunction seeking to enjoin the unconstitutional Regulatory Scheme. Similar pending complaints were also consolidated. Oral argument was held on February 24, 2023. On March 27, 2023, Appellants' Motion for Preliminary Injunction was denied. ("Mem. Op."). On April 6, 2023, Appellants timely filed this appeal.

## SUMMARY OF THE ARGUMENT

The Second Amendment guarantees law-abiding Delawareans the right to possess, use, and sell firearms in common use for lawful purposes. The Regulatory Scheme infringes upon this right by prohibiting Delawareans from possessing a whole class of firearms—semiautomatic pistols and long guns as well as ammunition magazines capable of holding over seventeen rounds of ammunition. These arms are

---

[6] This case originally was also based on Section 20 of Article I of the Delaware Constitution, adopted in 1987, which is expressly broader than the Second Amendment. *See Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 652 (Del. 2017). The state law claims are now pending at *Delaware State Sportsmen's Association, Inc., et al. v. Delaware Department of Safety and Homeland Security, et al.*, Del. Super., C.A. No. K23C-024 RLG (2023).

undeniably in common use for lawful purposes by law-abiding persons. According to *Heller* and *Bruen*, the argument should end here because, as examined in *Heller*, this Nation has no historical tradition of banning arms in common use by law-abiding persons for lawful purposes. It is not proper to brush Supreme Court precedent aside, reexamine history and tradition again, and come up with a different result.

The District Court was not faithful to *Heller* and *Bruen*. Instead, the District Court upheld the Regulatory Scheme by invoking false historical analogues that bore no resemblance to the Regulatory Scheme and by engaging in improper interest-balancing under the guise of inapplicable "unprecedented societal concerns" and "dramatic technological changes." The Regulatory Scheme violates the Second Amendment. The District Court's decision should be reversed, with judgment entered in Appellants' favor.

## **STANDARD OF REVIEW FOR THE ISSUES ON APPEAL**

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 382 (3d Cir. 2013), *rev'd sub nom on other grounds*, *Burwell v. Hobby Lobby Stores*,

*Inc.*, 134 S.Ct. 2751 (2014). The District Court's denial of Appellant's Motion for a Preliminary Injunction is reviewed for abuse of discretion. *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir. 2018). Questions of law are reviewed de novo, and where (as here) there is legal error, review is plenary. *Id.*

## ARGUMENT

*Bruen* required the District Court to determine whether the arms and their components banned by Delaware are "in common use" by law-abiding persons for lawful purposes and, therefore, protected by the Second Amendment's "unqualified command." 142 S. Ct. at 2126, 2128. The District Court denied Appellants' Motion for Preliminary Injunction despite overwhelming evidence that the arms and components thereof banned by the State are in common use and thus indisputably covered by this command.

Despite denying Appellants' Motion for Preliminary Injunction, fortunately the District Court did correctly acknowledge certain basic principles upon which this appeal rests. First, the District Court affirmed that the semiautomatic rifles and shotguns banned by the Regulatory Scheme are arms in common use and, therefore, covered by the Second Amendment. Mem. Op. at 15. The District Court also affirmed that ammunition magazines banned under the Regulatory Scheme are "arms" as this Court has previously ruled, and also found that they are in common use and, thus, covered by the Second Amendment. Mem. Op. at 17-18; *see also*

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018).

But then, the District Court erred in its finding that Appellants were unlikely to succeed on the merits. It failed to recognize that common pistols, mislabeled as "assault pistols," and a subset of common semiautomatic weapons also mislabeled as "copycat weapons" were not in common use. Mem. Op. at 11. The District Court next erred by engaging in a flawed revisionist rewriting of the Nation's historical tradition of firearms regulation regarding the banned semiautomatic pistols, rifles, shotguns and ammunition magazines. That analysis should not have occurred for arms that are established as being in common use by law-abiding persons for lawful purposes. *Id*. at 17-18, 28. Next, regarding the likelihood to succeed on the merits, the District Court erred in concluding that the Regulatory Scheme implicates "dramatic technological change" and "unprecedented societal concerns" and that those factors determine the outcome of the District Court's analysis. *Id*. at 23.

I.    **THE DISTRICT COURT ERRED IN CONCLUDING THAT APPELLANTS WERE UNLIKELY TO SUCCEED ON THE MERITS**

A. **The District Court Erred in Failing to Recognize that Common Arms Mislabeled as "Assault Pistols" and "Copycat Weapons" Banned Under Delaware's Regulatory Scheme are in Common Use Today by Law-Abiding Persons for Lawful Purposes**

The District Court held that semiautomatic rifles, shotguns and ammunition magazines were in common use by law-abiding persons for lawful purposes[7], but then held that semiautomatic pistols and so-called "copycat weapons" were not.

---

[7] And rightfully so, as about 24.6 million individuals have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total). English, William, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494 (available at https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494). Semiautomatic rifles accounted for 40 percent of rifles sold in 2010; with two million AR-15s, America's most popular rifle, manufactured between 1986 and 2010. *Heller v. District of Columbia ("Heller II"),* 670 F.3d 1244, 1287 (D.C. Cir. 2011); *see also Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting from denial of cert)("Roughly five million Americans own AR-styled semiautomatic rifles…The overwhelming majority of citizens who own and use such rifles do so for lawful purposes including self-defense and target shooting.") Semiautomatic long guns "traditionally have been widely accepted as lawful possessions..." *see Staples v. United States*, 511 U.S. 600 612 (1994). As to the ammunition magazines, data from the firearm industry trade association indicates that 52% of modern sporting rifle magazines in the country have a capacity of 30 rounds. *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report*, available at https://bit.ly/3GLmErS (last accessed Dec. 21, 2022). About 39 million individuals have owned magazines that hold over 10 rounds (up to 542 million such magazines in total). English, William, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), *supra*.

126071400.2

Despite clarification from the Supreme Court, the District Court ignored the fact that semiautomatic pistols are in common use. *Caetano v. Massachusetts*, 577 U.S. 411, 416-17 (2016) (Alito, J., concurring) ("semiautomatic pistols" are among "the weapons most commonly used today for self-defense."); *see Heller II*, 670 F.3d at (Kavanaugh, J., dissenting)("[H]andguns—the vast majority of which today are semi-automatic—… have not traditionally been banned and are in common use by law-abiding citizens."); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,* 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons at issue are 'in common use' as that term was used in *Heller*.")

The District Court also held that so-called "copycat weapons" are not in common use. Holding that semiautomatic rifles and shotguns are in common use while "copycat weapons" are not, is a contradiction and incompatible with *Bruen*. *See* Stephen P. Halbrook, *America's Rifle: The Case for the AR-15*, 284 (2022)("And even to try to decide whether a firearm is a copy or duplicate of a verboten firearm, one must have a verboten firearm for comparison.") If semiautomatic arms are in common use then "copycat weapons," as a form of semiautomatic arm, are also in common use.

**B. The District Court Erred in Engaging in False Historical Tradition Analysis After Determining that the Common Arms Banned by Delaware's Regulatory Scheme Were Not "Dangerous and Unusual"**

Having established by recent Supreme Court precedent and overwhelming statistical support that the arms banned by the Regulatory Scheme are in common use by law-abiding persons for lawful purposes, the Regulatory Scheme cannot be consistent with the Nation's historical tradition of firearms regulation and cannot stand. *Bruen*, 142 S. Ct. at 2128 (holding it is "'fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"); *see also Heller*, 554 U.S. at 625 (holding a law, by definition, cannot fit into the Nation's historical tradition of restricting "dangerous and unusual" weapons if it bans "possession and use of weapons that are 'in common use.'")

At this juncture, the District Court's test should have been complete because the arms banned by the Regulatory Scheme were not dangerous *and* unusual because they are in common use. *See Caetano,* 577 U.S. at 417 (2016)(Alito, J. concurring) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual.") The District Court accepted that the banned semiautomatic rifles and banned detachable magazines were arms in common use—and that the dangerous and unusual test was a conjunctive one, and should have done the same for semiautomatic pistols and so-called "copycat weapons." But even where it

accepted this truth, the District Court strayed and improperly analogized the State's ban with a non-existent historical tradition.

### C. The District Court Erred in Concluding that Delaware's Regulatory Scheme is Consistent with the Nation's Historical Tradition of Firearm Regulation

The Regulatory Scheme is an outright ban that criminalizes the acquisition, possession and sale of entire classes of arms that are currently commonly possessed for lawful purposes. Therefore, the Regulatory Scheme fails under the *Heller* test confirmed in *Bruen* and violates the Second Amendment. But the District Court incorrectly went beyond the common-use analysis, and considered the State's proffered historical analogues, which it should not have done. Those analogues were also flawed and failed to demonstrate that the Regulatory Scheme "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

If analogues were to be considered, which they should not have been, *Bruen* instructs that historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical analogue...." *Id*. at 2133. The State failed to do so. To be compatible with the Second Amendment, regulations targeting longstanding problems must be "distinctly similar" to a historical analogue. *Id*. at 2131. *Bruen* offers two metrics that determine whether historical and modern firearms regulations are similar

enough: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

The historical inquiry is also limited to the relevant time period. That is because "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen* at 2136 (citing *Heller*, 554 U.S. at 634-35). The Second Amendment was adopted in 1791. Thus, the Founding Era is the relevant time period. The Court cautioned against "giving post-enactment history more weight than it can rightly bear." *Id*. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137 (citation omitted). Yet the State provided, and the District Court accepted, without scrutiny, a long list of false historical analogues, none from the Founding Era, that were not at all analogous to the Regulatory Scheme's bans. The District Court's opinion addressed the "how" and "why" of these purported historical analogues—but erred materially in its evaluation of both metrics.

The core of the District Court's reasoning is that various state Bowie-knife concealed carry legislation provides a historical analogue to the Regulatory Scheme. The District Court qualifies these Bowie-knife laws  generally as "from the Nation's early history" without directly acknowledging that they refer to the post-Founding Era from 1837 through 1925—*none* from the time of the Nation's founding and none being absolute bans. Mem. Op. at 23. These Bowie-knife regulations, none of which

are directly quoted by the District Court, are uniformly inapplicable to the constitutional question at hand.

The District Court first failed the "how" test regarding Bowie-knives. For the soul of its reasoning the District Court decision relied primarily and extensively on quotes from, and references to, the State's irrelevant Declaration of Robert J. Spitzer. The Court makes the conclusory assertion that Bowie-knife regulations were "extensive and ubiquitous," but cannot avoid acknowledging that they were either open carry and/or concealed carry bans—rather than outright bans on possession like the Regulatory Scheme.[8] While it remains unknown which, if any, particular Bowie-knife carry regulation from the Declaration the District Court specifically relied on—it did not cite any actual law—*Bruen* instructs that analogizing restrictions on open or concealed carry to outright bans directly contradicts *Heller* and *Bruen*. *Heller*, 554 U.S. at 626, 628.

In *Heller*, the Court specifically noted that restrictions on only concealed carry outside the home were supported by the Nation's historic tradition of firearms

---

[8] A review of the Bowie-knife laws cited by Spitzer and adopted by the District Court reveal that 15 states passed concealed carry laws and 18 more passed some lesser concealed carry restriction. These lesser restrictions range from laws barring concealed carry by people of color and/or minors, laws excluding concealed carry in self-defense, to generalized laws on concealed carry that do not reference Bowie-knives. *None were outright total bans*. Several additional laws were included and relied on that were passed by territories, before they became states.

regulation, *id*. at 626—but emphasized the point that the government may not "prohibit.… an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Id*. at 628. Bowie-knife laws that did not ban possession or otherwise constitute a total ban, but only imposed carry restrictions, therefore, already have been determined to be, to the extent they are tradition at all, entirely different and not analogous to the Regulatory Scheme's total bans. If the *Heller* and *Bruen* Court had taken the position of the District Court in this matter and held that a tradition of restricting only concealed carry outside the home was sufficient to support a law categorically banning arms commonly possessed by law-abiding persons for lawful purposes, *Heller* would have come out the other way.[9] A ban is a far heavier burden on the right to keep and bear arms than a restriction on the mode of carrying. The State and the District Court undeniably failed the "how" test of identifying the Nation's historical tradition of firearm regulation by analogy in heavily relying on the Bowie-knife restrictions compiled in the Declaration.

The District Court also failed the "why" test. Again citing Spitzer's Declaration without carefully analyzing its contents, the District Court asserts that

---

[9] Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied Heller in Arms-ban Cases—Again*, at 3 (June 2023) ("In arms-ban cases, *Heller*'s "in common use" constitutional *test* controls, and there is nothing for the lower courts to do except apply that *test* to the facts at issue.) (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4483206)

Bowie-knives were largely known for their "widespread use in fights, duels, and other criminal activities." Mem. Op. at 23; *see also Range v. AG United States*, 69 F.4th 96, 112 (3d Cir., 2023) (Ambro, J., concurring) (acknowledging similar laws were designed to keep "tramps" and "those perceived to threaten the orderly functioning of society" from possessing arms). The assertion that Bowie-knives were widely and prominently used by criminals starkly contrasts with the Supreme Court's conclusions regarding semiautomatic pistols and rifles. *See Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 1042 (2015)(Thomas, J., dissenting from denial of cert)("Roughly five million Americans own AR-styled semiautomatic rifles…The overwhelming majority of citizens who own and use such rifles do so for lawful purposes including self-defense and target shooting."); *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1269 (D.C. Cir. 2011)(Kavanaugh, J., dissenting)("[H]andguns—the vast majority of which today are semi-automatic—… have not traditionally been banned and are in common use by law-abiding citizens.").

The District Court's reliance on additional "melee weapon," slungshot and billy club restrictions fare no better. The District Court describes the slungshot as a weapon "widely used by criminals and as a fighting implement" that forty-three states regulated [not necessarily banned]—after the Founding Era—between 1850 and 1900. Mem. Op. at 24. The District Court, again relying almost entirely on

126071400.2

Spitzer's Declaration, generically describes these regulations as "anti-slungshot laws." *Id*. Similarly, fourteen states in the 1800s and eleven states in the 1900s are described generically as having enacted "anti-billy club laws." *Id*. While the District Court did not engage in any further analysis of the "melee weapon" regulations, even a cursory review of Spitzer's tendentious Declaration reveals that these regulations are a hodgepodge of concealed carry restrictions, restrictions on sale to minors, and even, egregiously, racist restrictions[10] on the rights of enslaved and free people of color, well after the Founding Era. Racially discriminatory laws provide no support for upholding the Regulatory Scheme. *See Bruen*, 142 S. Ct. at 2151 (systematic efforts to disarm blacks provide no support for firearm restrictions). As just one of many such examples, the Declaration of Spitzer lists an 1860 "anti-slungshot" law

---

[10] Regarding the overtly racist history that has motivated most gun licensing and registration, *see, e.g.,* Virginia's 1723 statute forbidding any "negro, mulatto, or Indian . . . to keep, or carry any gun," unless they were "a house-keeper, or listed in the militia." William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia*, 131 (1823). An exception was provided, however, for "negroes, mullattos, or Indians, bond or free, living at any frontier plantation," who could "keep and use guns" if they "first obtained a license for the same, from some justice of the peace." *Id.* Delaware also used laws to restrict the use of firearms as a means of racial discrimination. *Laws of the State of Delaware*, Chapter 94, Vol. 12, March 6, 1861, at Section 7 (prohibiting free blacks from possessing guns); Stephen B. Tahmassebi, *Gun Control and Racism*, 2 Civil Rights Law Journal 67 (1991) (describing history of gun control coinciding with oppression of blacks). *See also, First Conviction under Weapon Law; Judge Foster gives Marino Rossi One Year for Arming Himself….*" N.Y. Times (Sept. 28, 1911) at 5 (describing Sullivan Law targeting Italian immigrants to restrict their Second Amendment rights).

enacted by the State of Georgia one year before it seceded from the Union, included within the group of forty-three referenced by the District Court. Mem. Op. at 24. That law, 1860 Ga. Laws, 56, reads:

> "[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . ."

Declaration of Robert J. Spitzer, ECF 40-1 Ex. E, p. 21. This racist law cannot support upholding HB 450 or SS 1 for SB 6. *See Range v. Att'y Gen. United States of Am.,* 69 F.4th 96, 104–05 (3d Cir. 2023).

Like the Bowie-knife, the "melee weapon" regulations primarily address open carry and/or concealed carry restrictions and to the extent there are any "outright bans" included in the generic grouping, those bans were frequently directed only at minors, or more sinisterly, people of color, which this Court cannot condone as an analogy in 2023. *Bruen*, 142 S. Ct. at 2151. They also regulated weapons that were perceived to be primarily used in crime—rather than arms that were commonly possessed by law-abiding citizens for lawful purposes. These regulations are not analogous to the Regulatory Scheme in a manner that complies with *Bruen*.

After its cursory review of Bowie-knives and other "melee weapons" the District Court invoked concealed-carry laws for revolver pistols, primarily at the

beginning of the 20th Century, to support its incomplete reasoning. As previously referenced, in *Bruen*, the Court held that some history supported modern laws prohibiting concealed carry but "so long as they left open the option to carry openly." *Id*. at 2150. It follows that if such laws cannot support a prohibition of open carry of arms in public, they also cannot support a categorical ban such as the Regulatory Scheme. This fails the "how" test. Further, to the extent the District Court referenced six regulations banning possession of revolver pistols at the beginning the 20th Century, Mem. Op. at 24, these regulations are nothing more than a handful of isolated examples and outliers from an irrelevant point in history—and not complete bans like the Regulatory Scheme. The "bare existence" of "localized restrictions" is insufficient to counter an American tradition. *Bruen* at 2154. A handful of examples is insufficient to show a tradition. *Id*. at 2142. Isolated examples do not "demonstrate a broad tradition of [the] States." *Id*. at 2156.[11]

A final and equally inapposite purported analogy made by the State and accepted by the District Court is that of 20th Century bans on fully automatic "Tommy Guns." As a threshold matter, the District Court concedes that absent recognition of the previously addressed Bowie-knife, "melee weapon" and pistol regulations as supposedly relevantly similar to the Regulatory Scheme, "Tommy

---

[11] In 2023, as of this writing, 27 states allow "constitutional carry" of firearms without permits.

Gun" regulations should not properly be considered. Mem. Op. at 25. The connection to those inapposite prior regulations is too far removed from the Founding Era for consideration. *Id.* ("Plaintiffs urge me to disregard machine gun regulations as irrelevant, as those regulations are temporally remote from the adoption of the Second and Fourteenth Amendments….[b]ut these later regulations are consistent with the earlier regulations that Defendants provide…. The analogous twentieth-century regulations do not depart from this pattern, and, indeed, reinforce it. Therefore, I decline to disregard them.")[12]  It was clear error for the District Court to consider the "Tommy Gun" regulations to support its holding.

The historical tradition that the District Court fashions between Bowie-knife and "melee weapon" regulations, and its leap of faith to "Tommy Guns" and then to the Regulatory Scheme, cannot be reconciled with *Bruen*. *See Bruen*, 142 S. Ct. at 2153–54. In fact, the Supreme Court expressed this concept even more forcefully in *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2257–2258 (2020), where it held that laws enacted in the second half of the 1800s—even if enacted by the overwhelming majority of states—are not relevant to the "history and tradition" inquiry regarding the scope of a provision of the Bill of Rights.

---

[12] *But see Range v. AG United States,* 69 F.4th 96 (3d Cir. 2023) (Porter, J., concurring) (recognizing the purpose of the 1934 National Firearms Act was to restrict the use of such arms in gangster-style crimes).

126071400.2

22

Now, many generations after this analysis should have ended, "Tommy Gun" regulations of the early 20th Century are "too little too late," and still cannot satisfy *Bruen*'s "how" and "why" test. The State cannot satisfy its burden to demonstrate that "Tommy Guns" were ever commonly possessed for lawful purposes by law-abiding persons. To the contrary, legislative history as to the motivation and factual basis for passing "Tommy Gun" regulations shows they were not. At the Congressional Hearings in advance of the passing of the National Firearms Act of 1934, Attorney General Homer Cummings spoke directly to the widespread criminal use of the machine gun, including the "Tommy Gun," as motivation for the Act:

> "That is what I say, and I have no fear of the law-abiding citizen getting into trouble….Now we are dealing with armed people, criminals….We have recently broken into places where criminals had recently left and found regular arsenals of machine guns, revolvers, pistols, clips, vests and Lord Knows what."

*National Firearms Act: Hearings Before the Committee on Ways and Means House of Representatives on H.R. 9066*, 73d Cong., 2d sess. 4 (1934).

 "Tommy Gun" regulations did not burden the Second Amendment rights of law abiding citizens because these arms were never in common use by law-abiding persons for lawful purposes.

The ill-fitting analogues that the State provided and the District Court accepted bear no meaningful or relevant similarities to  the Regulatory Scheme— nor do those misplaced analogues comply with the command of *Bruen* that they be consistent with the Nation's tradition of firearm regulation during relevant periods.

But, once again, the District Court should not have even been considering these supposed analogues.

### D. The District Court Erred in Concluding that Delaware's Regulatory Scheme Implicates "Dramatic Technological Changes" and "Unprecedented Societal Concerns"

In what amounts to improper "interest-balancing," the District Court also justifies the Regulatory Scheme by invoking "dramatic technological changes" and "unprecedented societal concerns." Mem. Op. at 20-22. It did so without ever providing a relevant historical comparison to what qualifies as a "dramatic technological change" or an "unprecedented societal concern." Instead, first as to "dramatic technological changes," the District Court claims that semiautomatic weapons qualify for a total ban because they did not begin to "circulate appreciably in society" until after World War I. Mem. Op. at 20. Despite this dubious statement, the District Court suggests that an arm that began to circulate appreciably more than one-hundred years ago qualifies as a "dramatic technological change" in 2023. That standard for "dramatic technological change" flunks *Caetano*, because stun guns are protected by the Second Amendment despite not being available until the late 20th Century.

But the District Court also ignores the much longer history of multi-shot arms. Several such arms pre-dated the Revolution. The popular Pepperbox-style pistol could "shoot 18 or 24 shots before reloading individual cylinders." *Duncan v.*

*Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2021)(vacated and remanded by Supreme Court in light of *Bruen*).  "Cartridge-fed" "repeating" firearms, ubiquitous among civilians by the end of the Civil War, first became available "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, … a full-size lever-action rifle capable of carrying 17 rounds" that "could fire 18 rounds in half as many seconds." *Id.* at 1148; *see* Louis A. Garavaglia & Charles G. Woman, *Firearms of the American West 1866-1894*, at 128 (1984). "[O]ver 170,000" Winchester 66's "were sold domestically," *Duncan*, 970 F.3d at 1148; the successors that replaced the Model 66, the Model 73 and Model 92, sold more than ten times that amount in the ensuing decades. *Id.* Banning such arms would have been unforeseen to the Founders. "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity." *David B. Kopel, The History of Firearm Magazines and Magazine Prohibitions,* 78 Alb. L. Rev. 849, 864 (2015).

Regarding "unprecedented societal concerns," the District Court chooses to focus on certain isolated, dramatic and undeniably tragic events that are certainly concerning but that are neither unprecedented nor a statistically significant portion of societal violence at large. But mass murder, and particularly mass murder committed using a semiautomatic firearm also represents a miniscule fraction of overall murder and of gun violence in America today. While no uniform definition

of "mass shooting" exists, based on both Pew Research and FBI statistics, "active shooter incidents" which the FBI defines as "one or more individuals actively engaged in killing or attempting to kill people in a populated area" accounted for 103 of a total of 48,183 gun deaths[13] in 2021. *See* Gramlich, John, *What the data says about gun deaths in the U.S.*, Pew Research Center (2023) https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/

*Heller* was decided in 2008. This was after Congress adopted a failed nationwide ban on many semiautomatic firearms and ammunition feeding devices similar to the bans at issue in this appeal, purportedly as a result of a rise in mass shootings. *See* Pub. L. No. 103-322,108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)). Congress allowed that law to expire in 2004 because it failed to achieve its purpose. A Justice Department study revealed that the federal ban on semiautomatic arms and so-called "large capacity magazines" had produced "no discernible reduction" in violence committed with firearms. Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003, Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004)* (available at *https://bit.ly/3wUdGRE*)

---

[13] This equates to 0.002% of total gun deaths.

The Supreme Court was also aware of this history of failed firearm regulations banning semiautomatics and magazines similar to the Regulatory Scheme in 2008. And yet, with that recent history behind it, *Heller* still held that " [j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends,  prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582 (internal citations omitted). Fully aware of what modern arms were available to law-abiding citizens, and the existence of mass shootings and societal concerns regarding them, in 2008 and again in 2022, the Supreme Court still ruled that law-abiding citizens were entitled to those modern arms in common use, for lawful purposes. It contradicts *Heller* and *Bruen* to ban the modern, common arms used by law-abiding persons for lawful purposes, included in the Regulatory Scheme under the auspices of "dramatic technological changes" or "unprecedented societal concerns."

## II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT APPELLANTS WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

Appellants satisfy the requirement for injunctive relief that they are more likely than not to suffer irreparable harm in the absence of a preliminary injunction. To hold otherwise is to defy the Supreme Court's post-*Heller* jurisprudence: "The constitutional right to bear arms … is not a 'second class right subject to an entirely

different body of rules than other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (2022) (citing *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)). Plaintiffs allege no "incidental inhibition"; they face jail time for bearing or attempting to bear arms that are banned.

The District Court held that, "an alleged deprivation of a Second Amendment right does not automatically constitute irreparable harm." Mem. Op. at 29. This is the very essence of subjecting the Second Amendment to an "entirely different body of rules." *See Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS 74756, at *16 (S.D. Ill. Apr. 28, 2023)(granting preliminary injunction for similar semiautomatic arms ban and holding Plaintiffs provide irreparable harm via facial Second Amendment challenge); *Rocky Mountain Gun Owners v. The Town of Superior*, Civ. Action No. 22-cv-01685-RM (D. Colo. July 22, 2022)(granting temporary restraining order for arms ban, and finding irreparable harm on basis that infringement of a constitutional right is enough to show irreparable harm.)

HB 450's and SS1 for SB 6's criminal penalties impose a chilling effect on Delawareans' right to keep and bear arms, and that chilling effect cannot be compensated by monetary damages. *See, e.g., Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("The Second Amendment protects [] intangible and unqualified interests … Infringements of this right cannot be compensated by damages.").

## III.    THE PUBLIC INTEREST AND BALANCE OF HARDSHIPS STRONGLY FAVOR APPELLANTS.

Though the District Court did not analyze the public-interest or hardship factors, both equally weigh in Appellants' favor. "[E]nforcement of an unconstitutional law vindicates no public interest." *K.A. v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013). By the same token, enjoining the enforcement of an unconstitutional law poses no hardship to the State. *See*, *e.g.*, Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) ("well under 1% of [crime guns] are with 'assault rifles'").

## <u>CONCLUSION</u>

Appellants are likely to succeed on the merits of their challenge, because: (1) The arms banned by the Regulatory Scheme are in common use by law-abiding persons for lawful purposes; (2) There is no historical tradition in this Nation's history that permits banning arms that are in common use by law-abiding persons for lawful purposes; (3) Appellants will suffer irreparable harm if their Motion for Preliminary Injunction is not granted; and (4) It is in the public interest to prevent the State from enforcing the Regulatory Scheme.

Therefore, this Court should reverse the District Court's denial of Appellants'

Motion for Preliminary Injunction.

Respectfully submitted,

LEWIS BRISBOIS
   BISGAARD & SMITH LLP

  */s/ Francis G.X. Pileggi, Esquire*
Francis G.X. Pileggi, Esquire
Alexander MacMullan, Esquire
Dean Pillarella, Esquire
500 Delaware Ave., Suite 700
Wilmington, DE 19801
302-985-6000
Francis.Pileggi@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com
Dean.Pillarella@LewisBrisBois.com


Dated: July 3, 2023

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am an attorney in good standing of the bar of the Third Circuit.

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi

DATED: July 3, 2023

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am an attorney in good standing of the bar of the Third Circuit.

*/s/ Alexander MacMullan*
Alexander MacMullan

DATED: July 3, 2023

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am an attorney in good standing of the bar of the Third Circuit.

*/s/ Dean Pillarella*
Dean Pillarella

DATED: July 3, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6,953 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word in 14 point Times New Roman font.

3. The text of the electronic brief is identical to the text in the paper copies.

4. This file was scanned for viruses using Sophos and was found to be virus-free.

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi

DATED: July 3, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on July 3, 2023. Service on all counsel for all parties has been accomplished via ECF.

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi
*Attorney for Plaintiffs-Appellants*

Dated: July 3, 2023