Nos. 23-1633, 23-1634 & 23-1641

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC.; BRIDGEVILLE RIFLE & PISTOL
CLUB, LTD.; DELAWARE RIFLE AND PISTOL CLUB; DELAWARE ASSOCIATION OF
FEDERAL FIREARMS LICENSEES; MADONNA M. NEDZA; CECIL CURTIS CLEMENTS;
JAMES E. HOSFELT, JR.; BRUCE C. SMITH; VICKIE LYNN PRICKETT; and
FRANK M. NEDZA,

*Appellants in No. 23-1641*

v.

DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; CABINET
SECRETARY DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY;
SUPERINTENDENT DELAWARE STATE POLICE

―――――――――

GABRIEL GRAY; WILLIAM TAYLOR; DJJAMS LLC; FIREARMS POLICY COALITION,
INC.; and SECOND AMENDMENT FOUNDATION,

*Appellants in No. 23-1633*

v.

ATTORNEY GENERAL DELAWARE

―――――――――

CHRISTOPHER GRAHAM; OWEN STEVENS; FIREARMS POLICY COALITION, INC.; and
SECOND AMENDMENT FOUNDATION,

*Appellants in No. 23-1634*

v.

ATTORNEY GENERAL DELAWARE

―――――――――

On Appeal from the United States District Court for the District of Delaware
Judge Richard G. Andrews, Case Nos. 22-cv-00951, 22-cv-01500, 23-cv-00033

**BRIEF OF AMICUS CURIAE STATE OF MONTANA AND 19
OTHER STATES SUPPORTING APPELLANTS AND REVERSAL**

AUSTIN KNUDSEN
  *Montana Attorney General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
peter.torstensen@mt.gov

CHRISTIAN B. CORRIGAN
  *Solicitor General*
PETER M. TORSTENSEN, JR.
  *Assistant Solicitor General*
TANNER BAIRD[*]
  *Solicitor's Fellow*
*Counsel for Amicus Curiae*
*State of Montana*

―――――――――

[*] Admitted in Texas only.  Supervised by members of the Montana bar.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

INTERESTS OF AMICI CURIAE........................................................1

SUMMARY OF ARGUMENT ............................................................1

ARGUMENT......................................................................................5

I.   Delaware fails to show that its assault weapon and LCM bans align with this Nation's tradition of firearm regulation ................6

    A. Delaware fails to identify historical regulations that are "relevantly similar" to the challenged regulations. .................10

    B. The district court failed to engage in the nuanced analogical inquiry that *Bruen* requires. ....................................................19

II.  After *Bruen*, Second Amendment violations should be presumed to constitute irreparable harm.....................................23

CONCLUSION ..................................................................................25

CERTIFICATE OF COMPLIANCE....................................................28

CERTIFICATE OF SERVICE .............................................................29

# TABLE OF AUTHORITIES

## Cases

*Bennington Foods LLC v. St. Croix Renaissance Grp., LLC,*
    528 F.3d 176 (3d Cir. 2008) ................................................................ 23

*Binderup v. Att'y Gen.,*
    836 F.3d 336 (3d Cir. 2016) ....................................................... 22–23

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ...................................................................... 1

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC,*
    142 S. Ct. 1464 (2022) ................................................................. 24

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ......................................................... 1, 6, 7, 25

*Drummond v. Robinson Twp.,*
    9 F.4th 217 (3d Cir. 2021) .......................................................... 21

*Del. State Sportsmen's Ass'n, Inc. et al. v. Del. Dep't of Safety &
Homeland Sec'y, et al,*
    No. 22-cv-00951 (D. Del.) ......................................................... 3, 18

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................ 4–5, 23

*Gamble v. United States,*
    139 S. Ct. 1960 (2019) .............................................................. 9–10

*Graham et al. v. Jennings et al.,*
    No. 23-cv-00033 (D. Del.) ............................................................ 3

*Grey et al. v. Jennings, et al.*
    No. 22-cv-01500 (D. Del.) ............................................................ 3

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ..................................................... 8

*Konigsberg v. State Bar of Cal.*,
   366 U.S. 36 (1961) ............................................................... 7

*McDonald v. City of Chi.*,
   561 U.S. 742 (2010) ............................................................ 1

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ........................................... *passim*

*Presser v. Illinois*,
   116 U.S. 252 (1886) ........................................................ 19

*Range v. Att'y Gen.*,
   69 F.4th 96 (3d Cir. 2023) .............................. 5, 14, 19, 20

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017) .......................................... 23

*TD Bank N.A. v. Hill*,
   928 F.3d 259 (3d Cir. 2019) .......................................... 23

*United States v. Cruikshank*,
   92 U.S. 542 (1875) ........................................................ 19

### OTHER AUTHORITIES

**UNITED STATES CONSTITUTION**

   U.S. Const. amend. II ............................................... 6, 25

**STATUTES**

   11 Del. C. §§ 1441, 1468–69A .......................................... 2

   11 Del. C. §§ 1464–67 ...................................................... 2

   11 Del. C. §§ 1465(2)–(4) ................................................. 2

   11 Del. C. §§ 1465(6)(a)(1)–(5), (b), (h) ............................ 2

   11 Del. C. §§ 1465(6)(c)(1)–(4), (g) .................................. 2

   11 Del. C. §§ 1465(6)(d)(1)–(2), (e) .................................. 2

   11 Del. C. §§ 1465(6)(f) .................................................... 2

   11 Del. C. §§ 1466(c) ....................................................... 2

11 Del. C. §§ 1469(d) ............................................................ 3

11 Del. C. §§ 1469(a), 1468(2) ............................................ 3

1860 Ga. Laws 56, § 1 ........................................................ 14

1859 Ky. Act. 245, § 23 ..................................................... 14

## PUBLICATIONS

11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2948.1 (3d ed. 2022) ............................................................ 23

William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, (2019) ............................................................................. 8, 10

*Modern Sporting Rifle: The Facts,* National Shooting Sports Foundation (June 29, 2023) ....................................................... 9

Penn Hunting & Trapping Guide (July 1, 2023 – June 30, 2024) .......... 9

Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741 (1993) ............................................................................ 10

Amy Swearer, *Protecting America from Assault Weapons,* Heritage Foundation (Sept. 28, 2019) ................................................. 8

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191 (2006) ........................................ 20

iv

## INTERESTS OF AMICI CURIAE

The States of Montana, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Hampshire, North Dakota, South Carolina, South Dakota, Utah, Virginia, West Virginia, and Wyoming ("Amici States") submit this amicus brief to safeguard individuals' "constitutional right to bear arms in public for self-defense" against unnecessary intrusions. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2022). And that necessarily includes the right to keep and bear "modern [arms] that facilitate armed self-defense." *Id.* at 2132 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam)). Amici States urge this Court to reverse the decision below.

## SUMMARY OF ARGUMENT

*Bruen* reaffirmed that the right to keep and bear arms "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Id.* at 2156 (quoting *McDonald v. City of Chi.*, 561 U.S. 742, 780 (2010) (plurality op.)). The Second Amendment stands as a reminder to state governments that "the people" have a "*pre-existing*" right to keep and bear arms. *District of Columbia v. Heller*, 554

U.S. 570, 592 (2008).  And it extends to all "bearable arms," including arms carried "for offensive or defensive action in a case of conflict."  *See id.* at 582, 584.

On the heels of *Bruen*, Delaware enacted a package of gun control bills prohibiting the manufacture, purchase, sale, or possession of so-called "assault weapons" and large-capacity magazines ("LCMs").  *See* H.B. 450, 151st Gen. Assemb. (Del. 2022) (codified at 11 Del. C. §§ 1464–67) ("HB 450"); Senate Substitute 1 for S.B. 6, 151st Gen. Assemb. (Del. 2022) (codified at 11 Del. C. §§ 1441, 1468–69A) ("SS 1").

Subject to limited exceptions not relevant here, HB 450 enumerates 44 semi-automatic "assault long gun[s]"—including the AR-15, AK-47, Uzi, and more—19 semi-automatic "assault pistol[s]," and "copycat weapon[s]."[2]  *See* 11 Del. C. §§ 1465(2)–(4).  But HB 450 permits people who purchased or possessed prohibited firearms before its effective date to continue to possess and transport those firearms under certain

---

[2] "Copycat weapon[s]" are defined to include semiautomatic, centerfire rifles with other defined characteristics, *see* 11 Del. C. §§ 1465(6)(a)(1)–(5), (b), (h), semiautomatic pistols with other defined characteristics, *see id.* §§ 1465(6)(c)(1)–(4), (g), semiautomatic shotguns with other defined characteristics, *see id.* §§ 1465(6)(d)(1)–(2), (e), and a shotgun with a re-volving cylinder, *see id.* § 1465(6)(f).

conditions.  *See id.* § 1466(c).  SS 1's LCM ban applies to magazines "capable of accepting, or that can be readily converted to hold, more than 17 rounds of ammunition."  *See id.* §§ 1469(a), 1468(2).  Unlike HB 450, SS 1 doesn't grandfather any magazines; instead, it requires Delaware to implement a buy-back program.  *See id.* § 1469(d).

Between July 2022 and January 2023, three sets of plaintiffs challenged HB 450, SS 1, or both, on the grounds that they violated plaintiffs' rights under the Second and Fourteenth Amendments of the U.S. Constitution.  *See Del. State Sportsmen's Ass'n, Inc. et al. v. Del. Dep't of Safety & Homeland Sec'y et al.*, No. 22-cv-00951 (D. Del.); *Gray et al. v. Jennings et al.*, No. 22-cv-01500 (D. Del.); *Graham et al. v. Jennings et al.*, No. 23-cv-00033 (D. Del.); *see also* App.9–10.  In each case, the plaintiffs moved for a preliminary injunction.[3]  App.9–10.  The district court denied DSSA's request for preliminary relief because it found that DSSA failed to establish the two threshold preliminary injunction factors—likelihood of success on the merits, and irreparable harm.  App.11–12.

---

[3] For ease of reference, the brief will refer to all plaintiffs as "DSSA" and all defendants as "Defendants" unless otherwise indicated.

*Bruen*'s analogical inquiry requires courts to employ a "nuanced approach" to determine whether proposed historical analogues are "relevantly similar" to a challenged regulation. *See* 142 S. Ct. at 2132–33. That inquiry requires courts to do more than simply count the number of historical state laws restricting certain weapons—instead, courts must consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. And discerning "the *original meaning of the Constitution*" remains the guiding light of that inquiry. *Id.* at 2162 (Barrett, J., concurring).

The district court's analysis falls short of the "nuanced" inquiry *Bruen* requires. Nearly all of the historical regulations that the district court relied on stop short of complete bans, and instead tailored their prohibitions to minimize the criminal use of certain dangerous and unusual weapons. But HB 450 and SS 1 go farther and impose complete bans on so-called assault weapons and LCMs, so they are not "relevantly similar" to the proposed historical analogues.

Because deprivations of Second Amendment rights, like deprivations of First Amendment rights, cannot be restored after-the-fact, this

4

Court should extend the presumption of irreparable harm applied in First Amendment cases to the Second Amendment context. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.) (First Amendment deprivations, even for "minimal periods of time," are presumed to be irreparable). Unlike First Amendment violations, which are all evaluated under some form of means-end scrutiny, Second Amendment violations after *Bruen* are not evaluated under any form of means-end scrutiny. For these reasons, this Court should reverse.

## ARGUMENT

After *Bruen*, courts must determine whether the "text of the Second Amendment applies to a person and his proposed conduct." *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) (citing *Bruen*, 142 S. Ct. at 2134–35). For DSSA, that proposed conduct is keeping or bearing the "arms" prohibited by HB 450 and SS 1. And if the Second Amendment's text covers DSSA's proposed conduct, the government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* (quoting *Bruen*, 142 S. Ct. at 2127).

## I.   Delaware fails to show that its assault weapon and LCM bans align with this Nation's tradition of firearm regulation.

The Second Amendment preserves the right of the people to keep and bear "Arms," which "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132.  And its protections extend, "prima facie, to *all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding."[4] *Heller*, 554 U.S. at 582; *see also id.* at 584 (explaining that "bearable arms" include those carried "for offensive or defensive action in case of conflict").

Because HB 450 and SS 1 both regulate conduct covered by the "plain text" of the Second Amendment—"keep[ing] and bear[ing] Arms," *see* U.S. Const. amend. II—they are presumptively unconstitutional.  To justify HB 450 and SS 1, Delaware "must demonstrate that the

---

[4] The district court held that "assault pistols" and "copycat weapons" were not presumptively protected under *Bruen* because DSSA failed to show that these "arms" are "in common use." *See* App.13–18.  In grafting on this new requirement to *Bruen*'s step one inquiry, the district court likely erred.  *See Bruen*, 142 S. Ct. at 2132 (explaining that courts "use history to determine which modern 'arms' are protected by the Second Amendment); *see also id.* at 2128 (finding it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time'" (quoting *Heller*, 554 U.S. at 627)).  Whether an "arm" is in common use, then, is a historical inquiry that must be evaluated at *Bruen*'s second step.

regulation is consistent with this Nation's historical tradition of firearm regulation"—only then "may a court conclude that [DSSA]'s conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Courts must follow the course charted by *Heller* and *Bruen* to determine whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding. That analysis requires courts to compare respondents' historical evidence with the "'historical precedent' from before, during, and even after the founding" to see if those historical materials show "a comparable tradition of regulation." *Id.* at 2131–32; *see also id.* at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (quoting *Heller*, 554 U.S. at 634–35) (emphasis in original)).

Even though Delaware's obligation to respect DSSA's right to keep and bear arms flows from the Fourteenth Amendment, not the Second, the rights enumerated in the Bill of Rights, and incorporated against the States after the Fourteenth Amendment's adoption, "have the same scope as against the Federal Government." *Id.* at 2137. And the scope of that

right is generally "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *See id.* (collecting cases).

*Bruen* also cautioned courts "against giving postenactment history more weight than it can rightly bear." *Id.* at 2136. So, while a regular course of conduct *can*, in certain instances, "liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution," *id.* (cleaned up), "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," *id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *see also* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13–14 (2019) (liquidation requires indeterminacy because "[i]f first-order interpretive principles make the meaning clear in a given context, there is no need to resort to liquidation").

The district court rightly observed that "a regular course of practice" *could* "liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution," but "to the extent later history contradicts what the text says, the text controls." App.25 (quoting *Bruen*, 142 S. Ct. at 2136–37 (cleaned up)). And it further explained that

*Bruen*'s analogical inquiry "require[s] a more nuanced approach" when considering "cases implicating unprecedented societal concerns or dramatic technological changes." App.25 (quoting *Bruen*, 142 S. Ct. at 2132).

Because it found that HB 450 and SS 1 implicate "unprecedented societal concerns" and "dramatic technological changes,"[5] App.25–29, the district court considered the historical regulation of various arms between the 1830s and 1930s, including bowie knives, billy clubs, slungshots, revolver pistols, and the fully automatic Tommy gun, App.29–31. Those later-in-time regulations, however, are only relevant to the extent they confirm what the relevant historical record "already … established." *Bruen*, 142 S. Ct. at 2137 (quoting *Gamble v. United States*, 139 S. Ct.

---

[5] The district court relied heavily on alleged "assault rifle" bullet traits to find these guns unreasonably dangerous. App.28. But that analysis ignores the fact that "AR-15-style rifles are … less powerful than common big-game hunting cartridges like the $30 - 06$ Springfield and .300 Win. Mag." *Modern Sporting Rifle: The Facts*, National Shooting Sports Foundation (accessed June 29, 2023). The .223 round commonly employed by AR-15-type rifles is underpowered even when compared to muzzleloading rifles around at the founding. *See, e.g.*, Penn. Hunting & Trapping Guide at 20 (prohibiting the use rifles that are not "at least 26 caliber" but allowing "[m]uzzleloading firearms").

1960, 1976 (2019)).[6]  Even so, the talismanic invocation of "unprece-
dented societal concerns" and "dramatic technological changes" doesn't
permit courts to consider comparable historical regulations that shed no
light on the Second Amendment's original meaning.

### A. Delaware fails to identify historical regulations that are "relevantly similar" to the challenged regulations.

Even assuming that the historical regulations Delaware identi-
fies—regulations that post-date ratification of the Constitution by 40
years or more—*could* settle the original meaning of the Second Amend-
ment, *see* Baude, *supra*, at 50–51 (arguing that in certain cases post-rat-
ification *could* liquidate the meaning of individual rights provisions),
those regulations are not "relevantly similar" to either HB 450 or SS 1.
*See Bruen*, 142 S. Ct. at 2132 (quoting Cass Sunstein, *On Analogical Rea-
soning*, 106 Harv. L. Rev. 741, 773 (1993)).  *Bruen* explained that *Heller*

---

[6] Justice Barrett observed that "the Court does not conclusively deter-
mine the manner and circumstances in which postratification practice
may bear on the original meaning of the Constitution," but she confirms
the aim of any such inquiry: to discern "the *original meaning* of the Con-
stitution." *Bruen*, 142 S. Ct. at 2162 (Barrett, J., concurring).  So, to the
extent *Bruen*'s analogical inquiry permits consideration of later-in-time
regulations of new societal concerns or technological innovations, the gov-
ernment must still show that those regulations form part of "a well-es-
tablished and representative historical *analogue*."  *See id.* at 2133.

and *McDonald* pointed "toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. So, at a minimum, *Bruen*'s analogical inquiry requires courts to consider "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is *comparably justified*." *Id.* (emphasis added). But the burden imposed by HB 450 and SS 1 is neither comparable nor comparably justified.

***Bowie Knife.*** One of Delaware's experts identified state regulations of the Bowie knife—a "type of long-bladed and usually single-edged knife with a hand guard," App.309—as a possible historical analogue. The Bowie knife gained popularity during the 1830s, and they were "widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate." App.309–10. But it was closely associated with criminal activity, so laws barring the public or concealed carry of Bowie knives closely followed. *See* App.310–11. Even the analysis in the state cases reviewed by Delaware's expert—but ignored by the district court—was driven in part by the close association between the Bowie knife and criminal activity. *See* App.311–14. Yet all of the restrictions that Delaware's expert identified stopped short of an

outright ban—29 states barred *concealed* carry, 15 others barred all public carry, 7 states imposed enhanced criminal penalties, 7 other states imposed taxes on sale or possession, and others simply punished brandishing the knife.  *See* App.314–15.

**Billy Clubs and Slingshots.**  Delaware's expert also pointed to historical regulations of billy (or billie) clubs and slingshots—which the district court referred to as "melee weapons," *see* App.30—as another possible historical analogue.  App.306.  A billy club is a "heavy, hand-held rigid club," often "made of wood, plastic, or metal," that resembles a police baton or nightstick.  *Id.*  The billy club emerged on the scene around 1854, and Kansas passed the first anti-billy club law in 1862, with New York following in 1866.  *Id.*  Five more states passed similar laws by 1872,[7] and seven more passed similar laws between 1882 and 1898.[8]  But of those 14 states that passed anti-billy club laws between 1862 and 1898, 10 imposed concealed carry restrictions, and none of them imposed complete bans.

---

[7] The states were Florida, Maryland, Missouri, Nebraska, and New Jersey.  App.472, 488, 498, 501–02, 505–06.

[8] The states were Iowa, Michigan, Oklahoma, Oregon, Pennsylvania, Rhode Island, and West Virginia.  App.480, 493, 519, 522, 524, 541.

The slungshot entered the scene a bit earlier—the 1840s—but it had a similar history of regulation. A slungshot is a "hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle." App.307. Because they were "easy to make, silent, and very effective, particularly against an unsuspecting opponent," slungshots "were widely used by criminals and street gang members in the 19th Century." *Id.* The first anti-slungshot law was enacted in Massachusetts in 1850, and more quickly followed. Between 1850 and 1872, 17 states (plus D.C.) passed anti-slungshot laws.[9] And between 1873 and 1898, 27 more states (and territories) followed suit.[10] But like the regulations imposed on billy clubs, most of the 44 states' and territories' anti-slungshot laws passed in the 1800s—27 to be precise—barred

[9] The states were Arkansas, California, District of Columbia, Florida, Georgia, Hawaii, Kansas, Kentucky, Massachusetts, Missouri, Nebraska, New Jersey, New Mexico, New York, Pennsylvania, Texas, and Wisconsin. App.460, 462–63, 468, 472, 474, 475, 481, 485, 492–93, 498, 501–02, 505–06, 509, 511, 523, 531, 541.

[10] The states were Alabama, Alaska, Arizona, Colorado, Connecticut, Idaho, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Mississippi, Nevada, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, Wyoming. App.456–58, 466, 476–77, 479–80, 490, 493, 495, 497, 503–04, 516–17, 519, 522, 524, 526–27, 530, 534–35, 537, 541, 544.

only concealed carry, and 9 more states barred public carry.[11]  Yet none of the laws identified by Delaware's expert imposed a complete ban.

***Revolver Pistols.***  After the Civil War, the Colt multi-shot revolver and similar firearms entered the civilian market.  App.323–24.  The increased circulation of multi-shot handguns during the post-Civil War period contributed to an increase in interpersonal violence, so states responded with a host of concealed carry restrictions.  App.325.  According to Delaware's expert, by the end of the 1800s, virtually every state "prohibited or severely restricted concealed gun and other weapons carrying," and between 1881 and 1917, six states—California, Illinois, Iowa, Kansas, New York, and North Dakota—barred possession of them outright. App.325–26.

***Thompson Submachine Gun ("Tommy gun").***  After World War I, the "first practical, lighter-weight, reliable, hand-held, fully automatic

---

[11] One of the laws cited by Delaware's expert barred "sell[ing] or furnish[ing] to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon."  App.474 (citing 1860 Ga. Laws 56, § 1).  And another barred "sell[ing]," "giv[ing]," or "loan[ing]" a similar assortment of arms "to any minor, or slave, or free negro."  App.485 (citing 1859 Ky. Acts 245, § 23).  But given that those race-based restrictions would now be unconstitutional under the Fourteenth Amendment, it is doubtful these regulations may serve as a proper historical analogue.  *See Range*, 69 F.4th at 104.

weapon" entered the civilian market: "the Thompson submachine gun, widely known as the Tommy gun." App.327.  The Tommy gun failed to gain a foothold in police forces, but "[a]s a criminal's weapon, [it] was an unqualified success."  App.328 (citation and quotations omitted).  Even though Delaware's expert observed that the Tommy gun was used relatively infrequently by criminals, he pointed to several press stories highlighting the use of Tommy guns in criminal activity, including the seizure of 600 guns and ammunition from a New Jersey port in 1921, reports of gang use in Chicago and armed robberies in New Jersey in 1926, and other stories advocating for legal solutions to the criminal use of "machine gun[s]." *See* App.329, 331–32.  Between 1925 and 1934, at least 32 states passed anti-machine gun bans.  App.329, 331–32.  During that time, as many as 10 states (plus D.C.) passed laws restricting semi-automatic weapons, and many states restricted ammunition feeding devices or guns that could accommodate them.  App.335, 346.  And in 1934, Congress passed the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition of fully automatic weapons, but it did so through a tax-and-register system, not an outright ban.  *See* App.334.

15

But unlike nearly all of these historical regulations, HB 450 and SS 1 both prospectively impose an outright ban on the prohibited arms, so the burden they impose is not comparable to the historical burden imposed on possessing and carrying bowie knives, billy clubs, slungshots, revolver pistols, or even Tommy guns.  Most of these regulations barred concealed or public carry of the prohibited arm, and many states imposed only sentencing enhancements when criminals used the prohibited arm during the commission of a crime—meaning that the state generally permitted the concealed or public carry of the arm.[12]

The district court, however, found that HB 450 and SS 1 imposed a comparable burden because (1) LCMs with more than 17 rounds are unnecessary for self defense and assault weapons are rarely used in self-defense; and (2) other historical regulations, like the prohibitions on so-called melee weapons, imposed categorical bans, while HB 450 only banned specifically enumerated arms.  App.33.  But neither justification supports the district court's conclusion.  *First*, Delaware may not limit

---

[12] Arkansas, Florida, and Massachusetts each imposed sentencing enhancements for possessing some or all of the following during the commission of a crime: bowie knives, slungshots, brass knuckles, pistols, revolvers, or other dangerous weapons.  *See* App.460, 472, 492.

Second Amendment rights to whatever "arms" it deems "necessary" for self-defense—it must instead show that any regulation it seeks to impose is supported by a historical tradition of analogous regulations. *Bruen*, 142 S. Ct. at 2127. *Second*, even if the district court is right that so-called "melee weapons" were categorically banned, that's really beside the point. The question is whether those regulations imposed a comparable burden on the exercise of the Second Amendment right, *see id.* at 2133, not whether a category of weapons were subject to some form of regulation. And on that point, the historical record shows that those regulations rarely, if ever, imposed a complete ban on the weapon at issue.

Nor is the burden imposed by HB 450 and SS 1 comparably justified. All of the evidence Delaware's expert put forward emphasizes the close association of the prohibited arm to criminal activity—in essence, these were not the "arms" of law-abiding citizens. But HB 450 and SS 1 ban "arms" without a similarly close association to criminal activity. No doubt that these "arms" *can* be used to carry out criminal activity (and it is a travesty *any time* they are used in this manner), but the record comes

nowhere near showing a comparably similar association to criminal activity.[13]

Indeed, the district court relied on another expert's analysis of data on the weapons used in 179 mass shootings. *See* Decl. of Lucy P. Allen in Supp. of Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ¶ 33, ECF No. 38, *Del. State Sportsmen's Ass'n, Inc. et al. v. Del. Dep't of Safety & Homeland Sec'y et al.*, No. 22-cv-00951 (D. Del. Jan. 31, 2023). In 153 of the 179 incidents, the weapon used could be determined, and in 36 of those 153 incidents (or 24%), the weapon used was an "assault weapon." *See id.* But that is an infinitesimal fraction of the approximately 40 million AR-15s (or similar rifles) owned by Americans, *see* App.18, not to mention the number of Americans who own any of the 62 other firearms prohibited by HB 450. The historical regulations identified by Delaware's expert— which, again, largely banned concealed or public carry—were clearly

---

[13] Nor can it. The features used to define "assault weapons" make the weapons easier for law-abiding use. *See* Amy Swearer, *Protecting America from Assault Weapons*, Heritage Foundation (Sept. 28, 2019) ("[T]he cosmetic features distinguishing 'assault weapons' from 'non-assault weapons' do not change the lethality or mechanical operation of a firearm, but rather make the firearm safer and easier to operate in lawful contexts."), https://www.heritage.org/testimony/protecting-america-assault-weapons.

designed to forestall criminal activity with the prohibited arm, while generally avoiding complete bans.  Without any indication that the arms banned by HB 450 and SS 1 share a similar association to criminal activity, the complete bans they impose are not comparably justified.

### B. The district court failed to engage in the nuanced analogical inquiry that *Bruen* requires.

When evaluating "cases implicating unprecedented societal concerns or dramatic technological changes," *Bruen*'s analogical inquiry requires "a more nuanced approach."  142 S. Ct. at 2132.  And because the Second Amendment's "meaning is fixed according to the understandings of those who ratified it," that nuanced approach still requires that the "government identify a well-established and representative historical *analogue*."  *See id.* at 2132–33.

Due to the lack of a federal police power, federal gun regulations were largely non-existent before the New Deal Revolution.  *Range*, 69 F.4th at 107–08 (Porter, J., concurring) (citing *United States v. Cruikshank*, 92 U.S. 542, 553 (1875), and *Presser v. Illinois*, 116 U.S. 252, 265 (1886) for the proposition that before 1937 "Congress was powerless to regulate gun possession and use").  Even so, state statutes and cases may provide some "clues about the people's right to bear arms."  *Id.* at 108.

Because the states retained police powers and were originally uncon-strained by the Bill of Rights, "they were free to regulate the possession and use of weapons" however they thought appropriate. *Id.* By 1868, 15 of 37 states had not protected the right to keep and bear arms—6 states still haven't—so these states laws provide little if any insight into the contours of the Second Amendment right. *See* Eeugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 205, 208–11 (2006). And courts must do more than simply count of the number of state laws banning arguably analogous "arms"—they must de-termine whether those state laws "provide … insight about the scope of the Second Amendment right." *Range*, 69 F.4th at 109.

In at least three ways, the district court failed to employ the "nu-anced" approach *Bruen* requires. *First*, in finding that machine gun reg-ulations enacted in the 1920s and 1930s were "relevantly similar" to ear-lier historical regulations, the district court adopted Defendants' argu-ment that the machine gun regulations demonstrated a consistent pat-tern for regulating dangerous weapons—namely, that when dangerous weapons entered society, proliferated, and resulted in violence, they were subject to strict and wide-ranging regulation. App.31. But the

"comparable burden" inquiry does not ask whether—at an exceedingly high level of generality—the pattern of regulating an "arm" today is similar to the pattern employed in the historical regulations of "arms." Indeed, it's hard to imagine that *any* such regulation wouldn't follow precisely the same pattern—after all, if certain "arms" are never used in violent criminal activity, no need to regulate those "arms" ever surfaces. And finding that the pattern of regulation is "relevantly similar" operates like a "regulatory blank check," *Bruen*, 142 S. Ct. at 2133, which "risk[s] endorsing outliers that our ancestors would never have accepted," *see Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021).

*Second*, the district court rejected DSSA's argument that the historical regulations were driven by the perception that the weapons were "almost exclusively used by criminals" because some of the weapons "circulated appreciably before they were restricted" and others were actually used infrequently by criminals. App.31–32. But neither of the district court's justifications have anything to say about whether a current regulation is comparably justified to a proposed historical analogue. Even if the historical arms circulated appreciably before regulation, the relevant question is whether the burden imposed now—*i.e.*, complete ban, limited

ban, or sentence enhancement—is imposed for similar reasons as the historical burdens imposed on "arms"—*i.e.*, to prevent criminal conduct and ensure public safety.[14]  *See Bruen*, 142 S. Ct. at 2133.

*Third*, the district court found that HB 450 and SS 1 were "comparably justified" by improperly smuggling in the interest-balancing, means-end analysis that *Bruen* rejected.  *See* App.33–34.  Properly framed, the district's analysis reads like so: To protect Delaware residents from mass shooting incidents involving the use of assault weapons with LCMs, Delaware enacted HB 450 and SS 1 to ban both assault weapons and LCMs.  App.33–34.  If that's not means-end scrutiny, nothing is.  And *Bruen* rejected those "judge-empowering interest-balancing inquir[ies]" because "[t]he very enumeration of the right takes out of the hands of government … the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  142 S. Ct. at 2129 (quotations omitted); *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 378 n.26

---

[14] The district court compounded these errors with another: shifting the burden to DSSA to show that "the historical regulations under discussion regulated weapons that are relevantly different than those at issue here by virtue of their criminality."  App.32.  *Bruen* places that burden—to "affirmatively prove that its … restriction is part of th[is Nation's] historical tradition"—squarely on the government's shoulders, and this Court should ensure it stays there.  142 S. Ct. at 2127.

(3d Cir. 2016) (en banc) (Hardiman, J., concurring in part) (explaining that the "winners and losers of [means-end] scrutiny contests are increasingly reflective of what rights—enumerated or not—'scrutinizing' judges favor or disfavor").

## II. After *Bruen*, Second Amendment violations should be presumed to constitute irreparable harm.

In addition to showing that it's likely to succeed on the merits of its Second Amendment claim, DSSA must also show "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). The availability of legal remedies, like money damages, "belies a claim of irreparable injury." *TD Bank N.A. v. Hill*, 928 F.3d 259, 282 (3d Cir. 2019) (quoting *Bennington Foods LLC v. St. Croix Renaissance Grp., LLC*, 528 F.3d 176, 179 (3d Cir. 2008)). But as the district court correctly observed, "[d]eprivations of constitutional rights often … amount to 'irreparable harm.'" App.34 (quoting 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc., § 2948.1 (3d ed. 2022)).

While this Court hasn't expressly extended the Supreme Court's holding in *Elrod*—that First Amendment deprivations, even for "minimal periods of time," are presumed to be irreparable, *see* 427 U.S. at 373—to

the Second Amendment context, it should do so after *Bruen*. *Elrod*'s presumption was deemed necessary to safeguard threatened First Amendment rights "against infringement by public office holders," *see id.* (quotations omitted), especially when such injuries cannot be undone.

The same is true for Second Amendment deprivations. Many American "live in high-crime neighborhoods," "are members of groups whose members feel especially vulnerable," and "some of these people reasonably believe that unless they can brandish or, if necessary, use a [firearm] in the case of attack, they may be murdered, raped, or suffer some other serious injury." *Bruen*, 142 S. Ct. at 2158 (Alito, J., concurring). Barring Americans from keeping and bearing protected "arms" that they feel most comfortable using for purposes of armed self-defense is a deprivation similar in function if not in form to First Amendment deprivations. And unlike First Amendment violations, which are all subject to some form of means-end scrutiny, *see, e.g.*, *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (context-based speech regulation subject to strict scrutiny), Second Amendment violations after *Bruen* can no longer be justified by means-end scrutiny, *see* 142 S. Ct. at 2129.

Because DSSA is likely to succeed on the merits of its claim, *see supra* Sect.I, this Court should presume that those violations cause irreparable harm.

## CONCLUSION

The Second Amendment guarantees all Americans the right to bear arms for self-defense and other lawful purposes "subject to certain reasonable, well-defined restrictions." *Id.* at 2156 (citing *Heller*, 554 U.S. at 581). No doubt HB 450 and SS 1 were motivated by an understandable concern with the recent rise in mass shooting incidents, but they are inconsistent with this Nation's historical tradition of regulating dangerous and unusual weapons. This Court should reverse.

DATED this 10th day of July, 2023.

<div style="margin-left:40%">

AUSTIN KNUDSEN
 *Montana Attorney General*

CHRISTIAN B. CORRIGAN
 *Solicitor General*

s/Peter M. Torstensen, Jr.
PETER M. TORSTENSEN, JR.
 *Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549
*Counsel for Amicus Curiae
State of Montana*

</div>

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of
Alabama*

TIM GRIFFIN
*Attorney General of
Arkansas*

CHRISTOPHER M. CARR
*Attorney General of
Georgia*

RAÚL R. LABRADOR
*Attorney General of
Idaho*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

DANIEL CAMERON
*Attorney General of
Kentucky*

JEFF LANDRY
*Attorney General of
Louisiana*

LYNN FITCH
*Attorney General of
Mississippi*

ANDREW BAILEY
*Attorney General of
Missouri*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

JOHN M. FORMELLA
*Attorney General of
New Hampshire*

DREW H. WRIGLEY
*Attorney General of
North Dakota*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

SEAN D. REYES
*Attorney General of
Utah*

JASON MIYARES
*Attorney General of
Virginia*

PATRICK MORRISEY
*Attorney General of
West Virginia*

BRIDGET HILL
*Attorney General of*
*Wyoming*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,203 words.

2.  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and is double-spaced except for footnotes and for quoted and indented material.

3.  As required by 3d Cir. L.A.R. 31.1(c), I certify that the text of the electronic brief is identical to the text in the paper copies of the brief. This brief was scanned for viruses using CrowdStrike Falcon Malware Version 6.54.16812.0 and no viruses were detected.

4.  As required by 3d Cir. L.A.R. 28.3(d), I certify that I am admitted to practice before the U.S. Court of Appeals for the Third Circuit.

Dated: July 10, 2023                    /s/    *Peter M. Torstensen, Jr.*
                                        PETER M. TORSTENSEN, JR.

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: July 10, 2023                        /s/     *Peter M. Torstensen, Jr.*
                                            PETER M. TORSTENSEN, JR.