Nos. 23-1633 (lead case), 23-1634, and 23-1641

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

DELAWARE STATE SPORTSMEN'S ASSOCIATION *et al.*,
*Plaintiffs-Appellants,*
v.
DELAWARE DEPARTMENT OF SAFETY AND
HOMELAND SECURITY *et al.*,
*Defendants-Appellees.*

_____

**On Appeal from the United States District Court
for the District of Delaware
(Nos. 23-cv-00033, 22-cv-00951, and 22-cv-01500)**

_____

**BRIEF OF AMICUS CURIAE DELAWARE ASSOCIATION
OF SECOND AMENDMENT LAWYERS**

_____

Dan M. Peterson                      Stephen P. Halbrook*
Dan M. Peterson PLLC                 3925 Chain Bridge Road, Suite 403
3925 Chain Bridge Road, Suite 403    Fairfax, Virginia 22030
Fairfax, Virginia 22030              Telephone: (703) 352-7276
Telephone: (703) 352-7276            protell@aol.com
dan@danpetersonlaw.com
Counsel for *Amicus Curiae*          *Counsel of Record for *Amicus Curiae*

July 10, 2023

## United States Court of Appeals for the Third Circuit

## <u>Corporate Disclosure Statement and<br>Statement of Financial Interest</u>

No. _____ 23-1633, -1634, -1641

Delaware State Sportsmen's Association et al.

v.

Delaware Department of Safety and Homeland Security et al.

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest.  This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings.  If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list.  LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first.  A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed.  Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Delaware Association of Second Amendment Lawyers II

_____

(Name of Party)

       1) For non-governmental corporate parties please list all parent corporations: None

       2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None

       3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None

       4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

## /s/ Stephen P. Halbrook

_____

(Signature of Counsel or Party)

Dated: July 10, 2023

_____

**rev: 09/2014**                    (Page 2 of 2)

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES .................................................................v

INTEREST OF *AMICI CURIAE* ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ................................................................................3

I.   NOTHING ABOUT THE FEATURES OF A RIFLE
     DEROGATORILY NAMED AN "ASSAULT WEAPON"
     MAKES IT MORE DANGEROUS OR REMOVES IT
     FROM SECOND AMENDMENT PROTECTION ......................................3

     A.   "Assault Weapon" is a Derogatory Term Without Objective
          Meaning that Does Nothing to Remove Firearms from
          Second Amendment Protection................................................3

     B.   Nothing About a "Pistol Grip" or Other Features
          Increases the Rate of Fire .......................................................5

     C.   The Firearms that Are Banned by Name Are in Common
          Use and Have No Features Excluding Them from
          Second Amendment Protection................................................8

II.  CARRY RESTRICTIONS ARE NOT ANALOGUES FOR A
     POSSESSION BAN, THE HISTORICAL TWIN OF WHICH
     MAY BE FOUND IN THE SLAVE CODES ..............................................10

     A.   Early Bans on Concealed Carry Are Not
          Analogues for a Ban on Possession ...................................11

     B.   The Only Early Prohibitions on Mere Possession of Arms
          Applied to Slaves and Persons of Color, and They Are Historical
          Analogues for What the Second Amendment *Prohibits*....................16

III.   THE APPROPRIATE TIME PERIOD TO DETERMINE ORIGINAL
       PUBLIC UNDERSTANDING OF THE SECOND AMENDMENT
       IS 1791, WHEN THE BILL OF RIGHTS WAS ADOPTED ...................... 20

       A.   The Time to Determine the Original Meaning of the
            Bill of Rights is *Not* When the Fourteenth Amendment
            Was Ratified ....................................................................... 20

       B.   Court of Appeals Opinions Relied on to Establish
            1868 as the Pertinent Year Are Illusory ............................... 22

       C.   Key Constitutional Principles Make It Impossible
            to Substitute 1868 for 1791 ................................................. 25

       D.   Adopting 1868 as the Proper Year is Contrary to
            the Supreme Court's Precedents and Would Upset
            the Court's Entire Bill of Rights Jurisprudence ................... 28

CONCLUSION ................................................................................... 30

CERTIFICATE OF BAR MEMBERSHIP ............................................. 31

CERTIFICATE OF COMPLIANCE ....................................................... 31

CERTIFICATE OF SERVICE .............................................................. 32

## TABLE OF AUTHORITIES

**Page**

## CASES

*Aldridge v. Commonwealth*, 2 Va. 447 (Gen. Ct. 1824)...........................................18

*Barnett v. Raoul*, No. 23-209, Doc. No. 54 (S.D. Ill. 2023)...................................21

*Benton v. Maryland*, 395 U.S. 784 (1969).................................................................29

*Bevis v. City of Naperville*, No. 23-1353, Doc. No. 89 (7th Cir. 2023)...................21

*Bliss v. Commonwealth*, 2 Litt. 90 (Ky. 1822) ........................................................12

*Boland v. Bonta*, No. 23-55276, Doc. No. 19 (9th Cir. 2023).................................21

*Cooper v. Savannah*, 4 Ga. 72 (1848)......................................................................17

*Crawford v. Washington*, 541 U.S. 36 (2004) .........................................................29

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ......................................23

*Duncan v. Louisiana*, 391 U.S. 145 (1968) .............................................................29

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................3, 22, 23

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)...........................................28

*Gamble v. United States*, 139 S. Ct. 1960 (2019).............................................26, 29

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ......................................................23

*Hosanna-Tabor Evangelical Lutheran Church
and School v. E.E.O.C.*, 565 U.S. 171 (2012)...........................................................28

*Klopfer v. North Carolina*, 386 U.S. 213 (1967)......................................................29

*Lynch v. Donnelly*, 465 U.S. 668 (1984) .................................................................28

*Malloy v. Hogan*, 378 U.S. 1 (1964)........................................................................25

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...................................19, 22, 23

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................................23

*National Rifle Association v. Bondi*, 61 F.4th 1317 (11th Cir. 2023)......................22

*Near v. Minnesota*, 283 U.S. 697 (1931) .................................................................28

*Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) ................................28

*New York Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) ....................*passim*

*Nunn v. State*, 1 Ga. 243 (1846)........................................................................12, 13

*In re Oliver*, 333 U.S. 257 (1948)............................................................................29

*Powell v. Alabama*, 287 U.S. 45 (1932) ..................................................................29

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ..........................................................29

*Range v. Attorney General United States*,
No. 21-2835, Doc. No. 96 (3d Cir. 2023)................................................................21

*Reynolds v. United States*, 98 U.S. 145 (1878)........................................................28

*Scott v. Sanford*, 60 U.S. (19 How.) 393 (1857)......................................................19

*Springfield Armory, Inc. v. City of Columbus*,
29 F.3d 250 (6th Cir. 1994) .......................................................................................9

*Staples v. United States*, 511 U.S. 600 (1994) .......................................................9, 10

*State v. Allmond*, 7 Del. 612 (Gen. Sess. 1856) .......................................................17

*State v. DeCiccio*, 315 Conn. 79, 105 A.3d 165 (2014) .........................................15

*State v. Delgado,* 298 Or. 395,  692 P.2d 610 (1984).......................................14, 15

*State v. Kessler*, 289 Or. 359, 614 P.2d 94 (1980) .................................................14

*State v. Newsom*, 27 N.C. 250 (1844) .....................................................................18

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) .................................................................29

*United States v. Carolene Products Co.,* 304 U.S. 144 (1938) ...............................4

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ..........................................23

*United States v. Jones*, 565 U.S. 400 (2012) ...........................................................25

*Virginia v. Moore*, 553 U.S. 164 (2008) ..................................................................28

*Washington v. Texas*, 388 U.S. 14 (1967) ...............................................................29

*Waters v. State*, 1 Gill 302 (Md. 1843) ...................................................................19

*Wilson v. Arkansas*, 514 U.S. 927 (1995) ...............................................................28

*Wyoming v. Houghton*, 526 U.S. 295 (1999) ...........................................................28

## CONSTITUTIONS, STATUTES, AND REGULATIONS

U.S. CONST. AMEND. I ...............................................................................................28

U.S. CONST. AMEND. II ......................................................................................*passim*

U.S. CONST. AMEND. IV.............................................................................................28

U.S. CONST. AMEND. V ..............................................................................................29

U.S. CONST. amend. VI.................................................................29

U.S. CONST. amend. VIII..............................................................29

U.S. CONST. amend. XIV.........................................................*passim*

Ky. Const., Art. XIII, § 25 (1850) ...............................................12

18 U.S.C. § 921(a)(7)......................................................................3

18 U.S.C. § 921(a)(29)....................................................................3

4 VAC 15-270-10.............................................................................7

7 Del.C. § 704(g)(1).........................................................................7

7 Del.C. § 704(g)(3).........................................................................7

11 Del. C. § 1465(2)(o)....................................................................8

11 Del. C. § 1465(3)....................................................................5, 8

11 Del. C. § 1465(5)(a)(2)...........................................................4, 5

11 Del.C. § 1466...........................................................................30

11 Del.C. § 1469...........................................................................30

28 Del.C. § 801(b)............................................................................3

520 ILCS 5/2.25..............................................................................7

1806 Md. Laws 44.........................................................................18

1827 Del. Laws 153.......................................................................16

1832 Del. Laws 208.......................................................................16

1837 Ga. Acts 90 ............................................................................................12

1840 N.C. Sess. Laws 61, ch. 30–31 .............................................................18

1865 Fla. Laws 25, ch. 1466 ..........................................................................19

1865 Miss. Laws p. 165, § 1 ..........................................................................19

§ 7, 1833 Ga. Laws 226, 228 .........................................................................17

Md. Code, Criminal Law, § 4-301(d) ..............................................................4

Md. Code, Criminal Law, § 4-301(h)(1) .........................................................4

Va. 1819, c. 111, § 7 .......................................................................................17

Va. 1819, c. 111, § 8 .......................................................................................17

§ 54-211(1)(A), Cook County, Ill., Ordinance No. 06–O–50 (2006)................4

## OTHER AUTHORITIES

"223 Remington Ballistics Chart" ....................................................................7

AKHIL REED AMAR, THE BILL OF RIGHTS:
CREATION AND RECONSTRUCTION (1998) ..............................................24

Dennis Bradley, ".50 Caliber Pistol Cartridges,"
*Shooting Illustrated* (Oct. 10, 2022) ...............................................................7

Digest of the Laws of the State of Georgia (1802) .........................................17

K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine
of Incorporation*, 97 Ind. L.J. 1439 (2022).............................................24, 29

Mark Smith, *Attention Originalists: The Second Amendment
Was Adopted in 1791, not 1868*, Harvard Journal of Law
& Public Policy Per Curiam (Fall 2022).........................................................28

## INTEREST OF AMICUS CURIAE[1]

The Delaware Association of Second Amendment Lawyers ("DASAL") is a state-wide civic organization of Delaware lawyers whose practices, academic interests, and intellectual pursuits include matters pertaining to the historical, constitutional, and legal principles concerning the right to keep and bear arms for lawful purposes, the Second Amendment to the United States Constitution, and Article I, § 20, of the Delaware Constitution. DASAL is a non-profit corporation based in Wilmington, Delaware.[2]

This brief is intended to bring to the attention of the Court relevant matter not already brought to its attention by the parties.

## INTRODUCTION AND SUMMARY OF ARGUMENT

These consolidated cases present the question of whether *Heller*'s "in common use" test provides the governing rule in arms ban cases, or whether that test may be disregarded by lower courts and a test that allows banning of arms that are believed to be "exceptionally dangerous" should be substituted for the Supreme Court's test. The opening briefs of the plaintiffs-appellants capably demonstrate

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

[2] The technical name of the corporation is Delaware Association of Second Amendment Lawyers II. See Corporate Disclosure Statement.

that the Supreme Court's "in common use" test must be followed. Those arguments will not be repeated here.

Instead, this amicus brief addresses three issues that will only arise if the lower courts are permitted to conduct their own historical analyses anew in arms ban cases rather than following the rule in *Heller*. First, nothing about the features of a rifle mislabeled as an "assault weapon" makes it more dangerous or removes it from Second Amendment protection. Neither a pistol grip nor any other feature increases the rate of fire. The firearms banned by name are in common use and remain protected by the Second Amendment. The cartridge fired by most AR-15 rifles is so much less powerful than typical deer hunting rounds that it is banned for deer hunting in some jurisdictions.

Second, restrictions on the carrying of concealed arms in some states in the early Republic provide no historical analogue for Delaware's ban on mere possession of firearms, as the right to bear arms could be exercised by carrying them openly. The only ban on possession of arms at the Founding applied to slaves and persons of color, and that is an analogue only for what the Second and Fourteenth Amendments *prohibit*.

Third, if analogues are to be consulted, the relevant time is around 1791 when the Second Amendment was adopted, not 1868 when the Fourteenth Amendment was ratified. Cases from the courts of appeals that suggest otherwise

are based on a single error in the Seventh Circuit's *Ezell* case, which was later corrected. Every time the Supreme Court has looked to history to determine the original meaning of a provision of the Bill of Rights, it has always looked principally to the Founding, never primarily to 1868.

## ARGUMENT

## I.    NOTHING ABOUT THE FEATURES OF A RIFLE DEROGATORILY NAMED AN "ASSAULT WEAPON" MAKES IT MORE DANGEROUS OR REMOVES IT FROM SECOND AMENDMENT PROTECTION.

### A.    "Assault Weapon" is a Derogatory Term Without Objective Meaning that Does Nothing to Remove Firearms from Second Amendment Protection.

The firearms that Delaware pejoratively calls "assault weapons" are primarily semiautomatic rifles with certain innocuous features that make them safer, not more dangerous. Unlike a machine gun, which is capable of fully-automatic fire, a semiautomatic rifle requires a separate pull of the trigger to fire each shot.[3]

A court should not refer to the subject firearms as "assault weapons," other than in quotation marks, as "no pronouncement of a Legislature can forestall attack

---

[3] A "rifle" is "intended to be fired from the shoulder," and so has a shoulder stock, and it fires "only a single projectile through a rifled bore for each single pull of the trigger"; and a "semiautomatic rifle" also "requires a separate pull of the trigger to fire each cartridge." 18 U.S.C. §§ 921(a)(7), (29). See 28 Del.C. § 801(b) (incorporation of federal definitions).

3

upon the constitutionality of the prohibition which it enacts by applying opprobrious epithets to the prohibited act . . . ."[4] Had the District of Columbia pejoratively named handguns "murder weapons" when it banned them, the term would have done nothing to save the ban from being declared unconstitutional in *Heller*.

No objective definition exists for "assault weapons," which are defined in contradictory ways:

• Delaware defines "assault weapon" as "a semiautomatic, centerfire rifle that can accept a detachable magazine" if it has a "pistol grip."[5] So a rifle, which has a shoulder stock, is banned if it also has a pistol grip.

• Cook County, Illinois, defines "assault weapon" as a semiautomatic rifle featuring "only a pistol grip *without* a stock attached."[6] So a rifle with a pistol grip is banned if it *doesn't* have a shoulder stock.

• Maryland does not define "assault weapon" as including either a rifle having a pistol grip and stock *or* a pistol grip and no stock.[7]

---

[4] *United States v. Carolene Products Co*., 304 U.S. 144, 152 (1938).

[5] 11 Del. C. § 1465(5)(a)(2).

[6] § 54-211(1)(A), Cook County, Ill., Ordinance No. 06–O–50 (2006) (emphasis added).

[7] Md. Code, Criminal Law, §§ 4-301(h)(1) ("copycat weapon"), 4-301(d) (assault weapon" includes "a copycat weapon").

4

In sum, "assault weapon" is a meaningless term unless used in an assault. The State cannot sustain its burden of showing that the firearms it bans lack Second Amendment protection, especially given that the features it bans are completely arbitrary.

### B.    Nothing About a "Pistol Grip" or Other Features Increases the Rate of Fire.

The Delaware law does not ban semiautomatic firearms as such, but bans them if they have certain features, such as a pistol grip.[8] Neither the pistol grip nor any other listed feature increases the rate of fire. And nothing about these features removes such firearms from Second Amendment protection, because they are in common use by law-abiding citizens for lawful purposes.

The district court makes no attempt to explain how the banned features make the rifles so dangerous. It states that "pistol grips and barrel shrouds" supposedly "increase their lethality," but fails to explain how.[9] Consider the following feature of a "copycat weapon," which Delaware defines as a type of "assault weapon":

> Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing.[10]

---

[8] 11 Del. C. § 1465(5)(a)(2).

[9] App. 27. "App." herein refers to the Appendix in No. 23-1633.

[10] 11 Del. C. § 1465(3), (5)(a)(2).

5

Are we to believe that a rifle is more lethal if one's fingers are in this position rather than in some other position "when firing"? And the very idea that one's finger placement removes an arm from Second Amendment protection trivializes the constitutional right.

The suggestion that pistol grips are associated with "lethality" is belied by the fact that identical pistol grips are found on single-shot rifles (which hold only one round),[11] bolt-action rifles (which require manual reloading for each round),[12] and even on air guns used in Olympic competition.[13]

Next, the court claims that "an assault rifle bullet travels at multiple times the velocity of a handgun bullet," but there is no such thing as "an assault rifle bullet."[14] Bullets such as the .223 caliber may be fired in any rifle of that caliber, regardless of the rifle's features. It may be a single-shot or a semiautomatic with no

[11] A single shot is a gun that is capable of holding only one round for firing. See photo of Feinwerkbau Model 2800 .22 cal. single-shot rifle with protruding pistol grip at https://www.feinwerkbau.de/New-Small-Bore-Rifle.

[12] A bolt-action rifle is manually loaded, cocked and unloaded by operating a bolt mechanism to eject a spent cartridge and load another. See Ruger Precision Rimfire bolt-action rifle with protruding pistol grip at https://ruger.com/products/precisionRimfire/models.html.

[13] See a single-shot air rifle with a protruding pistol grip at https://www.feinwerkbau.de/en/Sporting-Weapons/Air-Rifles/Model-800-Evolution.

[14] App. 28.

banned features. Nothing about a bullet becomes more lethal if fired from a rifle with a pistol grip or a rifle without one.

It is noteworthy that Delaware law allows deer hunting with rifles using cartridges with a minimum diameter of .357 caliber and a maximum of .50 caliber,[15] which excludes the much smaller .223 caliber bullet. The .223 bullet typically weighs just 55 grains.[16] By contrast, the .50 S&W handgun cartridge which may be used for hunting in Delaware is offered with bullets more than twice the diameter of the .223 and weighing 300 to 700 grains.[17] For deer hunting, some states require use of rifle cartridges larger than the .223, which is not considered powerful enough.[18]

The court identifies "rate of fire" as another dangerous characteristic.[19] But a semiautomatic rifle with, e.g., a pistol grip, fires no faster than a semiautomatic rifle without one, and Delaware does not ban semiautomatic rifles without the

---

[15] 7 Del.C. § 704(g)(1), (3).

[16] "223 Remington Ballistics Chart," http://www.ballistics101.com/223_remington.php.

[17] Dennis Bradley, ".50 Caliber Pistol Cartridges," *Shooting Illustrated* (Oct. 10, 2022).

[18] E.g., 520 ILCS 5/2.25 (in Illinois, for deer hunting "the only legal ammunition for a centerfire . . . rifle is a . . . centerfire cartridge of .30 caliber or larger"); 4 VAC 15-270-10 (in Virginia, it is "unlawful to use a rifle of a caliber less than 23 for the hunting of bear, elk, and deer").

[19] App. 28.

verboten features. "Assault rifles are designed for long-range use" is another alleged dangerous feature,[20] but all rifles are designed for long-range use. There is nothing about any of the banned features that increases a rifle's range over a rifle without those features.

### C. The Firearms that Are Banned by Name Are in Common Use and Have No Features Excluding Them from Second Amendment Protection.

"Assault long gun," which Delaware defines as a type of "assault weapon," includes a long list of makes and models, including: "any of the following or a copy, regardless of the producer or manufacturer," e.g., "Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle."[21]

The district court found that "the prohibited assault long guns are in common use for self-defense, and therefore 'presumptively protect[ed]' by the Second Amendment," and that one model had been used in two mass shootings.[22] However, without any discussion, the court simply assumed that all firearms on the long list are too dangerous and may be banned. But nothing about these semiautomatic arms warrants banning them or removes them from Second Amendment protection.

---

[20] *Id.*

[21] 11 Del. C. § 1465(2)(o), (3).

[22] App. 17, 25-26.

As noted, the ban includes not just the listed rifles, but also "copies" and "imitations," without setting forth any criteria to make that determination. "Ordinary consumers cannot be expected to know the developmental history of a particular weapon."[23] This ban of commonly-possessed firearms of such a sweeping, unknown scope only exacerbates its violation of the Second Amendment.

The district court repeatedly refers to the banned rifles as having "military" features,[24] but they lack the one feature that is the *sine qua non* of a military rifle – automatic fire. As the Supreme Court explained in *Staples v. United States*: "The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon. The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire."[25] "Automatic" fire means that it keeps firing as long as "its trigger is

---

[23] *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 253 (6th Cir. 1994) (declaring "assault weapon" ban unconstitutionally vague). Further, "the average gun owner knows very little about how his gun operates or its design features." *Id*.

[24] App. 26-27.

[25] *Staples v. United States*, 511 U.S. 600, 603 (1994).

depressed," but a "semiautomatic" "fires only one shot with each pull of the trigger…."[26]

In the context of the AR-15 rifle involved in that case, *Staples* acknowledged "a long tradition of widespread lawful gun ownership by private individuals in this country," found such firearms to be "commonplace and generally available,"[27] and added that they "traditionally have been widely accepted as lawful possessions . . . ."[28]

## II.    CARRY RESTRICTIONS ARE NOT ANALOGUES FOR A POSSESSION BAN, THE HISTORICAL TWIN OF WHICH MAY BE FOUND IN THE SLAVE CODES.

Early restrictions on the concealed carry of arms, since open carry was lawful, did not violate the right to bear arms, and provide no proper analogues for Delaware's ban on mere possession. The only early prohibitions on mere possession of arms applied to slaves and persons of color, and they are historical analogues for what the Second Amendment *prohibits*.

---

[26] *Id*. at 602 n.1.

[27] *Id*. at 610-11.

[28] *Id*. at 612. "The Nation's legislators chose to place under a registration requirement only a very limited class of firearms, those they considered especially dangerous." *Id*. at 622 (Ginsburg, J., concurring).

### A.    Early Bans on Concealed Carry Are Not Analogues for a Ban on Possession.

The district court opined that the early regulations of arms like revolvers and Bowie knives provide historical analogues that justify Delaware's ban.[29] However, these early regulations generally restricted only the *carrying* of such arms *concealed*, while Delaware bans mere *possession* of certain arms, even in the home. Under the district court's reasoning, *Heller* should have upheld the District of Columbia's handgun ban.

When considering non-arms ban cases not governed by *Heller*, *Bruen* instructs that "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."[30] The Founding generation addressed the societal problem of armed violence by restricting concealed carry, not open carry, and certainly did not ban mere possession of arms.

As *Bruen* explains, in the first half of the 19th century some states prohibited "the concealed carry of pistols and other small weapons," and those laws were held to be valid under the Second Amendment or state analogues. However, "the history reveals a consensus that States could *not* ban public carry altogether," and could

---

[29] App. 29.

[30] *Bruen*, 142 S. Ct. at 2131.

11

ban concealed carry "only if they did not similarly prohibit *open* carry."[31] If a state could not ban open carry, it certainly could not ban mere possession.

*Bliss v. Commonwealth* (1822), the earliest decision *Bruen* cites, invalidated Kentucky's prohibition against "wear[ing] a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling on a journey."[32] The defendant's conviction for wearing a sword cane, which *Bliss* assumed is a protected "arm," was overturned on the basis that the legislature could ban neither concealed nor open carry.[33] The state's constitution was amended to authorize laws to "prevent persons from carrying concealed arms."[34]

The district court points to 1837 as the year when concealed carry of Bowie knives was first restricted.[35] That was when a Georgia law was enacted that also banned the carrying of pistols, but it exempted a person who "shall openly wear, externally, bowie-knives" and certain other arms, but not pistols.[36] In *Nunn v. State*,

---

[31] *Bruen*, 142 S. Ct. at 2146.

[32] *Bliss v. Commonwealth*, 2 Litt. 90 (Ky. 1822).

[33] *Id*. at 92.

[34] Ky. Const., Art. XIII, § 25 (1850).

[35] App. 29

[36] 1837 Ga. Acts 90. See text of law in *Nunn v. State*, 1 Ga. 243, 246 (1846).

the Georgia Supreme Court held that, to the extent the law "contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void . . . .*"[37]

*Heller* approvingly cited *Nunn* when it commented, "Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down."[38] Delaware's gun ban violates the Second Amendment for the same reason that the District's ban did so.

Further, as *Bruen* instructs, if any enactments "were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."[39] As the Court added about *Nunn*, "it was considered beyond the constitutional pale in antebellum America to altogether prohibit public carry."[40] All the more so would it have been considered beyond the constitutional pale to ban mere possession in the home.

Because some states prohibited the *concealed carrying* of Bowie knives, billy clubs, and other hand-held arms, the district court illogically jumped to the conclusion that they are not "arms" protected by the Second Amendment, thus

---

[37] *Nunn*, 1 Ga. at 251.

[38] *Heller,* 554 U.S. at 629.

[39] *Bruen*, 142 S. Ct. at 2131.

[40] *Id.*

justifying Delaware's ban on the *possession* of *rifles*.[41] But the court provided no reasoning for its presumption that such hand-carried arms are not protected "arms."

*Bruen* itself notes that in medieval times, "[a]lmost everyone carried a knife or a dagger in his belt," they were worn for self-protection and other purposes, and they "strike us as most analogous to modern handguns."[42]

Before *Heller*, the Oregon Supreme Court found that "the term 'arms' as used by the drafters of the constitutions probably was intended to include those weapons used by settlers for both personal and military defense."[43] Further, the club is "the first personal weapon fashioned by humans," it is "used today as a personal weapon, commonly carried by the police," and it is thus a protected arm.[44]

The same court refused to recognize a distinction between "offensive" and "defensive" weapons because "[a]ll hand-held weapons necessarily share both characteristics. A kitchen knife can as easily be raised in attack as in defense."[45] American frontiersmen carried large knives for defense and hunting, and daggers

---

[41] App. 28.

[42] *Bruen*, 142 S. Ct. at 2140.

[43] *State v. Kessler*, 289 Or. 359, 371-72, 368, 614 P.2d 94 (1980).

[44] *Id*. at 371-72.

[45] *State v. Delgado,* 298 Or. 395, 399-400, 692 P.2d 610 (1984).

and Bowie knives were in common use in the 19th century.[46] It held that a ban on mere possession of knives, including switchblades, violates the right to bear arms.[47]

Post-*Heller*, the Connecticut Supreme Court found that the Oregon holdings applied "a definitional approach that mirrors the model employed by" *Heller*.[48] Applying *Heller*'s text-history approach, the court found that dirks and batons were in widespread use at the Founding and remain so now, and are not "dangerous and unusual."[49] Possession thereof is thus protected by the Second Amendment.[50]

In sum, early laws on concealed carry, because they did not ban open carry, may be good analogues for restrictions on the method of carry. But such laws are not good analogues for bans on mere possession, like Delaware's. And as the following shows, the historical twins for a possession ban are the slave and black codes, which are exactly what the Second and Fourteenth Amendments prohibit.

---

[46] *Id*. at 401-02.

[47] *Id*. at 403-04.

[48] *State v. DeCiccio*, 315 Conn. 79, 117, 105 A.3d 165 (2014).

[49] *Id*. at 122-23, 133.

[50] *Id*. at 148-49.

**B.    The Only Early Prohibitions on Mere Possession of Arms Applied to Slaves and Persons of Color, and They Are Historical Analogues for What the Second Amendment *Prohibits*.**

There is a historical twin to Delaware's ban on mere possession, and that was the ban on possession of arms by slaves and free persons of color in the antebellum South. That ban was defended on the basis that African Americans were not citizens and had no right to keep and bear arms. Delaware's ban is exactly what the Second and Fourteenth Amendments were understood to prohibit.

Delaware punished with whipping "any negro or mulatto slave" who "shall without special permission of his or her master or mistress, presume . . . to carry any gun, pistol, sword, dirk, or other unusual or dangerous weapon or arms . . . ."[51] Delaware forbade "free negroes and free mulattoes to have, own, keep, or possess any gun, pistol, pistol, sword or any warlike instruments whatsoever," except that they could apply for a permit to possess a gun or fowling piece, which could be granted if "the circumstances of his case justify his keeping and using a gun…."[52] Delaware's current ban does not even provide for a comparable permit.

Delaware's Court of General Sessions justified restrictions such as "the prohibition of free negroes to own or have in possession fire arms or warlike

---

[51] 1827 Del. Laws 153.

[52] 1832 Del. Laws 208.

instruments" under the "police power," meaning that no constitutional right was at stake.[53]

Georgia made it unlawful for a slave "to carry and make use of fire arms, or any offensive weapon whatsoever."[54] It was also unlawful "for any free person of colour in this state, to own, use, or carry fire arms of any description whatever…."[55] Georgia's Supreme Court held: "Free persons of color have never been recognized here as citizens; they are not entitled to bear arms, vote for members of the legislature, or to hold any civil office."[56]

Virginia provided that "[n]o negro or mulatto slave whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive."[57] Further, "[n]o free negro or mulatto, shall be suffered to keep or carry any fire-lock of any kind, any military weapon, or any powder or lead, without first obtaining a license."[58] As the Virginia Supreme Court observed, among the "numerous restrictions imposed on this class of people [free blacks] in our Statute

---

[53] *State v. Allmond*, 7 Del. 612, 641 (Gen. Sess. 1856).

[54] Digest of the Laws of the State of Georgia 424 (1802).

[55] § 7, 1833 Ga. Laws 226, 228.

[56] *Cooper v. Savannah*, 4 Ga. 72 (1848).

[57] Va. 1819, c. 111, § 7.

[58] *Id.* § 8.

Book, many of which are inconsistent with the letter and spirit of the Constitution, both of this State and of the United States," was "the restriction . . . upon their right to bear arms."[59]

North Carolina made it unlawful for "any free Negro, Mulatto, or free Person of Colour" to "wear or carry about his or her person, or keep in his or her house, any Shot-gun, Musket, Rifle, Pistol, Sword, Dagger or Bowie-knife, unless he or she shall have obtained a license therefor . . . ."[60] North Carolina's Supreme Court upheld this ban as constitutional partly on the ground that "the free people of color cannot be considered as citizens…."[61]

Maryland made it unlawful "for any negro or mulatto within this state to keep any dog, bitch or gun," and for "any free negro or mulatto to go at large with any gun, or other offensive weapon," without a certificate from a justice of the peace.[62] The Court of Appeals of Maryland described "free negroes" as being treated as "a vicious or dangerous population," as exemplified by laws "to prevent

---

[59] *Aldridge v. Commonwealth*, 2 Va. 447, 449 (Gen. Ct. 1824).

[60] 1840 N.C. Sess. Laws 61, ch. 30–31.

[61] *State v. Newsom*, 27 N.C. 250, 254 (1844).

[62] 1806 Md. Laws 44.

their migration to this State; to make it unlawful for them to bear arms; to guard even their religious assemblages with peculiar watchfulness."[63]

The above state laws were bolstered by the Supreme Court's *Dred Scott* decision, which held that African Americans were not citizens.[64] Chief Justice Roger Taney wrote that, if African Americans were considered citizens, "it would give them the full liberty of speech…, and to keep and carry arms wherever they went."[65]

After slavery was abolished, the black codes replaced the slave codes. Mississippi provided that "no freedman, free negro or mulatto, … not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife."[66] That was the first state law noted by the Supreme Court in *McDonald v. Chicago* as typical of what the Fourteenth Amendment would prohibit.[67]

---

[63] *Waters v. State*, 1 Gill 302, 309 (Md. 1843).

[64] *Scott v. Sanford*, 60 U.S. (19 How.) 393 (1857).

[65] *Id.* at 417.

[66] Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, § 1, quoted in *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2010). See also 1865 Fla. Laws 25, ch. 1466 (same).

[67] *McDonald*, 561 U.S. at 771.

In short, African Americans were not considered as having the right to keep and bear arms because they were not considered to be American citizens. That status was reflected in the prohibitions on them possessing a firearm, Bowie knife, or other weapon, with the discretionary licensing exception. This is the only close analogue to Delaware's current ban on possession of "assault weapons," and it is utterly inconsistent with the Second and Fourteenth Amendments.

III.    **THE APPROPRIATE TIME PERIOD TO DETERMINE ORIGINAL PUBLIC UNDERSTANDING OF THE SECOND AMENDMENT IS 1791, WHEN THE BILL OF RIGHTS WAS ADOPTED.**

A.    **The Time to Determine the Original Meaning of the Bill of Rights is *Not* When the Fourteenth Amendment Was Ratified.**

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Bruen*, 142 S. Ct. 2136 (quoting *Heller*, 554 U.S. 570, 634–635 (2008)). The Bill of Rights, including the Second Amendment, was ratified by the people in 1791. Both *Heller* and *Bruen* thus recognized that the scope of the Second Amendment is determined by the meaning it had in 1791.

The time of ratification of the Fourteenth Amendment in 1868 has nothing to do with the original public understanding of the Second Amendment in 1791 and tells us nothing relevant about that understanding. Yet, the district court (in reliance on "expert" declarations) freely cited late 19th century and even 20th century laws as "analogues" to determine the historical tradition of firearms

regulation in this country.[68]

In several post-*Bruen* amicus briefs, particularly before courts of appeals, the gun prohibition group Everytown for Gun Safety has contended that 1868, and not 1791, is the "most relevant" time period for the historical inquiry because that is "when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states."[69] Although amicus briefs in support of defendants/appellees in this case are not yet due, it is reasonable to assume that such a brief will be filed by Everytown in this case, and thus those erroneous arguments should be addressed.

Examination of the cases cited by Everytown reveals that, with the exception of one non-final case, all rely on a single error in one Seventh Circuit case. Reliance on 1868 is also illogical and barred by principles that are firmly established in the Supreme Court's Bill of Rights jurisprudence. Most conclusively, it is contrary to the Court's universal practice of looking at the time

---

[68] App. 29-34 (relying on Bowie knife restrictions down to 1925; billy club laws between 1862 and the early 1900s; anti-slungshot laws between 1850 and 1900; pistol carry restrictions at "the end of the 1800s" and in the "early 1900s"; and expressly "declin[ing] to disregard" twentieth-century laws as late as 1934).

[69] See, e.g., the Everytown briefs in the following arms-ban cases: *Bevis v. City of Naperville*, No. 23-1353, Doc. No. 89 at 8 (7th Cir. 2023); *Boland v. Bonta*, No. 23-55276, Doc. No. 19 (9th Cir. 2023); *Barnett v. Raoul*, No. 23-209, Doc. No. 54 (S.D. Ill. 2023) (cites and quotations herein are to the Everytown brief in *Bevis*); see also *Range v. Attorney General United States*, No. 21-2835, Doc. No. 96 (3d Cir. 2023).

of the Founding, not the Reconstruction period, to determine the meaning of the substantive provisions of the Bill of Rights, including the Second Amendment.

### B.    Court of Appeals Opinions Relied on to Establish 1868 as the Pertinent Year Are Illusory.

To try to support its contention that 1868 is the pertinent year, Everytown argues that several courts of appeals have reached this conclusion.[70] It first cites a panel decision in the case of *National Rifle Association v. Bondi*.[71] However, the mandate was withheld in that case on the day it was decided,[72] and a petition for rehearing en banc was later filed.[73] After the panel decision, the court has recently accepted materials to supplement the record.[74] If rehearing en banc is granted, the panel decision will be vacated. Thus, it would be prudent not to give much weight to this panel opinion before the case is concluded.

Everytown quotes *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011), as stating that "*McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was

---

[70] *Bevis* Everytown Br. at 8.

[71] 61 F.4th 1317 (11th Cir. 2023) ("*Bondi*").

[72] *Bondi*, Case No. 21-12314, Doc. No. 67 (11th Cir. Mar. 9, 2023).

[73] *Bondi*, Doc. No. 68 (11th Cir. Mar. 30, 2023).

[74] *Bondi*, Doc. No. 85 (11th Cir. Jul. 5, 2023).

proposed and ratified."[75] Everytown omits *Ezell*'s citation to *McDonald*, which was "*McDonald*, 130 S.Ct. at 3038–47." But the *McDonald* opinion in that page range merely examines history after the Civil War to determine whether the Second Amendment should be held to be incorporated. It does not say that 1868 is the principal time period for determining the meaning or scope of the Second Amendment.

*Ezell* simply made a mistake. The Seventh Circuit corrected that mistake the next year in *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). There, it held that "1791, the year the Second Amendment was ratified" is "the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago, supra*, 130 S.Ct. at 3035 and n. 14."

The other court of appeals cases cited by Everytown for the proposition that 1868 is the proper year all ultimately rely on the error in *Ezell*.[76]

What does Everytown *not* cite for the proposition that the 1868 time of ratification ought to be controlling? It does not cite a single Supreme Court case that has ever held that 1868 is the principal relevant time for determining the

---

[75] *Bevis* Everytown Br. at 7.

[76] *Bevis* Everytown Br. at 9, citing *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (relies on *Greeno*); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (relies on *Ezell*); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) (cryptic remark that did not hold that 1868 is the proper date and did not attempt to ascertain the scope of the right).

original public understanding of the Second Amendment or of any of the first eight provisions of the Bill of Rights. That is because the Supreme Court has always looked to the Founding era as the principal focus.

Everytown tries to transmute a passing remark in *Bruen* into a holding that 1868 is the key year. *Bruen* merely noted the unexceptionable principle that "Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second…. [citation omitted] And we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. [citing three Court cases holding that 1791 is the proper period for determining public understanding of the First, Fourth, and Sixth Amendments].[77]

*Bruen* then merely acknowledged an "ongoing scholarly debate" on whether courts should primarily rely on the prevailing understanding in 1868, which it found unnecessary to address.[78]

---

[77] *Bruen*, 142 S.Ct. at 2137-38.

[78] *Id.* at 2138 (citing A. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998); K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* [now published at 97 Ind. L.J. 1439 (2022)].

### C.    Key Constitutional Principles Make It Impossible to Substitute 1868 for 1791.

*Bruen* held that the Constitution's "meaning is fixed according to the understandings of those who ratified it," although "the Constitution can, and must, apply to circumstances beyond those *the Founders* specifically anticipated."[79] And *Heller* said that the "normal meaning of the Constitution" "excludes secret or technical meanings that would not have been known to ordinary citizens *in the founding generation*."[80] So, *Heller* and *Bruen* agree that the Constitution, including the Bill of Rights and Second Amendment, had an ascertainable, fixed meaning at the time it was adopted at the Founding.

*Bruen* itself made it clear that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."[81] That principle was conclusively established in *Malloy v. Hogan*.[82] *McDonald* observed that *Malloy* "decisively held that incorporated Bill of Rights protections 'are all to be enforced

---

[79] *Bruen*, 142 S.Ct. 2132 (citing *United States v. Jones*, 565 U.S. 400, 404–405 (2012) (installation of a tracking device "would have been considered a 'search' within the meaning of the Fourth Amendment *when it was adopted*") (emphasis added).

[80] *Heller*, 554 U.S. at 576-77 (emphasis added).

[81] *Bruen*, 142 S.Ct. at 2137.

[82] 378 U.S. 1 (1964).

against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'"[83]

If the Second Amendment meant something in 1791 regarding the restraints placed on the federal government, then it meant the identical thing when applied to restrain the states in 1868 and thereafter.

Although both *Heller* and *Bruen* examined a small amount of evidence from the mid- to late-nineteenth century, they clearly did so only to confirm the original understanding from the time of the ratification of the Second Amendment in 1791. *Bruen* relied on *Gamble v. United States* to make that point concisely.[84] *Bruen* noted that "we made clear in *Gamble* that *Heller's* interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence 'only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions.'"[85] Any evidence from the mid- to late-nineteenth century was treated as "mere confirmation of what the Court thought had already been established."[86]

Furthermore, both *Heller* and *Bruen* noted that little weight should be given

---

[83] *McDonald*, 561 U.S. at 765-66 (citing cases).

[84] 139 S. Ct. 1960 (2019).

[85] *Bruen,* 142 S. Ct. at 2137 (quoting *Gamble*, 139 S. Ct. at 1975–76).

[86] *Id.*

to such nineteenth century evidence under any circumstances. *Bruen* expressly cautioned "against giving postenactment history more weight than it can rightly bear."[87] *Bruen* also quoted *Heller* regarding post-Civil War discussions of the right to keep and bear arms, observing that because they "took place 75 years after the *ratification of the Second Amendment*, they do not provide as much insight into its original meaning as earlier sources."[88] *Bruen* refused even to consider "any of the 20th-century historical evidence brought to bear by respondents or their amici."[89] The Court's reason: "As with their late-19th-century evidence, the 20th century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."[90]

The reason that Delaware offered historical analogues from after the Civil War through the 20th century is precisely *because* they contradict earlier evidence. The tradition at the time of the Founding, and up until a smattering of short-lived laws in the 1920s and 1930s, was that the government could not ban the sale or possession of arms.

---

[87] *Bruen*, 142 S.Ct. at 2136.

[88] *Id*. at 2137 (emphasis added).

[89] *Id*. at 2154 n.28.

[90] *Id*.

**D.    Adopting 1868 as the Proper Year is Contrary
to the Supreme Court's Precedents and Would Upset
the Court's Entire Bill of Rights Jurisprudence.**

When it has employed history to determine the original meaning of a provision of the Bill of Rights, the Supreme Court has always considered the Founding to be the principal or exclusive period that is determinative. Following is a partial list of such cases using history from the Founding:[91]

**First Amendment:** *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1894–912 (2021) (Free Exercise Clause) (concurrence by Justices Alito, Thomas, and Gorsuch); *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 182–84 (2012) (Establishment Clause and Free Exercise Clause); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (freedom of speech); *Lynch v. Donnelly*, 465 U.S. 668, 673–74 (1984) (Establishment Clause); *Near v. Minnesota*, 283 U.S. 697, 713–17 (1931) (freedom of the press); *Reynolds v. United States*, 98 U.S. 145, 163 (1878) (Free Exercise Clause).

**Second Amendment:** *Heller* and *Bruen*.

**Fourth Amendment:** *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008); *Wyoming v. Houghton*, 526 U.S. 295, 299 (1999); *Wilson v. Arkansas*, 514 U.S.

---

[91] This list is based in part on a list contained in Mark Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, Harvard Journal of Law & Public Policy Per Curiam 7 n.35 (Fall 2022), https://www.harvard-jlpp.com/wp-content/uploads/sites/21/2022/12/Smith-1791-vF1.pdf.

927, 931 (1995).

**Fifth Amendment:** *Gamble v. United States*, 139 S. Ct. 1960, 1965 (2019) (Double Jeopardy Clause); *Benton v. Maryland*, 395 U.S. 784, 795–96 (1969) (Double Jeopardy Clause).

**Sixth Amendment:** *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395–96 (2020) (Jury Trial); *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Confrontation Clause); *Duncan v. Louisiana*, 391 U.S. 145, 151–54 (1968) (jury trial in state cases); *Klopfer v. North Carolina*, 386 U.S. 213, 223–25 (1967) (speedy trial); *Washington v. Texas*, 388 U.S. 14, 20, 23 (1967) (Compulsory Process Clause); *In re Oliver*, 333 U.S. 257, 266–268 (1948) (public trial); *Powell v. Alabama*, 287 U.S. 45, 60–67 (1932) (Right to Counsel).

**Eighth Amendment:** *Timbs v. Indiana*, 139 S. Ct. 682, 687–99 (2019) (Excessive Fines).

In sum, when the Court looks at history, the period around 1791, not 1868, has been the central, often exclusive, time period that it has examined to determine original public understanding of the Bill of Rights. Any supposedly changed meaning in 1868 cannot be "read back" to change the meaning of provisions of the Bill of Rights as understood in 1791, as Prof. Lash has proposed.[92] Because the

---

[92] Lash, *supra* n.78.

Second Amendment is not a "second class right,"[93] that would upset the Court's entire Bill of Rights jurisprudence.

## CONCLUSION

For the foregoing reasons, this Court should reverse the order of the district court in these consolidated cases and remand with instructions to preliminarily enjoin the enforcement of 11 Del.C. § 1466 and 11 Del.C. § 1469.

Respectfully submitted,

Dan M. Peterson                          /s/ Stephen P. Halbrook
Dan M. Peterson PLLC                     Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403        3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030                  Fairfax, Virginia 22030
Telephone: (703) 352-7276                Telephone: (703) 352-7276
dan@danpetersonlaw.com                   protell@aol.com

Counsel for Amicus Curiae                Counsel of Record for Amicus Curiae


Dated: July 10, 2023

---

[93] *McDonald*, 561 U.S. at 779-80.

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of this Court.

/s/ Stephen P. Halbrook
Stephen P. Halbrook
Counsel of Record for Amicus Curiae

Dated: July 10, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,420 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Windows in 14-point Times New Roman font.

As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies supplied to the Court.

The Portable Document Format version of the attached document has been scanned for viruses using Malwarebytes Premium v. 4.5.3 and, according to that program, the document is free of viruses.

/s/ Stephen P. Halbrook
Stephen P. Halbrook
Counsel of Record for Amicus Curiae

Dated: July 10, 2023

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on July 10, 2023. Service on all counsel for all parties has been accomplished via ECF.

/s/ Stephen P. Halbrook
Stephen P. Halbrook
Counsel of Record for Amicus Curiae

Dated: July 10, 2023