Nos. 23-1641, 23-1633, 23-1634

In the United States Court of Appeals
for the Third Circuit

DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC., ET AL.,

*Plaintiffs-Appellants in No. 23-1641*,

v.

DELAWARE DEPARMENT OF SAFETY & HOMELAND SECURITY, ET AL.,

*Defendants-Appellees*.

GABRIEL GRAY, ET AL.,

*Plaintiffs-Appellants in No. 23-1633*,

v.

ATTORNEY GENERAL DELAWARE, ET AL.,

*Defendants-Appellees*.

CHRISTOPHER GRAHAM, ET AL.,

*Plaintiffs-Appellants in No. 23-1634*,

v.

ATTORNEY GENERAL DELAWARE, ET AL.,

*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Delaware
Nos. 1:22-cv-00951, 1:22-cv-01500 & 1:23-cv-00033
United States District Court Judge Richard G. Andrews

**BRIEF OF AMICUS CURIAE GUN OWNERS OF AMERICA, INC., SECOND AMENDMENT LAW CENTER, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., GUN OWNERS OF CALIFORNIA, SECOND AMENDMENT DEFENSE & EDUCATION COALITION, GUNS SAVE LIFE, FEDERAL FIREARMS LICENSEES OF ILLINOIS, & GUN OWNERS FOUNDATION IN SUPPORT OF APPELLANTS FOR REVERSAL**

C.D. Michel
Anna M. Barvir
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Email: cmichel@michellawyers.com
*Counsel for Amicus Curiae*

July 10, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Amicus Curiae Gun Owners of America, Inc., Second Amendment Law Center, California Rifle & Pistol Association, Inc., Gun Owners of California, Second Amendment Defense & Education Coalition, Guns Save Life, Federal Firearms Licensees of Illinois, & Gun Owners Foundation certify that they are nonprofit organizations and thus have no parent corporation and no stock.

Dated: July 10, 2023                    MICHEL & ASSOCIATES, P.C.

                                       /s/ *Anna M. Barvir*
                                       Anna M. Barvir
                                       Counsel for Amicus Curiae

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ................................................................ i

Table of Contents ................................................................................. ii

Table of Authorities............................................................................. iii

Interest of Amici Curiae ........................................................................1

Introduction .........................................................................................3

Argument.............................................................................................4

I.    The District Court Wrongly Held That the Regulatory Scheme Implicates "Dramatic Technological Advancements" and "Unprecedented Societal Concerns"..................................................................................4

    A.    The Banned Arms Do Not Represent a Dramatic Advancement in Firearm Technology...................................................................6

    B.    Mass Public Killing Is Not a New Societal Concern That Could Justify Delaware's Modern Gun Ban ...................................................12

II.   The Relevant History and Tradition Does Not Justify Delaware's Modern Ban on Protected Semiautomatic Firearms and Magazines ..........................15

    A.    Nineteenth Century Laws Regulating "Dangerous and Unusual Weapons" Are Not "Relevantly Similar" to the State's Modern Ban on Semiautomatic Firearms and Magazines in Common Use for Lawful Purposes..................................................................................17

    B.    The District Court's Reliance on 20th Century Machine Gun Laws Is Unpersuasive and Factually Wrong ...................................................20

Conclusion ..........................................................................................23

Certification of Bar Membership................................................................24

Certification of Bar Membership................................................................25

Certificate of Compliance ......................................................................26

Certificate of Service ............................................................................27

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Antonyuk v. Hochul*,
  No. 22-0986, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6, 2022) ...... 16, 20

*Boland v. Bonta*,
  No. 22-1421 (S.D. Cal. Mar. 20, 2023) ............................................... 19

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ...................................................................... 5

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................ 5, 23

*Duncan v. Becerra*,
  366 F. Supp. 3d 1131 (S.D. Cal. 2019) .............................................. 21

*Duncan v. Becerra*,
  970 F.3d 1133 (9th Cir. 2020) ........................................... 3, 6, 7, 10

*Duncan v. Bonta*,
  No. 17-cv-01017 (S.D. Cal. Dec. 1, 2022) ................................. passim

*Espinoza v. Montana*,
  __ U.S. __, 140 S. Ct. 2246 (2020) ................................................. 21

*FFL-IL v. Pritzker*,
  No. 23-cv-00209 (S.D. Ill. Mar. 23, 2023) ....................................... 13

*Funk v. United States*,
  290 U.S. 371 (1933) ...................................................................... 20

*Miller v. Bonta*,
  542 F. Supp. 3d 1009 (S.D. Cal. 2021) .............................................. 14

*N.Y. State Rifle & Pistol Assn., Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ...................................................... passim

**Statutes**

2023 Wash. Sess. Laws, ch. 162, § 1 ..................................................... 11

720 Ill. Comp. Stat. 5/24-1.9 ........................................................................11

Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115 ...............................11

Cal. Stats. 1989, ch. 19 (enacting Cal. Penal Code §§ 12275 ..................11

Conn. Gen. Stat. §§ 53-202a—53-202o ........................................................11

DC Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c).11

Del. Code tit. 11, § 1466(a) ...........................................................................11

Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8 .............................................11

Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131M ...................................11

Md. Code Ann., Crim. Law §§ 4-301—4-306 ...............................................11

Md. Code Ann., Pub. Safety § 5-101(r) ........................................................11

N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13 ...................11

N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a) ..........................11

## Other Authorities

7 Journals of the Continental Congress 1774-1789, at 324 (1907) ..........................8

Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838) ..................18

Benjamin Franklin, *A Narrative of the Late Massacres* (1764), *reprinted in* 4 The Writings of Benjamin Franklin 289-314 (1906) ..................................................12

David B. Kopel, *Bowie Knife Statutes 1837-1899*, The Volokh Conspiracy (Nov. 20, 2022), https://reason.com/volokh/2022/11/20/bowie-knifestatutes-1837-1899/..........................................................................................................19

David Kopel, et al.,
*Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 2197-98 (3d ed. 2021) ......................................................................... 7, 8, 9

David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849, 854 (2015)..................................................................9, 11

Harold L. Peterson,
*The Treasury of form, ...*229, 232 (1962)), *available at*
http://firearmsregulation.org/www/FRRP3d_CH23.pdf
(last visited July 7, 2023) ......................................................................8

Joseph Belton, *Letter to the Continental Congress* (Apr. 11, 1777), in *Papers of the
Continental Congress, Compiled 1774-1789*, vol. 1 A-B, at 123 ........................8

Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public
Mass Shootings*, Applied Economics Letters (2014) ............................................15

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As
Altered by Subsequent Legislation ......................................................................18

Myles Hudson, *Wounded Knew Massacre: United States Hisory [1890]*,
Britannica, https://www.britannica.com/event/Wounded-Knee-Massacre (last
updated Dec. 22, 2022) ......................................................................12

Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403 (2d ed.
2018) ......................................................................10

Norm Flayderman, *The Flayderman's Guide to Antique American Firearms and
Their Values* 683 (9th ed. 2019)..............................................................9

Robert Held, *The Belton Systems, 1758 and 1784-86: Americas' First Repeating
Firearms* 40, 77 (1986) ......................................................................8

Schauer & [Barbara A.] Spellman, *Analogy, Expertise, and Experience*, 84 U. Chi.
L. Rev. 249, 254 (2017) ......................................................................16

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* .........................8, 11

Steven Ambrose, *Undaunted Courage* 178 (1996)....................................................9

Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 711, 774 (1993) ..............16

*Whole Family Murdered*, Fair Play 1 (Oct. 20. 1900) ............................................13

Wikipedia, Harold L. Peterson, https://tinyurl.com/haroldlpeterson........................8

**INTEREST OF AMICI CURIAE**

Gun Owners of America, Inc. ("GOA") is a nonprofit organization formed in 1976 by the late Sen. H.L. (Bill) Richardson to preserve and defend the Second Amendment rights of gun owners. GOA sees firearms ownership as an issue of freedom and works to defend that freedom through lobbying, litigation, and outreach. GOA has served as a party or amicus in Second Amendment challenges in almost every state in the nation to protect gun owner rights. GOA has also worked with members of Congress, state legislators, and local citizens to protect gun ranges and local gun clubs from closure.

The Second Amendment Law Center, Inc. ("2ALC") is a nonprofit corporation headquartered in Henderson, Nevada. 2ALC is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of private firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, attorneys, police, and the public.

Founded in 1875, California Rifle & Pistol Association, Inc. ("CRPA") is a nonprofit organization that defends Second Amendment rights. In service of its mission to preserve the constitutional and statutory rights of gun ownership, CRPA regularly participates as a party or amicus in firearm-related litigation. CRPA has been a party to or amicus in various Second Amendment challenges to firearm restrictions, including the related matters of *Duncan v. Bonta*, Southern District of

1

California Case No. 17-cv-01017 (challenging California's ban on magazines able to hold more than 10 rounds of ammunition) and *Rupp v. Bonta*, Central District of California Case No. 17-cv-00746 (challenging California's ban on firearms statutorily defined as "assault weapons").

Gun Owners of California ("GOC") is a 501(c)(4) not-for-profit entity founded in 1975 to oppose infringements on Second Amendment rights. GOC is dedicated to the unequivocal defense of the Second Amendment and America's extraordinary heritage of firearm ownership. Its advocacy efforts regularly include the participation in Second Amendment litigation, having filed amicus briefs in numerous cases, including cases before the U.S. Supreme Court.

The Second Amendment Defense and Education Coalition ("SADEC") is a nonprofit organization dedicated to the defense of the right to bear arms and, as relating to or affecting the right to bear arms, the rights to free speech and assembly, to be free from unreasonable searches and seizures, and to equal protection of the law. In service of its goals, SADEC supports and participates in litigation that aims to secure and defend the right to bear arms. And it engages in education and outreach efforts to bring awareness to constitutional and civil rights violations—particularly violations of the right to bear arms—and to provide relevant background and legal information in a manner intended to be widely accessible to the public at large.

Guns Save Life ("GSL") is a Second Amendment civil rights organization founded to protect and defend the rights of law-abiding Americans to keep and bear arms, especially for the lawful purpose of self-defense.

Federal Firearms Licensees of Illinois ("FFL-IL") is a 501(c)(4) nonprofit organization that represents the interests of Federal Firearms Licensees throughout Illinois. The organization focuses on issues affecting Illinois FFLs, as well as the impact on the Second Amendment rights of all Illinois gun owners.

Gun Owners Foundation ("GOF") exists to educate the public about the importance of the Second Amendment and to provide legal, expert, and support assistance for law-abiding individuals involved in firearms-related cases. GOF is a 501(c)(3) charitable organization, incorporated in the Commonwealth of Virginia.

Amici GOA, GSL, FFL-IL, and GOF have a particular interest in this matter because they are parties in *Federal Firearms Licensees of Illinois v. Pritzker*, Seventh Circuit No. 23-1828, a similar appeal challenging Illinois's recently enacted ban on firearms statutorily defined as "assault weapons" and magazines able to hold more than 10 rounds of ammunition.

No party or counsel for a party authored any part of this brief, and no person other than amici monetarily contributed to its preparation or submission. All parties have consented to the filing of this brief.

## INTRODUCTION

As explained below, arms that could rapidly fire more than 10 rounds without reloading would by no means have been "unforeseen inventions to the Founders." *Duncan v. Becerra* ("*Duncan IV*"), 970 F.3d 1133, 1147 (9th Cir. 2020) But laws prohibiting their possession surely would have been. Indeed, while there is a long historical tradition of law-abiding citizens possessing such firearms for lawful purposes, there is no similar tradition of government regulation. There were

3

no restrictions on the possession of types of arms that were not "dangerous and unusual" when the Second and Fourteenth Amendments were ratified. Nor were there any restrictions on magazine capacity. Instead, firearm laws during this time largely sought to restrict access to guns by enslaved, Native, and free Black persons, and other marginalized groups.

Indeed, the first laws regulating the possession of certain rapid-fire arms did not come until the Prohibition Era and, even then, they were rare. Although many states and the federal government began regulating fully automatic weapons in the 1920s, only three states and the District of Columbia restricted the firing capacity of semi-automatic firearms—and most of those laws were repealed within a few decades. *Id.* at 1150 & n.10. Such laws are extreme outliers that provide no insight into the original meaning of the Second Amendment. So, contrary to the district court's findings, this handful of proposed analogues comes nowhere near justifying Delaware's modern ban on certain semi-automatic firearms and ammunition magazines able to hold more than 10 rounds ("Regulatory Scheme"). This Court should reverse.

## ARGUMENT

### I.   THE DISTRICT COURT WRONGLY HELD THAT THE REGULATORY SCHEME IMPLICATES "DRAMATIC TECHNOLOGICAL ADVANCEMENTS" AND "UNPRECEDENTED SOCIETAL CONCERNS"

As Appellants' opening briefs aptly show, the Regulatory Scheme bans the possession and acquisition of arms that are "typically possessed for lawful purposes"—conduct that the Constitution protects. Because the challenged law is a flat ban on these arms, this case is simple. *Heller* teaches us that there is no

4

relevant historical tradition of banning arms unless they are "dangerous and unusual." *District of Columbia v. Heller*, 554 U.S. 570, 625-27 (2008). This "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). No further analysis is necessary or required.

At the very least, however, the State must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S. Ct. 2111, 2126, 2130 (2022). The State did not meet this burden in the court below—because it cannot. As Delaware's own evidence demonstrates, no U.S. jurisdiction adopted a flat ban on the possession of any common arm during the Founding or any other potentially relevant period.[1] And even Founding-era bans on "dangerous and unusual weapons" generally restricted only the manner of carrying such arms, not their mere possession.

The district court, however, accepted the State's stretched analogies to such laws on the grounds that the Regulatory Scheme addresses "dramatic technological changes" and "unprecedented societal concerns." App.26-28. This was plain error. Both the technology about which Delaware complains and the societal problems of firearm violence, in general, and mass public killings, more specifically, long predate the Founding. And, of course, *Bruen* instructs that "when a challenged

---

[1] Indeed, the State's earliest evidence of a flat ban on possessing guns of any kind were 20th century bans on the sale or possession of machine guns. For the reasons discussed below, such laws provide no relevant historical justification for modern arms bans.

regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*

### A. The Banned Arms Do Not Represent a Dramatic Advancement in Firearm Technology

Contrary to the popular refrain, the Founders did not ratify the Second Amendment with only single-shot, muzzle-loading muskets in mind. They knew that firearms of the day could discharge multiple rounds quickly and accurately without the need to reload, and they were not ignorant of the potential for such technology to develop and become more popular. *Duncan IV*, 970 F.3d at 1147 ("Semi-automatic and multi-shot firearms were not novel or unforeseen inventions to the Founders."). Repeating firearms that could hold more than 10 rounds of ammunition had developed "at least a century before and during the ratification of the Second Amendment." Declaration of Ashley Hlebinsky in Support of Plaintiffs' Supplemental Brief ("Hlebinsky Decl.") ¶ 20, *Duncan v. Bonta*, No. 17-cv-01017 (S.D. Cal. Dec. 1, 2022), ECF No. 132-1. Indeed, the history of the advancement of firearms technology is marked by persistent innovation aimed at improving speed, firing capacity, accuracy, and functionality—a trend that long pre-dated the Founding and was familiar to our forebears.

"While the concept of a repeating firearm dates to the earliest technology of firearms," Hlebinsky Decl. ¶ 21, *Duncan v. Bonta*, No. 17-cv-01017 (S.D. Cal. Dec. 1, 2022), "the first firearm that could fire more than ten rounds without

reloading was invented around 1580," *Duncan IV*, 970 F.3d at 1147. Contrary to the district court's finding, this technology would not become popular for *military* use until the late 19th century. Instead, a market for repeating firearms commissioned by *civilians* fueled, at least in part, innovation in repeating firearm technology. *Compare* Hlebinsky Decl. ¶ 21, *Duncan v. Bonta*, No. 17-cv-01017 (S.D. Cal. Dec. 1, 2022) (That use of repeaters on the battlefield was not popular until the 19th century "did not mean … that innovation in repeating technology was stymied. In fact, it was quite the opposite. Without the confines of wartime tactics and budget, many repeating firearms were commissioned by civilians who utilized them."), *with* App.26 ("Neither were repeating rifles popular during the Civil War and Reconstruction; during these periods, they were used sparingly as military weapons and were available for civilian acquisition in limited numbers.").

For example, "[b]y the 1630s, a Dutch gun-making family, Kalthoff … began experimenting with a design that allowed up to fifteen shots to be fired in rapid succession." *Id.* ¶ 22. Kalthoff repeating rifles were commercially successful throughout the seventeenth century. Indeed, the Kalthoff system, which used a "tubular magazine located in a pistol's butt or a fowling piece's stock to hold powder and balls," was reproduced and modified for over 150 years. *Id.*

Similarly successful (and "more well-known … to the Founding Fathers," *id.*) were Lorenzoni magazine-fed firearms, which found their way to America as early as the mid-Eighteenth century. David Kopel, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 2197-98 (3d ed. 2021) (citing Harold L. Peterson, *The Treasury of form, …*229, 232 (1962)), *available at*

http://firearmsregulation.org/www/FRRP3d_CH23.pdf (last visited July 7, 2023).[2]
The Lorenzoni system featured "a magazine-fed repeater[] in pistol and rifle
form…. This design was copied and modified by numerous designers after its
invention with various configurations and magazine capacities." Hlebinsky Decl. ¶
22, *Duncan v. Bonta*, No. 17-cv-01017 (S.D. Cal. Dec. 1, 2022).

In 1777, the Continental Congress resolved to order from Joseph Belton, an
inventor and gunsmith, 100 muskets he claimed could "discharge sixteen, or
twenty [rounds], in sixteen, ten, or five seconds."[3] Belton later wrote to Congress
that his musket could "discharge[e] sixteen rounds in less space than a minute, that
shall do execution two hundred yards…." Halbrook, *America's Rifle*, *supra* n. 3, at
106 (quoting, Held, *supra* n. 3, at 37). While the deal fell through after Belton
requested "an extraordinary allowance,"[4] this anecdote shows that the Founders not
only knew such technology existed well before the ratification of the Bill of
Rights, but they also *encouraged* its further development.

By the ratification of the Second Amendment, the Girandoni air rifle, which
Merriweather Lewis famously carried on the Lewis & Clark Expedition, had taken

---

[2] Kopel's opinion that the Kalthoff and Lorenzoni firearms were "successful,"
or a "success," derives from the writings of Harold Peterson, widely considered
one of the leading American arms historians of all time. Wikipedia, Harold L.
Peterson, https://tinyurl.com/haroldlpeterson.

[3] Kopel, et al., *supra* p. 7, at 2206 (quoting Joseph Belton, *Letter to the
Continental Congress* (Apr. 11, 1777), in *Papers of the Continental Congress,
Compiled 1774-1789*, vol. 1 A-B, at 123; 7 Journals of the Continental Congress
1774-1789, at 324 (1907)); *see also* Stephen P. Halbrook, *America's Rifle: The
Case for the AR-15*, at 104 (citing Robert Held, *The Belton Systems, 1758 and
1784-86: Americas' First Repeating Firearms* 40, 77 (1986)).

[4] It has also been alleged that, after the deal fell through, Belton ultimately sold
his repeating firearms to the public. Hlebinsky Decl. ¶ 22, *Duncan v. Bonta*, No.
17-cv-01017 (S.D. Cal. Dec. 1, 2022).

hold as a state-of-the-art repeater. Kopel, et al., *supra* note 2, at 2206. It "could shoot 21 or 22 rounds in .46 or .49 caliber," *id.*; it was "ballistically equal to a powder gun, and powerful enough to take an elk," *id.* The Girandoni air rifle was, in many ways, superior to the musket for use on the expedition. After all, even a well-trained musket user could only fire three rounds per minute—and "[a]fter they had fired their rifles, they were nearly helpless" against man or beast "until they reloaded." Steven Ambrose, *Undaunted Courage* 178 (1996) (buffalo attack while reloading); *see also id.* at 238 (similar); *id.* at 391 (Indian attack while unable to reload); *id.* at 170 (discussing differential rate of fire from rifles versus arrows).

"After the ratification of the Second Amendment, repeating technology continued to evolve as it had for centuries." Hlebinsky Decl. ¶ 30, *Duncan v. Bonta*, No. 17-cv-01017 (S.D. Cal. Dec. 1, 2022). This period of advancement in firearms technology, leading up to the Industrial Revolution, was marked by trial and error. *Id.* Out of this experimentation came the Jennings repeating flintlock, designed in 1821, and capable of firing 12 rounds without reloading. *Id.* (citing Norm Flayderman, *The Flayderman's Guide to Antique American Firearms and Their Values* 683 (9th ed. 2019)).

Another breakthrough came around the time of the Civil War, when new technologies yielded mass-produced rifles that could be fed self-contained metallic cartridges from a fixed magazine. David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849, 854 (2015); *see also* Hlebinsky Decl. ¶ 30, *Duncan v. Bonta*, No. 17-cv-01017 (S.D. Cal. Dec. 1, 2022) (discussing the effect of the "transition of firearms being made by private

9

gunmakers … to factories by the mid-nineteenth century"). Using a lever action, arms like the Henry repeater allowed users to fire as fast as they could operate the lever and pull the trigger—a rate of 28 rounds per minute for the Henry, even when accounting for reloading time. Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 403 (2d ed. 2018).

By the end of the Civil War, "repeating, cartridge-fed firearms" were common, but they were never regulated—let alone banned. *Duncan IV*, 970 F.3d at 1148. And many popular models had magazines that held more than 10 rounds. For example, "the Volcanic Arms lever-action rifle … contained a 30-round tubular magazine" and the Winchester Model 66 "was a full-size lever-action rifle capable of carrying 17 rounds." *Id.* "The Model 66 Winchester was succeeded by the Model 73 and Model 92, combined selling over 1.7 million total copies between 1873 and 1941." *Id.*

The development of these repeating arms occurred around the time the Fourteenth Amendment incorporated the Bill of Rights, and it was the technological advancement most relevant here. From there, the semiautomatic action and detachable box magazine were, while significant, less seminal advancements. Gradual improvements in materials technology in the 20th century did not meaningfully alter the core technology here:

> American firearms development in the twentieth century was primarily about improving the types of guns. [Citation.] Even in the twenty-first century, the archetypical 'modern' gun is something that a consumer could have bought in the late 19th century: a breech-loading semi-automatic pistol using a detachable magazine to fire metal-cased ammunition with smokeless powder.

Kopel, et al., *supra* note 2, at 2200.

In short, the arms Delaware bans are simply the product of the natural and historical evolution of firearms technology. They are the linear descendants of the arms of the founding generation. They are *not* groundbreaking new technology that was unforeseen by our Founding Fathers or their contemporaries. Had a contemporary AR-15 style firearm been available during the Founding, it would have been welcomed—not banned.

But even if it made sense for the district court to ignore hundreds of years of repeating firearm technology and focus myopically on the circulation of semi-automatic long guns after World War I as the district court did, App.26,[5] the first real attempt at restricting the possession of such arms was not enacted until 1989. Halbrook, *America's Rifle*, *supra* n. 3, at 211 (citing Cal. Stats. 1989, ch. 19 (enacting Cal. Penal Code §§ 12275 *et seq.*)). Delaware's ban was not adopted until 2022. And only 10 states and the District of Columbia have such laws on the books even today.[6] It stretches reason to label the development of semi-automatic long guns a "dramatic technological change" that begs for unprecedented

---

[5] The district court lumps fully automatic long guns in with semi-automatic long guns here, App.26—ostensibly so that it can rely on machine gun bans from the Prohibition Era as historical analogues to Delaware's modern ban on semi-automatic long guns. But, for the reasons discussed in section II.B., *infra*, 20th century machine gun laws are not appropriate historical analogues.

[6] *See* Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115; Conn. Gen. Stat. §§ 53-202a—53-202o; Del. Code tit. 11, § 1466(a); DC Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c); Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8; 720 Ill. Comp. Stat. 5/24-1.9, et seq.; Md. Code Ann., Crim. Law §§ 4-301—4-306; Md. Code Ann., Pub. Safety § 5-101(r); Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131M; N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13; N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a); 2023 Wash. Sess. Laws, ch. 162, § 1.

government regulation, when *no state* saw fit to do so for 70 to 100 years after such arms "began to circulate appreciably in society." App.26.

### B.    Mass Public Killing Is Not a New Societal Concern That Could Justify Delaware's Modern Gun Ban

Tragically, mass murder is not some new phenomenon. To the contrary, it has been a fact of life in the United States since the mid-nineteenth century. Declaration of Randolph Roth ¶ 40, *Duncan v. Bonta*, No. 17-cv-01017 (S.D. Cal. Nov. 10, 2022) ("From the 1830s into the early twentieth century, mass killings were common."); *See also*, Benjamin Franklin, *A Narrative of the Late Massacres* (1764), *reprinted in* 4 The Writings of Benjamin Franklin 289-314 (1906). Even the use of firearms to commit mass murder is nothing new. Indeed, there were mass shootings in the United States dating to well before the invention of semiautomatic weapons, including the Wounded Knee Massacre, where soldiers murdered nearly 300 Lakota people in a botched attempt to disarm them.[7]

Yet the district court cites claims that mass public shootings committed with assault weapons and large capacity magazines are on the rise and result in more victims, App.27, suggesting that historical mass killings were not as lethal as the mass public shootings of today. But individual mass murder is neither particularly modern nor dependent on technological advances. Federal Firearms Licensees of Illinois Plaintiffs' Reply to Defendants' Opposition to Motion for Preliminary

---

[7] Myles Hudson, *Wounded Knew Massacre: United States History [1890]*, Britannica, https://www.britannica.com/event/Wounded-Knee-Massacre (last updated Dec. 22, 2022) (fact-checked by the editors of Encyclopedia Britannica).

Injunction Exhibit 1 ("Cramer Decl.") ¶ 48, *FFL-IL v. Pritzker*, No. 23-cv-00209 (S.D. Ill. Mar. 23, 2023), ECF No. 69.

In the similar cases of *Duncan v. Bonta* and *FFL-IL v. Pritzker*, expert historian Clayton Cramer traced the history of mass murder committed by individuals with "primitive weapons" to the late 1600s, collecting incidents like the 1805 murder of a woman and her eight children by her ax-wielding husband, and the 1806 murder by ax of a woman and seven of her children. *Id.* ¶¶ 11-17. *See also* Declaration of Clayton Cramer in Support of Plaintiffs' Supplemental Brief, *Duncan v. Bonta*, No. 17-cv-01017 (S.D. Cal. Dec. 1, 2022), ECF No. 132-7. His testimony also recounts some of the deadliest mass killings—those with dozens of fatalities—committed by a single person. For example, a dynamite explosion killed a "father, mother, and four young children" in 1900. Cramer Decl. ¶ 74, *FFL-IL v. Pritzker*, No. 23-cv-00209 (S.D. Ill. Mar. 23, 2023) (quoting *Whole Family Murdered*, Fair Play 1 (Oct. 20. 1900)). In 1927, the Bath School massacre took the lives of 37 elementary schoolchildren and six adults and injured 44 others. *Id.* ¶ 83. And, as recently as 1990, the Happyland Social Club fire killed 87, leaving only three survivors. *Id.* ¶ 94.

While these massacres often involved the use of explosives or simple arson, such tragedies show that an individual bent on causing maximum suffering does not require (and has never required) sophisticated weapons to do so. It is also the case that arson remains a common method of mass murder in countries where firearms are heavily restricted: "In Australia, an arsonist burned the Childers, Queensland's Palace Backpackers Hostel in 2000, killing 15. The 2011 Quakers

Hill Nursing Home fire killed eleven, …. [And] Japan had several arson mass murders in late 2021, killing 24, 17, and 33 in separate incidents." *Id.*

But even if there were a good reason to call an increase in mass public *shootings* a new societal concern, the State and the district court are engaged in a forbidden interest-balancing and legislative-deference argument. They are essentially arguing that, because our mass shooting (but not mass killing) problem is allegedly worse now than it has been in the past, the State should be given more room to rely on stretched analogies to uphold its otherwise unprecedented law. This Court should reject that invitation. *Bruen* tells us that its examination of historical analogues is not meant to be a way to sneak back in the abrogated interest-balancing tests: Courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry…. Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances…. It is not an invitation to revise that balance through means-end scrutiny." *Bruen*, 142 S. Ct. at 2133, n.7.

What's more, the premise that mass shootings, specifically, are so common today that they rise to the level of an "unprecedented societal concern" does not reflect findings that (even today) such crimes, though horrific, are rare. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1018 (S.D. Cal. 2021) (recognizing that mass shootings are, fortunately, very rare). And mass murders involving the types of firearms Delaware targets for banishment are even rarer. As the district court in *Miller* held, even taking the state's most favorable evidence, "78% of mass shooting events did not involve an assault weapon." *Id.* at 1048 (citing Mark Gius,

*The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*,

Applied Economics Letters (2014), at 1).[8] In fact, "according to a recent study,

*handguns* were the most used type of firearm in mass shootings (32.99% of mass

shootings); rifles were used in only 8.25% of mass shootings." *Id.* (emphasis

added). Even so, *Heller* is clear that, even though handguns are so common in

crime, including mass murder, this is *not* grounds to ban law-abiding citizens from

possessing them for lawful purposes, including self-defense. *See* 554 U.S. at 624-

645. The same is true here as to the semiautomatic firearms Delaware has banned.

## II.    THE RELEVANT HISTORY AND TRADITION DOES NOT JUSTIFY DELAWARE'S MODERN BAN ON PROTECTED SEMIAUTOMATIC FIREARMS AND MAGAZINES

Because this case does not involve either a "dramatic technological change"

or an "unprecedented societal concern," *Bruen*, 142 S. Ct. at 2132, the district

court was wrong to adopt a "more nuanced approach" to analogical inquiry, and to

accept Delaware's citation to marginally relevant historical laws to justify modern

bans on popular semiautomatic firearms and magazines in error. App.29-34. Even

if it were appropriate to give the State some latitude to rely on "relevantly similar"

historical analogues, the Supreme Court's reference to a "more nuanced approach"

is not a "get out of the *Bruen* analysis free" card. Rather, to justify a modern gun

control law, the government must still present an *enduring American tradition of*

*genuine analogues* that are "relevantly similar" to the restrictions it seeks to

---

[8] The evidence in this case is similar. The district court cited the State's claims that "[o]ne analysis, which examined almost two hundred mass shootings across four databases, concluded that assault weapons were used in *nearly a quarter* of the incidents for which the type of weapon could be determined." App.27 (emphasis added).

defend. 142 S. Ct. at 2122. The *Bruen* Court pointed toward at least two metrics:
how and why the regulations" govern facially protected conduct. *Id.* at 2133. All
the State's proposed analogues ignore one or both metrics.

When looking at the "how," this Court should ask whether the challenged
modern law and the proposed historical analogue impose a similar *type* of
restriction, not just a similarly *severe* one. Indeed, the Supreme Court highlighted
the importance of precision when engaged in "analogical reasoning" when it
observed that "'[e]verything is similar in infinite ways to everything else,' [Cass]
Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 711, 774 (1993)], one needs
'some metric enabling the analogizer to assess which similarities are important and
which are not,' [Frederick] Schauer & [Barbara A.] Spellman, *Analogy, Expertise,
and Experience*, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck
and a green hat are relevantly similar if one's metric is 'things that are green.' [*Id.*]
They are not relevantly similar if the applicable metric is 'things you can wear.'"
*Bruen*, 142 S. Ct. at 2132.

When looking at the "why," this Court should consider whether the law is
"comparably justified," mindful that historical laws enacted for one purpose cannot
be used as a pretext to justify a modern law enacted for different reasons. *Id*.
Certainly, "a historical statute cannot earn the title 'analogue' if it is clearly more
distinguishable than it is similar to the thing to which it is compared." *Antonyuk v.
Hochul*, No. 22-0986, 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6,
2022). As discussed below, this is the sort of strained comparison-making on which
the State relies for each of its proposed historical analogues. In banning the sale

16

and possession of common arms, the Regulatory Scheme lacks a single valid analogue. It violates the Second Amendment.

### A. Nineteenth Century Laws Regulating "Dangerous and Unusual Weapons" Are Not "Relevantly Similar" to the State's Modern Ban on Semiautomatic Firearms and Magazines in Common Use for Lawful Purposes

Holding that Appellants had failed to show they were likely to succeed on the merits of their claims, the district court found that Delaware's Regulatory Scheme is "consistent with the Nation's historical tradition of firearm regulation." App.34. The conclusion is not supported by the record or precedent. The State did not cite a *single law* from the Founding Era through the 19th century that banned the possession of commonly owned firearms as the Regulatory Scheme does. Nor could it—because no such laws existed, despite the technological leap that occurred during this period. *See supra*, Part I.A. Even still, the government cited— and the district court relied on—marginally relevant laws that it claims provide historical support to save Delaware's modern ban on common semi-automatic firearms and magazines. Several examples reveal what is wrong with all the State's proposed analogues and the district court's reliance on them.

First, the district court discusses the State's reliance on those laws adopted in the mid- to late-1800s regulating certain sharp instruments (especially "Bowie knives," but also "Arkansas toothpicks," "sword canes," "dirks," and "daggers"), "melee weapons" (including "bludgeons," "billies," "clubs," "slungshots," and "sandbags"), concealed pistols, and other concealed weapons. But as the district court openly recognized, these laws generally targeted only the carrying of such

items, App.29-30, *not the mere acquisition or possession of them for lawful purposes*.

Amici are aware of only *two* laws that restricted the possession of such arms before the end of the Reconstruction era.[9] The older of the two was an 1837 law from Georgia that banned the sale and possession of "Bowie or other kinds of knives," as well as "pistols, dirks, sword-canes, [and] spears." Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838)). Shortly after its adoption, however, the Supreme Court of Georgia held that the entire law (except for one section barring concealed carry) violated the Second Amendment. *Nunn v. State*, 1 Ga. 243 (1846).

What's more, David Kopel, a prolific legal scholar whose work was cited favorably in *Bruen*, recently published a detailed evaluation of Reconstruction-era Bowie knife laws. He concluded:

> ***At the end of the 19th century, no state prohibited possession of Bowie knives***. Two states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes,

---

[9] *See* Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838)); Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index, at 2512 (Vol. 3, 1882), An Act to Prevent the Furtive Possession and use of slungshot and other dangerous weapons, ch. 716, § 1.

> such as Alabama's $100 transfer tax from 1837, had been repealed.
>
> Only a very few statutes had ever attempted to regulate the peaceable possession or carrying of Bowie knives more stringently than handguns or other fighting knives, such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on the books by the end of the century…. As with handguns, ***the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives***…. The much more common approach was to legislate against concealed carry, criminal misuse, or sales to minors.

David B. Kopel, *Bowie Knife Statutes 1837-1899*, The Volokh Conspiracy (Nov. 20, 2022), https://reason.com/volokh/2022/11/20/bowie-knifestatutes-1837-1899/ (double emphasis added).

In short, the State and district court relied on historical laws restricting just the *manner* of carrying arms in public, not their possession or even use. Under the Regulatory Scheme, Delaware does not merely regulate the carry of the subject arms; it bans their mere *possession*, even *in the home* for *self-defense* purposes. "The differences between how and why these laws burden a law-abiding citizen's right to armed self-defense is evident." *Boland v. Bonta*, No. 22-1421, at *14 (S.D. Cal. Mar. 20, 2023) (granting preliminary injunction motion). At best, the State has shown that concealed carry was disfavored in Reconstruction-era America. Yet such evidence was not enough to justify modern-day bans on concealed carry in *Bruen*, and so it is hard to see how such enactments could bear the weight of Delaware's flat ban on the possession of common semiautomatic firearms and magazines here.

Again, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared."

19

*Antonyuk*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20. Historical laws that banned just the carry of certain arms[10] are clearly more distinguishable than they are similar to Delaware's flat ban on the sale and possession of some of the most popular arms in the country. And even though *Bruen* does not impose a "regulatory straitjacket," 142 S. Ct. 2111 at 2133, as its shoddy proposed analogues bear no relevant similarity in either "how" or "why" the regulations operated, the State demanded, and the district court signed, a "regulatory blank check." *Id*. This Court should not cash it.

## B.    The District Court's Reliance on 20th Century Machine Gun Laws Is Unpersuasive and Factually Wrong

The *Bruen* Court gave little weight to laws that long pre-dated the Founding, finding them only relevant where evidence shows that they survived to become the laws of the Founders. 142 S. Ct at 2136 (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)). The Court considered 20th-century history even *less* important, relegating its discussion of the laws of the period to a mere footnote. *Id.* at 2154, n.28. Declining even to consider such evidence, the Court explained that, like laws of the late-19th-century, 20th-century evidence "does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*." *Id.* (emphasis added).

This does not mean the State can rely on any law from the mid-to-late-19th or 20th centuries unless it *conflicts* with an 18th-century law. Rather, the State may only rely on laws enacted after 1868 when they *confirm* our understanding of the

---

[10] None of which applied to rifles. Indeed, the district court cited *no laws* that restricted the sale or possession of popular repeating rifles in the 19th century.

text and 1791 tradition. The *Bruen* analysis supports this reading. To be sure, *Bruen* left open the possibility of using 1800s sources, but only "as mere confirmation of what the Court thought already had been established." 142 S. Ct. at 2137; *see also* 142 S. Ct. at 2163 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.").[11]

Still, the district court inexplicably relied on several machine-gun bans adopted between 1925 and 1933. App.30-34. But as the district court in *Duncan* held, the "machine gun statutes cited by the Attorney General do not stand as proof of long-standing prohibitions on the firing-capacity of Second Amendment-protected commonly possessed firearms." *Duncan v. Becerra* ("*Duncan III*"), 366 F. Supp. 3d 1131, 1152 (S.D. Cal. 2019). Nor do they stand as proof of long-standing prohibitions on the type of popular semiautomatic rifles Delaware bans.

To reiterate, 20th century laws alone cannot establish a historical tradition; they can only confirm what came before. As already discussed, there is no relevant Founding-era or Reconstruction-era tradition of banning arms commonly chosen for lawful purposes. So if any of the 20th-century laws the district court relied on restricted possession of *semiautomatic* firearms (instead of mistakenly equating

---

[11] There is other recent precedent supporting Plaintiffs' interpretation of the Court's use of 19th and 20th century evidence. *See, e.g.*, *Espinoza v. Montana*, __ U.S. __, 140 S. Ct. 2246 (2020) (reviewing 30 state statutes from the second half of the 19th century, the Court held that "[s]uch a development, of course, cannot by itself establish an early American tradition ... such evidence may reinforce an early practice *but cannot create one*.") (emphasis added).

automatic and semiautomatic firearms), these outlier laws would contradict this country's long history of *not* banning classes of arms in common use for lawful purposes. Such 20th-century semiautomatic restrictions thus contradict the relevant historical tradition rather than reaffirm it. Under *Bruen*, that makes them entirely irrelevant to the analysis.

* * * * *

The State did not carry its burden to show that its distinctly modern ban on common semiautomatic firearms and magazines over 10 rounds is part of a broad and enduring American tradition. The district court erred when it ruled otherwise. As Judge Bumatay observed in his dissent from the now reversed Ninth Circuit en banc decision in *Duncan v. Bonta*:

> Not only is California's [large capacity magazine] ban not historically longstanding, but it also ***differs in kind*** from the regulatory measures mentioned in *Heller*. Regulations on possession by people dangerous to society, where a firearm may be carried, and how firearms may be exchanged, *see Heller*, 554 U.S. at 626-27, ***are about the manner or place of use and sale or the condition of the user***. California's ban, on the other hand, is much more like a "prohibition on an entire class of 'arms' that is overwhelmingly chosen by American society" for home defense. *Id.* at 628. Also, like the ban in *Heller*, California's ban extends "to the home, where the need for defense of self, family, and property is most acute." *Id.*

*Duncan V*, 19 F.4th at 1158-59 (Bumatay, J. dissenting) (double emphasis added).

The district court's discussion of comparable burdens and justifications appears to be no more than a thinly veiled use of the now-rejected interest-balancing approach. Of course, the Supreme Court did not expressly reject the interest-balancing approach only to re-adopt it later in the same case. Instead,

22

"[t]he Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. (Citation.) It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen*, 142 U.S. at 2131 (quoting *Heller*, 554 U.S. at 635). Despite its attempts, Delaware cannot rid itself of the responsibility of establishing similar eighteenth or nineteenth century laws, a burden it cannot meet.

## CONCLUSION

For these reasons, as well as those laid out in the Appellants' opening briefs, this Court should reverse the district court's flawed decision and direct the court to grant Appellants motions for a preliminary injunction.

Dated: July 10, 2023                         MICHEL & ASSOCIATES, P.C.


                                            /s/ *Anna M. Barvir*
                                            Anna M. Barvir
                                            Counsel for Amicus Curiae

# CERTIFICATION OF BAR MEMBERSHIP

Under Local Rule 28.3(d), I certify that I am a member in good standing of this Court.

Dated: July 10, 2023                                    **MICHEL & ASSOCIATES, P.C.**

                                                        /s/ *C.D. Michel*
                                                        C.D. Michel
                                                        Counsel for Amicus Curiae

24

## CERTIFICATION OF BAR MEMBERSHIP

Under Local Rule 28.3(d), I certify that I am a member in good standing of this Court.

Dated: July 10, 2023                    **MICHEL & ASSOCIATES, P.C.**

                                        /s/ *Anna M. Barvir*
                                        Anna M. Barvir
                                        Counsel for Amicus Curiae

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6336 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.      As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies supplied to the Court.

4.      The pdf version of the attached document has been scanned for viruses using VirusTotal Antivirus software, and according to that program, the document is free of viruses.

Dated: July 10, 2023                    MICHEL & ASSOCIATES, P.C.


                                        /s/ *Anna M. Barvir* _____ _____
                                        Anna M. Barvir
                                        Counsel for Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on July 10, 2023. Service on all counsel for all parties has been accomplished via ECF.

Dated: July 10, 2023                    MICHEL & ASSOCIATES, P.C.


/s/ *Anna M. Barvir*
Anna M. Barvir
Counsel for Amicus Curiae