No. 23-1633

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC., ET AL.,

*Plaintiffs-Appellants*,

v.

DELAWARE DEPARTMENT OF SAFETY & HOMELAND SECURITY, ET

AL.,

*Defendants-Appellees*,

On Appeal from the United States District Court for the District of Delaware,
Consolidated Case No. 1:22-cv-00951-RGA
The Honorable Richard G. Andrews, United States District Court Judge

## BRIEF OF *AMICI CURIAE*
## GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY
## CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR
## LIVES IN SUPPORT OF DEFENDANTS-APPELLEES

JENNIFER B. LOEB
FRESHFIELDS BRUCKHAUS DERINGER US
LLP
700 13TH STREET, NW, 10TH FLOOR
WASHINGTON, DC 20005
(202) 777-4500

SCOTT A. EISMAN
   *Counsel of Record*
AARON R. MARCU
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
601 LEXINGTON AVE., 31ST FLOOR
NEW YORK, NY 10022
(212) 277-4000
scott.eisman@freshfields.com

*Counsel for Amici Curiae Giffords Law Center to Prevent Gun Violence, Brady
Center to Prevent Gun Violence, and March for Our Lives*

Dated: August 23, 2023

## CORPORATE DISCLOSURE STATEMENT AND NOTIFICATION OF PUBLICLY HELD AFFILIATES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives state that they are non-profit corporations organized under 26 U.S.C. § 501(c)(3), have no parent corporation, do not issue stock, and have no publicly-held affiliates.

/s/ *Scott A. Eisman*
Scott A. Eisman

*Counsel of Record for Amici Curiae*
*Giffords Law Center to Prevent Gun*
*Violence, Brady Center to Prevent Gun*
*Violence, and March for Our Lives*

ii

# TABLE OF CONTENTS

I.    STATEMENT OF IDENTIFICATION ........................................................1

II.   SUMMARY OF ARGUMENT..................................................................2

III.  ARGUMENT............................................................................................3

A.    *Bruen*'s New Second Amendment Test Effectively Requires the Consideration of Empirical Social Science Research. .........................3

B.    Because the Challenged Statutes Address Unprecedented Social and Technological Conditions, *Bruen* Requires a Nuanced Approach. ................................................................................................5

    1.    The Frequency, Lethality, and Geographic Concentration of Premeditated Public Mass Shootings Are Novel Societal Concerns.........................................................5

    2.    The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined. ...............................7

    3.    Advances in Gun Technology Have Combined with These Societal Changes to Create a Perfect Storm for Mass Shootings. .......................................................................9

    4.    *Bruen* Requires Nuance in Analyzing Historical Analogues.................................................................................11

C.    Plaintiffs' Conception of "Common Use" Is Inherently Flawed: Because Neither Challenged Statute Is a Categorical Ban, the Common-Use Standard Does Not Apply. .............................................13

D.    Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment. ..........................................................................................17

    1.    Pistol Grips ..............................................................................22

    2.    Forward Grips...........................................................................23

    3.    Detachable Magazines ..............................................................23

**4.      Grenade Launchers** ...............................................................**24**

**E.      Regulation of LCMs Likewise Does Not Burden the Individual Right to Lawful Self-Defense.** ....................................................**24**

**IV.   CONCLUSION** .........................................................................................**26**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*D.C. v. Heller*,
    554 U.S. 570 (2008)...................................................................*passim*

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021) ...........................................................25

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ....................................................... 22, 24

*Kolbe v. O'Malley*,
    42 F. Supp. 3d 768 (D. Md. 2014) ................................................... 26

*Libertarian Party of Erie Cnty. v. Cuomo*,
    970 F.3d 106 (2d Cir. 2020) ................................................................2

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010)............................................................................2

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    990 F. Supp. 2d 349 (W.D.N.Y. 2013)............................................. 22

*Oregon Firearms Fed'n, Inc. v. Brown*,
    2022 WL 17454829 (D. Or. Dec. 6, 2022)....................................... 18

*Richmond Boro Gun Club, Inc. v. City of New York*,
    97 F.3d 681 (2d Cir.1996) ............................................................... 22

*Rocky Mountain Gun Owners v. Polis*,
    467 P.3d 314 (Colo. 2020)................................................................26

*State v. Misch*,
    214 Vt. 309 (Vt. 2021)..................................................................... 26

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019)............................................................... 25

**Statutes**

11 *Del. C.* §§ 1464-1467 ("Assault Weapons Statute") ...................................*passim*

11 *Del. C.* §§ 1441, 1468-1469A ("LCM Statute")..........................................*passim*

**Other Authorities**

Adam Lankford, *Confirmation That the United States Has Six Times Its Global Share of Public Mass Shooters, Courtesy of Lott and Moody's Data*, 16 Econ J. Watch 1, 73-77 (Mar. 2019), https://tinyurl.com/5c8xpuv9 ...................................................................6

AR15.com, "*What is your Par time for an AR-15 emergency reload?*," (Nov. 22, 2010) https://tinyurl.com/3csjs7kd ...................................... 10

Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, WASH. POST (May 9, 2021), https://tinyurl.com/537ww9z4 ................................................................ 6

Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. Trauma & Acute Care Surgery 11, 12 (2019) ........................................................................ 25

Chris Baker, *How Much Ammo Capacity Is Enough?*, Lucky Gunner (Sep. 2, 2016), https://tinyurl.com/47kz2tsh ...................................... 19

Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, WASH. POST (Feb. 15, 2018), https://wapo.st/2TARTva ................................................................ 25

Christopher Ingraham, *What 'Arms' Looked Like When The* 2nd *Amendment Was Written*, WASH. POST (June 13, 2016), https://tinyurl.com/mu5ety64 ....................................................... 10

Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM ........................... 18

Dan Alex*, Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye........................ 11

Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC NEWS (May 29, 2022), https://tinyurl.com/27hr2p2w ............................................................ 21

Dep't of the Army, *Rifle Marksmanship M16A1, M16A2/3, M16A4, and Carbine*, §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px ........................ 19

Dep't of the Army, *TC 3-22.9 Rifle and Carbine Manual*, §§ 8-19–20 (May 2016), https://tinyurl.com/2p963dxd .......................................... 11

*Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, House Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed ............................................................ 21

Educ. Fund to Stop Gun Violence, *Assault Weapons and Large Capacity Magazines*, https://tinyurl.com/yjmaba4k .................................... 22, 23

Erin Grinshteyn and David Hemenway, *Violent death rates in the US compared to those of the other high-income countries, 2015*, 130 Nursing and Health Professions Faculty Research and Publications 1 (2019), https://tinyurl.com/zb7phedb ................................................ 6

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t ......................................................... 11

Fla. Dep't of L. Enf't, *Marjory Stoneman Douglas High School Public Safety Commission Report* at 34 (Jan. 2, 2019), https://tinyurl.com/mvs34fky .............................................................. 25

Gun Violence Archive 2023, Gun Violence Archive (Aug. 22, 2023), https://tinyurl.com/5t4rrt56 .............................................................. 6

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe .......................................................... 20

Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa ....................... 8

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, MINUTEMAN REVIEW (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.............................................................. 10

Joshua Horwitz, *Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence (Sept. 2003)............................ 22, 23

Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9 ............................................ 18

Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017*, 109 AJPH 1754, 1755 (2019)............ 24, 25

Maria Hammack, *A Brief History of Mass Shootings*, BEHIND THE TOWER (2016), https://tinyurl.com/yc85z9pn....................................... 5

Mark Berman and Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, WASH. POST (Mar. 27, 2023), https://tinyurl.com/dkzjskxs ............................................. 11

Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc .................................................. 7

Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b .................................... 20

NECKBONE ARMORY, *Are Ar-15 Magazines Interchangeable? Which Ones Are*, https://tinyurl.com/hppuzpb2........................................... 10

Newcastle University National Civil War Centre, *Meet a Musketeer*, https://tinyurl.com/heehyjnk ................................................... 10

Off. of the N.Y. State Att'y Gen., *Investigative Report on the role of online platforms in the tragic mass shooting in Buffalo on May 14, 2022,* (Oct. 18, 2022) .................................................................. 8

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization,* Ch.3 in *Social Media and Democracy*, CAMBRIDGE UNIV. PRESS (Aug. 24, 2020), https://tinyurl.com/bdds6wf9 .............................. 7

*Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23 .............................................. 6

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths,* 80 J. Trauma & Acute Care Surgery 6, 856 (2016)................................................................... 10, 20

Pop Culture: 1800, U.S. Census Bureau (Dec. 9, 2022),
https://tinyurl.com/78cxvafx................................................................. 9

Sam Bocetta, *The Complete History of the AR-15 Rifle*, Small Wars J.
(July 12, 2017), https://tinyurl.com/2jwemryz ................................19

Sam Petulla*, Here is 1 Correlation Between State Gun Laws and Mass
Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27 ........................25

Sara Swann, *The history of the AR-15 and how it became a symbol of
American gun culture,* Poynter (June 29, 2022),
https://tinyurl.com/5bffkafr................................................................ 19

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED
(June 17, 2016), https://tinyurl.com/5d5prxmt................................... 21

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which
Version of the Past Will the Supreme Court Choose in NYSRPA v.
Bruen?,* 49 Hastings Const. L.Q. 145, 168-69 (2022),
https://tinyurl.com/zx2dvsmc ............................................................ 12

Scott Pelley, *What makes the AR-15 style rifle the weapon of choice
for mass shooters?*, CBS (June 23, 2019),
https://tinyurl.com/3y97wn33.............................................................10

Terry Gross, *How the AR-15 became the bestselling rifle in the U.S.*,
NPR (Apr. 20, 2023) https://tinyurl.com/3ak32wvp .........................19

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass
Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018),
https://tinyurl.com/4nedm6fa.........................................................19, 21

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn
after New York attack,* Reuters (May 15, 2022),
https://tinyurl.com/bdzbf8us .............................................................. 8

UBERTI USA, 1866 Yellowboy Rifle History,
https://tinyurl.com/3x2wjth3.............................................................. 11

Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes
Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk ....................9

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494 (May 13, 2022), https://tinyurl.com/yc3fer46 ..............................................................13

Winchester Gun Store, *Winchester Model 1866 Short 38 Special Lever Action Rifle*, https://tinyurl.com/yc3cv2zc ........................................................ 11

x

# I.    STATEMENT OF IDENTIFICATION[1]

*Amici Curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), Brady Center to Prevent Gun Violence ("Brady"), and March for Our Lives ("MFOL") (together, "*Amici*") respectfully submit this Brief in Support of Defendants-Appellees Delaware Department of Safety and Homeland Security, et al., urging affirmance.

Giffords Law Center is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.

Brady is the Nation's longest-standing non-partisan, nonprofit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.

MFOL is a youth-led nonprofit organization dedicated to promoting civic engagement, education and direct action by youth to achieve sensible gun violence prevention policies that will save lives.

 Through partnerships with researchers, public health experts, and community organizations, *Amici* conduct research for, draft, and defend laws, policies, and programs proven to reduce gun violence. *Amici* also advocate for the interests of gun

---

[1] In accordance with Fed. R. App. P. 29(a)(2), all parties have consented to this filing. In accordance with Fed. R. App. P. 29(a)(4)(E), no party's counsel authored any part of this brief, and no one other than *amici* contributed to its preparation or submission.

owners and law enforcement officials who understand that Second Amendment rights are (and have always been) consistent with gun-safety legislation and community violence prevention. Giffords Law Center, Brady, and MFOL have filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations,[2] and courts have cited the organizations' research and expertise.[3]

## II.    SUMMARY OF ARGUMENT

The Delaware Statutes regulating assault weapons, 11 Del. C. §§ 1464-1467 ("HB 450" or the "Assault Weapons Statute"), and large-capacity magazines ("LCMs"), 11 Del. C. §§ 1441, 1468-1469A (the "LCM Statute") (together the "Challenged Statutes") are constitutional under the new test in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* instructs that when a law regulates conduct covered by the plain text of the Second Amendment, courts reviewing the law's constitutionality must determine if the "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The Challenged Statutes are constitutional because they are relevantly similar to

---

[2] *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).

[3] *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont,* No. 22-CV-1118, 2023 WL 4975979, at *12 (D. Conn. Aug. 3, 2023); *Rupp v. Becerra,* 401 F. Supp. 3d 978, 990 (C.D. Cal. 2019); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. AG N.J.,* 910 F.3d 106, 121-22 (3d Cir. 2018); *Md. Shall Issue v. Hogan,* 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel v. Sessions,* 879 F.3d 198, 208 (6th Cir. 2018); *Peruta v. Cnty. of San Diego,* 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring). Giffords Law Center filed the latter two briefs under its former name Law Center to Prevent Gun Violence.

historical regulations that were designed to address pressing public safety concerns of the time. When considering the unprecedented social and technological conditions addressed by the Challenged Statutes, *Bruen* requires a "nuanced approach" to the analogical inquiry to avoid creating a "regulatory straitjacket." 142 S. Ct. at 2132–33.

The weapons and features governed by the Challenged Statutes are also uniquely dangerous, not useful for self-defense or commonly used that way, and, therefore, not covered by the plain text of the Second Amendment. These weapons are designed to kill large numbers of people quickly, making them significantly more lethal than any firearms in the 1700s or 1800s.

Finally, Plaintiffs' version of the common use test is inherently flawed and should be rejected.

## III.    ARGUMENT

### A.    *Bruen*'s New Second Amendment Test Effectively Requires the Consideration of Empirical Social Science Research.

In *Bruen*, the Supreme Court articulated a new standard for determining whether a regulation is unconstitutional under the Second Amendment. Under *Bruen*, the party challenging a law bears the initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text. The burden then shifts to the government to demonstrate that the regulation is "consistent with this Nation's historical tradition" of firearms regulation. 142 S. Ct. at 2135. For the

government to meet that burden, it need not show that the modern regulation is the "twin" of a historical regulation. *Id.* at 2132. Indeed, the Court recognized that while it is "relatively simple" to analogize modern regulations to "historical" ones in some cases, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* The Court also identified two important—but non-exclusive—considerations for lower courts to use: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphases added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant social science research on the prevailing conditions in modern and historical American society. Such empirical research helps courts contextualize modern and historical laws and the prevailing social backdrop against which those laws were passed, as *Bruen* requires.

*Bruen*'s analysis of historical analogues thus demands that gun-safety regulations be viewed in light of relevant prevailing societal conditions, and social science research provides indispensable evidence of these conditions.

**B.    Because the Challenged Statutes Address Unprecedented Social and Technological Conditions, *Bruen* Requires a Nuanced Approach.**

Over the past 200 years, unprecedented societal changes and advances in firearms technology have caused a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated the Challenged Statutes, which like many regulations spanning our Nation's history, were designed to protect the public. *See* 11 Del. C. § 1464 ("The General Assembly hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this State."); *see also* Delaware Br. 3 (explaining motivations).

**1.    The Frequency, Lethality, and Geographic Concentration of Premeditated Public Mass Shootings Are Novel Societal Concerns.**

The United States has experienced a recent, exponential increase in the frequency of public mass shootings. *Amici* could find only two instances of mass shootings in America throughout all of the 18th and 19th centuries,[4] both in 1891 and neither of which involved fatalities (likely given the limitations of gun technology at the time).[5] One scholar estimates that 25 mass shootings occurred

---

[4] As used here, a "mass shooting" is a shooting in which four or more people (other than the perpetrator(s)) are injured and/or killed, where victims are selected indiscriminately, and where the shootings are not attributable to any other underlying criminal activity or circumstance.

[5] *See* Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn.

between 1900 and 1965.[6] By contrast, sources report over 600 mass shootings *per year* in each of the last three years (610 in 2020, 690 in 2021, and 646 in 2022).[7] So far this year, 461 mass shootings have occurred in the United States,[8] an average of nearly 2 per day.

This societal threat is remarkable not just because of its swift rise to epidemic proportions in the United States, but also because of the disproportionately high rate of mass shootings in the United States relative to the rest of the world. At least one comprehensive study has found that between 1998 and 2012, the United States experienced 29.7% of all mass shootings globally, but accounted for just 4.5% of the world's population.[9] This disparity is even starker when measured by gun-related fatalities: in 2015, "[t]he overall firearm death rate was 11.4 times higher in the US than in other high-income countries," and "83.7% of all firearm deaths, 91.6% of women killed by guns, and 96.7% of all children aged 0-4 years killed by guns were from the US."[10]

---

[6] *See* Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, WASH. POST (May 9, 2021), https://tinyurl.com/537ww9z4.

[7] *See Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23.

[8] *See* Gun Violence Archive 2023, Gun Violence Archive (Aug. 22, 2023), https://tinyurl.com/5t4rrt56.

[9] *See* Adam Lankford, *Confirmation That the United States Has Six Times Its Global Share of Public Mass Shooters, Courtesy of Lott and Moody's Data*, 16 Econ J. Watch 1, 73−77 (Mar. 2019), https://tinyurl.com/5c8xpuv9.

[10] *See* Erin Grinshteyn and David Hemenway, *Violent death rates in the US compared to those of the other high-income countries, 2015*, 130 Nursing and Health Professions Faculty Research and Publications 1, 2 (2019), https://tinyurl.com/zb7phedb.

Together, these figures demonstrate that mass shootings are strikingly more prevalent in modern-day America than at any other time in history or in any other comparable place in the world.

### 2. The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined.

Several modern social phenomena coincided with a surge in mass shootings over the 21st century, making gun violence prevention especially imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

#### a. *Social Media*

Social media platforms create a means of communication that is faster, farther-reaching, and more difficult to regulate than anything the Founders could have imagined. Numerous studies correlate social media with increases in anti-social behavior; mental-health disorders; political, religious, and social extremism; and ultimately, mass shootings. Social media plays an important role in the radicalization of American extremists;[11] mounting evidence shows that content-ranking algorithms limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify biases.[12]

---

[11] *See, e.g.* Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc.

[12] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Ch.3 in *Social Media and Democracy*, CAMBRIDGE UNIV. PRESS (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

Amid such violent and frenetic discourse, many perpetrators of mass shootings have been inspired by what they read online. One example (of far too many) is the May 2022 Tops Buffalo shooting, in which the 18-year-old gunman published a racist manifesto online before broadcasting the shooting live on social media.[13] The New York Attorney General reported that the gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social media] website a brief clip of a [previous] mass shooting."[14] The shooter also posted material on a different social media platform, Discord, "with the explicit goal of provoking future mass shootings."[15] A *Reuters* article observed that the shooting "appear[ed] to be the latest in a line of 'copycat' gunmen carrying out deadlier mass shootings inspired by previous attackers."[16] Even more recently, on May 7, 2023, another mass shooter killed eight people in Allen, Texas, after seemingly being influenced by content on social media.[17]

  b.    *Urbanization*

Urbanization has also radically transformed society since the Founders' era.

---

[13] *See* Off. of the N.Y. State Att'y Gen., *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022* (Oct. 18, 2022).

[14] *Id*. at 3.

[15] *Id.* at 15.

[16] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.

[17] Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.

In 1800, the United States averaged 6.1 people per square mile.[18] By 2020, the population had increased by a staggering 1500% to an average of 93 per square mile.[19]

This explosion in population density has profoundly changed how people associate. People gather in large groups more frequently than they could have before urbanization and mass industrialization, including in schools that accommodate thousands of students, tightly packed commuter trains and buses, large office buildings, and crowded night clubs, concerts, movie theaters, malls, and parades. These gatherings create "sitting duck" situations in which mass shooters can efficiently injure or kill large numbers of people in a single event. The Las Vegas concert shooting lasted only 11 minutes but killed 58 concertgoers and injured nearly 1,000 others.[20]

### 3.   Advances in Gun Technology Have Combined with These Societal Changes to Create a Perfect Storm for Mass Shootings.

Against the backdrop of these societal changes, advances in gun technology allow even an inexperienced shooter to kill vastly more people more quickly than

---

[18] Pop Culture: 1800, U.S. Census Bureau (Dec. 9, 2022), https://tinyurl.com/78cxvafx.

[19] Because these figures are an average of the population density of all areas of the country, the much lower density in rural areas means that the numbers understate the impact of population density in urban areas, where most mass shootings occur.

[20] Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk.

ever before.

Modern firearms far surpass their Founding-era counterparts. The typical Revolutionary-era musket (i) could hold just one round at a time; (ii) had a maximum accurate range of 55 yards; (iii) had a muzzle velocity of roughly 1,000 feet per second; and (iv) took a "skilled shooter" half a minute to load a single shot.[21] By contrast, a typical AR-15 rifle (i) can hold 30 rounds[22] (30 times more); (ii) can shoot accurately from around 400 yards[23] (7 times as far); (iii) attains a muzzle velocity of around 3,251 feet per second[24] (over 3 times faster); and (iv) can be reloaded with full magazines in as little as 3 seconds.[25] Thus, a shooter wielding an AR-15 is massively more lethal than one with a Revolutionary-era musket.[26]

Even the most advanced firearms of the Civil War era were a far cry from modern weapons such as an AR-15 rifle. For example, the 1866 Winchester rifle had

---

[21] Christopher Ingraham, *What 'Arms' Looked Like When The 2nd Amendment Was Written*, WASH. POST (June 13, 2016), https://tinyurl.com/mu5ety64. "Muzzle velocity" is the speed of a projectile when leaving the muzzle of a gun, and is a general measure of the power and lethality of a firearm. Newcastle University National Civil War Centre, *Meet a Musketeer*, https://tinyurl.com/heehyjnk.

[22] AR-15 rifles use the same magazines as M16 rifles, which come in a standard size of 30 rounds. *See* NECKBONE ARMORY, *Are Ar-15 Magazines Interchangeable? Which Ones Are*, https://tinyurl.com/hppuzpb2. *See also*, Ingraham, *supra* note 21.

[23] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, MINUTEMAN REVIEW (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.

[24] Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. Trauma & Acute Care Surgery 6, 856 (2016).

[25] AR15.com, "What is your Par time for an AR-15 emergency reload?" (Nov. 22, 2010) https://tinyurl.com/3csjs7kd

[26] Scott Pelley, *What makes the AR-15 style rifle the weapon of choice for mass shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33.

a magazine capacity of 11 to 15 rounds,[27] a maximum effective range of approximately 100 yards (one-fourth of an AR-15 rifle), and a muzzle velocity of 1,100 feet per second (one-third of an AR-15 rifle),[28] and it could fire only 10 shots per minute.[29] Using a semiautomatic assault rifle, a shooter can fire 40 rounds in as little as nine seconds.[30] This meets the U.S. Army definition for "rapid semiautomatic fire."[31]

Increased firepower, coupled with advanced ballistics,[32] have made modern firearms far more deadly and fundamentally different from their historical predecessors. Current events too frequently illustrate how, with modern technology, a lone individual can commit mass murder in minutes. The ratifiers of the Second Amendment could not have imagined such rapid, indiscriminate carnage.

### 4.    *Bruen* Requires Nuance in Analyzing Historical Analogues.

In the Challenged Statutes, the Delaware legislature contended with realities

---

[27]    Winchester Gun Store, *Winchester Model 1866 Short 38 Special Lever Action Rifle*, https://tinyurl.com/yc3cv2zc; Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.

[28]    *Id.*

[29]    UBERTI USA, 1866 Yellowboy Rifle History, https://tinyurl.com/3x2wjth3 ("The gun's . . . rate of 10 or more shots per minute was a game changer.").

[30]    *See* Mark Berman and Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, WASH. POST (Mar. 27, 2023), https://tinyurl.com/dkzjskxs.

[31]    Headquarters, Department of the Army, *TC 3-22.9 Rifle and Carbine Manual*, §§ 8-19–20 (2016), https://tinyurl.com/2p963dxd.

[32]    *See, e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t.

that legislatures of the past did not, namely the increase in mass shootings, shifts in our society, and advances in gun technology. These drastic societal and technological changes require this Court, under *Bruen,* to employ a nuanced analysis when comparing the "hows" and "whys" of the Challenged Statutes with those of historical laws.

The motivation behind the Challenged Statutes—their ("why")—is to promote public safety. *See supra* Section III(B); *see also* Delaware Br. 3 (explaining motivations). Many (if not all) gun regulations at the Founding and throughout our history had the same motivation: to protect the public from deadly harm.[33] Thus, there is a strong and easily discernable link between the past and present "whys."

To analogize present and past "hows," the Court must determine whether the Challenged Statutes impose a "burden on the right of armed self-defense" that is "comparable" to that imposed by historical laws. *Bruen*, 142 S. Ct. at 2133. The Delaware legislature—like prior lawmakers—chose to restrict the use and sale of specific especially dangerous firearms and accessories to protect public safety, and it has done so without restricting access to the modern-day quintessential self-defense weapon. Employing *Bruen*'s nuanced approach, *id*. at 2132, the Court should conclude that the Challenged Statutes are relevantly similar to many

---

[33] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168-69 (2022), https://tinyurl.com/zx2dvsmc; *see also* Delaware Br. 46-58.

historical weapons regulations, and are thus consistent with our Nation's tradition of firearm regulation.

### C.    Plaintiffs' Conception of "Common Use" Is Inherently Flawed: Because Neither Challenged Statute Is a Categorical Ban, the Common-Use Standard Does Not Apply.

Plaintiffs argue that the Challenged Statutes constitute an "outright ban" on "entire classes of arms that are currently commonly possessed" and thus "fail[] under the *Heller* test confirmed in *Bruen* and violate[] the Second Amendment." Opening Brief of Appellants Delaware State Sportsmen's Association, et al., Dkt. No. 20-1 ("DSSA Brief").[34]

Preliminarily, Plaintiffs (and the District Court) are incorrect that the arms and magazines covered by the Challenged Statutes are in common use such that they are presumptively entitled to Second Amendment protection. Plaintiffs assert they are in common use because millions of individuals "have owned an AR-15 or similarly styled rifle" and "magazines that hold over 10 rounds." *Id.* at 11 n.7. For support, however, Plaintiffs cite only an unpublished, non-peer-reviewed summary of an online survey. *Id.* (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2 (May 13, 2022) ("English Survey"),

---

[34] *See also* Brief of Gabriel Gray et al. No. 23-1634 Dkt. No. 28 ("Gray Brief") at 15, ("*Heller* and *Bruen* precisely determine the limits of the Government's authority, 'consistent with the Nation's historical tradition of firearm regulation,' to enact 'a complete prohibition' on a type of firearm.").

https://tinyurl.com/yc3fer46). The summary acknowledges that actual ownership numbers are likely lower than stated because the survey asked whether respondents had "ever owned" such a rifle or magazine, *English Survey* at 22, 33, and its estimate thus does not account for transfer of ownership, such as resale, *id.* at 33. This highlights just one fallacy in Plaintiffs' use of historical ownership statistics to define "common use": the argument necessarily assumes that every individual who has ever owned these guns still owns them, actively uses them, and uses them only for lawful purposes. Using ownership statistics covering many decades to define "common use" also ignores the additional requirement that such weapons must be in common use for *lawful self-defense*. *See Bruen*, 142 S. Ct. at 2132 (amendment protects only "instruments that facilitate armed self-defense").

Nor do Plaintiffs compare the Challenged Statutes with the regulation at issue in *Heller* or provide any other support to justify their claim that the Challenged Statutes constitute an absolute, categorical ban. They could not do so. Delaware's Assault Weapons Statute does not ban possession of all "rifles" or "semi-automatic rifles." The statute regulates an enumerated, narrowly tailored list of semiautomatic rifles and semiautomatic pistols and an enumerated, narrowly tailored list of firearm features that pose a specific threat to society. Plaintiffs themselves confirm this point: they describe the Assault Weapons Statute as covering "enumerated semi-automatic assault long guns," "specifically identified semi-automatic assault

pistols,"[35] specific "models" of semiautomatic rifles, and certain "enumerated features."[36]

The LCM Statute likewise does not constitute a categorical ban. Even if the Court assumes that magazines are "arms", the LCM Statute does not ban magazines generally, just those "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 Del. C. § 1468(2). Rather, LCMs, as defined by the statute at issue, are non-essential firearm accessories.[37] The LCM statute, which simply requires an individual to reload their weapon after discharging 16 rounds of ammunition,[38] is a far cry from a "prohibition of an entire class of 'arms.'" *Heller*, 554 U.S. at 628;[39] *see also, e.g., S.F. Veteran Pol'y Officers Ass'n v. City & County of San Francisco*, 18 F. Supp. 3d 997, 1003 (N.D. Cal. 2014) (LCM ban was not "a total ban on all magazines" but instead "a total ban only on magazines

---

[35] Gray Br. at 4.

[36] DSSA Br. at 3 n.1.

[37] Gun retailers also make this distinction. *See, e.g., Gun Accessories for Sale*, Impact Guns, https://www.impactguns.com/high-capacity-magazines/?in_stock=1 ("In addition to being one of the largest online providers of firearms and ammunition, Impact Guns has a massive selection of gun accessories online as well. […] From gun cleaning materials to extended and high-capacity magazines, the products we carry will enhance your shooting and hunting experience in one way or another.").

[38] *See* Christopher S. Koper, *Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms*. 19 Criminology and Public Policy 147 (2020) ("LCM restrictions do not ban all firearms capable of accepting LCMs, but they do limit the capacity of the ammunition magazines that can be sold for these weapons . . . Although offenders blocked from access to AWs and LCMs can commit crimes with other guns and smaller magazines, the logic underlying [LCM] laws is that forcing this substitution should limit the number of shots fired in gun attacks.").

[39] *See* Delaware Br. at 61–62.

holding more than ten rounds," allowing citizens "to carry or keep . . . more magazines" as "a backup"). The LCM Statute further "exempts many of the same individuals as [the Assault Weapons Statute], along with individuals who have a valid concealed carry permit."[40] The LCM Statute thus restricts only a specified type of magazine for specific groups of people, rather than imposing a blanket ban on an entire class of arms.

The District Court thus correctly ruled that the Assault Weapons Statute "is not a categorical ban" because "the 'assault long guns' it prohibits are specifically enumerated." Plaintiffs-Appellants appendix ("Appendix"), 33. By limiting only a narrow category of firearms, the Challenged Statutes accord with *Heller*'s recognition that the Second Amendment right "is not unlimited" and had never been "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. That statute thus stands in contrast to the one the Court invalidated in *Heller*—a total ban on handgun possession in the home that "amount[ed] to a prohibition of an entire class of 'arms.'" *Id.* at 628.

Plaintiffs misunderstand this distinction between an absolute ban and a narrowly tailored regulation. They do not even try to show how the Challenged Statutes would constitute a "prohibition of an entire class of arms" as described in *Heller. Id.* Instead, Plaintiffs reason that, because the "the arms banned by the

---

[40] App. 11 (citing 11 Del. C. § 1469(c)); *see also* Del. Br. At 5.

[Challenged Statutes] are in common use," the Challenged Statutes "cannot be consistent with the Nation's historical tradition of firearms regulation and cannot stand."[41]

Yet even if this were an accurate interpretation of the law, it would be irrelevant here because the Challenged Statutes regulate specific, enumerated especially dangerous firearms, features, and accessories posing a threat to society. They do not constitute a complete ban on an entire class of weapons.[42]

### D. Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.

The Supreme Court has held that the Second Amendment right to bear "arms" protects the right of law-abiding, responsible citizens to possess a handgun—the "quintessential self-defense weapon"—inside and outside the home for self-defense. *Heller*, 554 U.S. at 629; *Bruen*, 142 S. Ct. at 2119. The Court cautioned, however, that the Second Amendment should not be understood to bestow a right to keep and carry any weapon, in any manner, for any purpose. Instead, it endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual

---

[41] DSSA Br. 13; *see also* Gray Br. 15-16 (stating that a government can "enact a complete prohibition" only if "the banned arms are not 'the sorts of weapons . . . in common use at the time'" (quoting *Heller*, 554 U.S. at 627)).

[42] *See* Delaware Br. 23 ("Numerous guns of all types, including handguns, shotguns, and long guns—including semi-automatic versions—are permitted by the Statutes. Likewise, many magazines—including magazines capable of holding substantial amounts of ammunition—remain unaffected.")

weapons.'" *Heller*, 554 U.S. at 626-27.[43]

In contrast, empirical research demonstrates that the ability to fire more than ten rounds without reloading (*e.g.*, through use of an LCM) does not aid in self-defense. For example, the National Rifle Association's Armed Citizen database shows that, in more than 700 self-defense incidents, *less than one half of one percent* involved more than ten rounds of ammunition. *See Oregon Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *10 (D. Or. Dec.6, 2022). Other sources confirm that the average number of shots fired by civilians in self-defense is only about two.[44] That figure aligns with FBI statistics, which suggest that "the average gunfight includes three rounds fired."[45] Lucky Gunner, an online retailer providing (self-proclaimed) "reliable shooting advice for regular people" has reported that "[i]n the overwhelming majority of the incidents where an armed civilian fires a shot in self-defense, probably 70 to 90% of them are able to resolve the situation within 3 or 4 rounds, and usually closer to one or two rounds," with only occasional instances of "5 to 8 rounds."[46] These statistics show that law-abiding citizens thus do not find

---

[43] *Bruen* makes clear that many regulations implicating Second Amendment rights will survive scrutiny. *See Bruen*, 142 S. Ct. at 2133–34.

[44] *See* Claude Werner, *The Armed Citizen - A Five Year Analysis*, GUNS SAVE LIVES (Mar. 12, 2012), tinyurl.com/bdemd7ya (average of 2.2 defensive shots fired per incident from 1997–2001); Decl. of Lucy P. Allen ¶ 17, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*, 2018 WL 4688345 (D.N.J. Sept. 28, 2018) (average of 2.34 shots fired per incident in 2011-2017).

[45] Kevin Michalowski, *The Statistically Perfect Gunfight*, USCCA (Feb. 25, 2019), https://tinyurl.com/3upbexr9.

[46] Further, Lucky Gunner states that "a small, five-shot revolver should be more than enough to take care

themselves in situations where they need to defend against a large group of people at long range such that assault weapons would be necessary or useful to the right to self-defense.

The Assault Weapon Statute thus fits neatly within the historical tradition of prohibiting "dangerous and unusual weapons". It regulates only a narrow subset of assault rifles with features that turn them into dangerous military-style firearms best suited to offensive use. The AR-15, for example, traces its origins to a military-grade rifle designed in the late 1950s.[47] It is the AR-15's "phenomenal lethality" that has made versions of it the U.S. military's standard-issue assault rifle since the Vietnam War.[48] Besides lacking automatic-fire capability,[49] the AR-15 is functionally the same as the M16, an automatic weapon designed for military combat.[50] The AR-15's and M16's gas-impingement system specifically appealed to the military—an innovation that redirects some of the energy from a fired bullet to reload the next

---

of the problem in all but the most extreme cases." Chris Baker, *How Much Ammo Capacity Is Enough?*, Lucky Gunner (Sep. 2, 2016), https://tinyurl.com/47kz2tsh.

[47] *See* Sam Bocetta, *The Complete History of the AR-15 Rifle*, Small Wars J. (July 12, 2017), https://tinyurl.com/2jwemryz; Sara Swann, *The History of the AR-15 and How It Became a Symbol of American Gun Culture*, Poynter (June 29, 2022), https://tinyurl.com/5bffkafr.

[48] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.

[49] Just because the AR-15 does not fire automatically does not make it appropriate for civilian use. The U.S. Army Field Manual instructs soldiers that *semi*automatic fire is "[t]he most important firing technique during modern, fast moving combat," emphasizing that it is "surprising how devastatingly accurate rapid [semiautomatic] fire can be." Dep't of the Army, *Rifle Marksmanship M16A1, M16A2/3, M16A4, and Carbine* §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px.

[50] Terry Gross, *How the AR-15 became the bestselling rifle in the U.S.*, NPR (Apr. 20, 2023) https://tinyurl.com/3ak32wvp.

bullet in order to reduce recoil and make it easier for a gunman to maintain aim, increasing accuracy.[51] Another assault weapon regulated by the Challenged Statutes, the AK-47, 11 Del. C. § 1465(2)(b), was created to match an assault rifle developed and used by Germany in World War II[52] and was designed to (and still does) "enable swift and effective battlefield attacks."[53] Indeed, virtually all of the world's armies use assault rifles that are variants of the AR-15 and AK-47.[54]

Assault weapons are exponentially more lethal than any firearms available during the ratification of the Second or Fourteenth Amendments or throughout most of our Nation's history. *See supra* p. 9-11. When traveling through the body, bullets fired from semiautomatic rifles cause "cavitation," whereby a swath of tissue several inches from the bullet's path ripples away from the bullet and then settles back, creating a large cavity.[55] Bullets need not hit an artery to cause catastrophic bleeding.[56] Exit wounds can be the size of oranges.[57] Underscoring the carnage that assault-rifle fire wreaks, Peter Rhee, a trauma surgeon at the University of Arizona,

---

[51] *Id.*

[52] *See* Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b.

[53] Delaware Br. 35.

[54] *Id.*

[55] See Heather Sher, What I Saw Treating the Victims from Parkland Should Change the Debate on Guns, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe (explaining the difference between injuries inflicted by semiautomatic rifles versus handguns).

[56] *Id.*

[57] *Id.*

has explained that wounds inflicted by a semiautomatic rifle "look[] like a grenade went off in there," whereas wounds inflicted by a 9mm handgun "look[] like a bad knife cut."[58]

The effects of assault weapons are particularly devastating in mass shootings involving child victims. Roy Guerrero, a pediatrician in Uvalde, Texas, recalled victims with "[o]pen chest wounds," "war wounds," wounds akin to "decapitation," "as if things exploded once the bullets hit the bodies."[59] In his congressional testimony, Dr. Guerrero recalled seeing children "whose bodies had been so pulverized, decapitated by the bullets fired at them, over and over again, whose flesh had been so ripped apart, that the only clue as to their identities were the blood-spattered cartoon clothes still clinging to them."[60]

Delaware's Assault Weapons Statute regulates specific features of "copycat guns"—including (1) pistol grips, (2) forward grips, (3) detachable magazines, and (4) grenade launchers[61]—that make them more like machine guns and thus increase their lethality, placing them far outside the category of "quintessential self-defense

---

[58] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt; *see also* Dickinson, *supra* note 48 (quoting the Navy trauma surgeon who operated on Congresswoman Gabrielle Giffords as saying that while handgun wounds are comparable to "stabbing with a bullet," shooting someone with an AR-15 is "as if you shot somebody with a Coke can").

[59] Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC NEWS (May 29, 2022), https://tinyurl.com/27hr2p2w.

[60] *Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, House Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed.

[61] 11 Del. C. § 1465(6).

weapons" at issue in *Heller*. "The very features that qualify [these] firearm[s] as . . . banned assault weapon[s] . . . 'serve specific, combat-functional ends'" that citizens would not require for ordinary self-defense. *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017).

### 1.    Pistol Grips[62]

Pistol grips alter the way a weapon functions in practice and increases its lethality, especially during prolonged episodes of rapid fire. By allowing the shooter to place the shooting hand beneath the gun, the shooter can exert leverage on the gun with both hands and maintain greater control and aim during rapid, prolonged firing.[63] Pistol grips also enable a shooter to shoot from the hip instead of the shoulder, something that is useless for hunting or self-defense, but that allows a shooter to spray fire into a crowd. *See Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685 (2d Cir. 1996) ("[P]istol grips are designed to make [] spray firing from the hip particularly easy."); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 370 (W.D.N.Y. 2013) (same), *aff'd in part, rev'd in part*, 804 F.3d 242 (2d Cir. 2015).

---

[62] 11 Del. C. § 1465 (6)(a)(3).

[63] *See* Joshua Horwitz, Educ. Fund to Stop Gun Violence, *Killing Machines: The Case for Banning Assault Weapons* 9 (2003), https://tinyurl.com/44wx7k36.

### 2.     Forward Grips[64]

Forward pistol grips (such as those found on AR-15 rifles) are located in front of the trigger and are meant to be used by the shooter's non-shooting hand. Forward grips give shooters "enhanced control" by allowing a shooter to place the non-shooting hand underneath the barrel of the gun, which grants more leverage and control during episodes of rapid firing.[65] The enhanced control and aim increase the weapon's lethality, especially during prolonged episodes of rapid fire.[66]

### 3.     Detachable Magazines[67]

Detachable magazines equip firearms with a drastically higher ammunition capacity because the number of rounds a detachable magazine can hold is not limited by the size of the gun.[68] Detachable magazines can hold as many as one hundred rounds without having to reload.[69] They also allow shooters to replace an empty magazine with a pre-loaded, full magazine in a few seconds, with little practice.[70] When combined with other features listed in the Challenged Statutes, 11 Del. C. § 1465 (6); 11 Del. C. §§ 1441, 1468-1469A, detachable magazines thus render

---

[64] 11 Del. C. § 1465 (6)(a)(3).

[65] *See* Horwitz, *supra* note 63.

[66] *Id*.

[67] 11 Del. C. § 1465 (6)(c).

[68]*See* Educ. Fund to Stop Gun Violence, *Assault Weapons and Large Capacity Magazines*, https://tinyurl.com/yjmaba4k.

[69] *Id*.

[70] *See id*.

weapons uniquely dangerous. They are especially lethal when used in combination with firearms that have "features that allow [for] enhanced control while firing multiple rounds."[71]

### 4.    Grenade Launchers[72]

Grenade launchers change the function of semiautomatic rifles and render them more deadly—in ways unthinkable in the civilian context—by allowing the user to launch grenades, which are obviously irrelevant to lawful self-defense.

\* \* \*

The regulated assault rifles and weapons with the regulated features are uniquely dangerous and unusual weapons. They are not the "quintessential self-defense weapons" that the Second Amendment protects.

### E.    Regulation of LCMs Likewise Does Not Burden the Individual Right to Lawful Self-Defense.

"Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings."[73] Indeed, LCMs are designed to perpetrate devastation on a massive scale by enhancing an already especially dangerous firearm's ability to fire more than ten rounds in rapid succession without

---

[71] *Id.*

[72] 11 Del. C. § 1465 (6)(a)(5).

[73] Klarevas et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 1990-2017, 109 AJPH 1754, 1755 (2019). LCMs are also considered especially useful in military applications, allowing gunmen "to hit multiple human targets very rapidly," *Kolbe*, 849 F.3d at 137 (4th Cir. 2017).

the need to reload. LCMs thus increase the lethality of attacks by eliminating the critical pause during which the gunman would have to reload and his targets could escape or disarm him.[74] For this reason, states that have restricted access to LCMs—usually defined with a 10-round limit[75]—experience 63% fewer mass shootings than states that do not.[76] At the national level, mass-shooting fatalities were 70% less likely to occur during the ten years that federal law banned LCMs than in other years.[77] After Congress allowed the ban to lapse, high-fatality mass shootings increased by 183%; deaths from such shootings increased by 239%.[78]

Numerous federal and state courts have found no evidence that firing more than 10 bullets without the need to reload is necessary or even beneficial for self-defense. *See, e.g.*, *Duncan v. Bonta,* 19 F.4th 1087, 1105 (9th Cir. 2021) (observing that "as in other cases," the record offered no indication that "the added benefit of a[n] [LCM]—being able to fire more than ten bullets in rapid succession—has *ever* been realized in self-defense in the home"); *Worman v. Healey*, 922 F.3d

---

[74] During the 2018 shooting in Parkland, Florida, the shooter's 13-second pause to reload a new magazine enabled a teacher and ten students to flee. Fla. Dep't of L. Enf't, *Marjory Stoneman Douglas High School Public Safety Commission Report* at 34 (2019), tinyurl.com/mvs34fky.

[75] Delaware's LCM Statute is considerably more lenient than most, allowing magazines that hold up to 17 rounds. 11 Del. C. § 1468 (2)(a).

[76] Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN (Oct. 5, 2017), https://tinyurl.com/bddjjm27.

[77] Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. Trauma & Acute Care Surgery 11, 12 (2019).

[78] Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, WASH. POST (Feb. 15, 2018), https://wapo.st/2TARTva (citing Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016)).

26, 37 ("[N]ot one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired."); *Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, 2023 WL 4541027, at *12 (D. Or. July 14, 2023) ("[I]t is exceedingly rare (far less than 1 percent) for an individual to fire more than ten shots in self-defense."); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 787 (D. Md. 2014) *aff'd* 849 F.3d 114 (4th Cir. 2017)*; State v. Misch*, 214 Vt. 309, 356 (2021); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020); *see also* Def.'s Proposed Findings of Fact & Conclusions of Law ¶¶ 127-128, *Ass'n of N.J. Rifle & Pistol Clubs*, 2018 WL 5724371 (noting testimony by a veteran firearms instructor "that it would be unwise for an untrained civilian to use a firearm with an LCM in self-defense because . . . [u]ntrained civilians are not likely to be good shots").

As these authorities show, the Challenged Statutes do not impose a burden on an individual's right to possess a firearm for lawful self-defense. LCMs are not used or useful in self-defense.

## IV.   CONCLUSION

Because the Challenged Statutes are constitutional, the Court should reject Plaintiff-Appellants' appeal and affirm the decision of the district court.

Dated: August 23, 2023   Respectfully submitted,

*/s/ Scott A. Eisman*
Scott A. Eisman
 *Counsel of Record*
Aaron R. Marcu
Brandt Henslee
Daniel Hodgkinson
Taylor Jachman
Freshfields Bruckhaus Deringer US LLP
601 Lexington Ave., 31st Floor
New York, NY 10022
Tel: (212) 277-4000
scott.eisman@freshfields.com
aaron.marcu@freshfields.com
brandt.henslee@freshfields.com
daniel.hodgkinson@freshfields.com
taylor.jachman@freshfields.com

Jennifer B. Loeb
Freshfields Bruckhaus Deringer US LLP
700 13th St. NW, 10th Floor
Washington, DC 20005
Tel: (202) 777-4500
jennifer.loeb@freshfields.com

*Counsel for Amici Curiae*
*Giffords Law Center to Prevent Gun Violence,*
*Brady Center to Prevent Gun Violence, and*
*March for Our Lives*

## COMBINED CERTIFICATIONS OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,183 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font in the body of the brief and 11-point Times New Roman font in the footnotes and is double-spaced except for footnotes.

3.    As required by 3d Cir. L.A.R. 31.1(c), I certify that the text of the electronic brief is identical to the text in the paper copies of the brief. The brief was scanned for viruses using Trellis McAfee and Microsoft Defender and no viruses were detected.

4.    As required by 3d Cir. L.A.R. 28.3(d), I certify that I am admitted to practice before the U.S. Court of Appeals for the Third Circuit and am in good standing.

Dated: August 23, 2023           */s/ Scott A. Eisman*
                                 Scott A. Eisman

                                 *Counsel of Record for Amici Curiae*
                                 *Giffords Law Center, Brady, and March for*
                                 *Our Lives*

## CERTIFICATE OF SERVICE

I certify that, on August 23, 2023, a true and correct copy of the foregoing Brief of Amici Curiae in Support of Defendants-Appellees was filed with the Clerk of the United States Court of Appeals for the Third Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

I also certify that seven (7) identical paper copies of the foregoing shall be filed with the Office of the Clerk, United States Court of Appeals for the Third Circuit, within 5 days of the date of electronic filing of the Brief.


Dated: August 23, 2023                    */s/ Scott A. Eisman*
                                          Scott A. Eisman

                                          *Counsel of Record for Amici Curiae*
                                          *Giffords Law Center, Brady, and March for*
                                          *Our Lives*