No. 23-1641

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC., ET AL.,

Plaintiffs-Appellants,

v.

DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY, ET AL.,

Defendants-Appellees.

Appeal from a Judgment of the United States District Court
for the District of Delaware (Andrews, J.)
Dist. Ct. No. 1:22-cv-00951-RGA

# REPLY BRIEF OF APPELLANTS DELAWARE STATE SPORTSMEN'S ASSOCIATION, ET AL.

Francis G.X. Pileggi, Esquire
Alexander MacMullan, Esquire
LEWIS BRISBOIS
    BISGAARD & SMITH LLP
500 Delaware Ave., Suite 700
Wilmington, DE 19801
302-985-6000
Francis.Pileggi@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com

September 20, 2023

# **TABLE OF CONTENTS**

<div align="right">Tab</div>

I.   INTRODUCTION.................................................................................1

II.  APPELLANTS' ARGUMENTS IN THE DISTRICT COURT AND A
THOROUGH REVIEW OF *HELLER* AND *BRUEN* DEMONSTRATE
THEY DID NOT WAIVE ANY ARGUMENTS PRESENTED ON
APPEAL.............................................................................................3

     1.   Appellants Have Consistently Objected to the Legal Conclusions
Drawn from the State's Purported Analogues Because they Ignore
*Heller* and *Bruen* ......................................................................3

     2.   Appellants Have Consistently Objected to the State and The District
Court's "Relevantly Similar" Analysis Because it Ignores *Heller*
and *Bruen*...................................................................................12

     3.   Appellants Have Consistently Objected to the State's and the
District Court's Invocation of "Dramatic Technological Changes"
and "Unprecedented Societal Concerns" Because it Ignores *Heller*
and *Bruen*...................................................................................17

III. APPELLANTS HAVE DEMONSTRATED IRREPARABLE HARM
AND THE STATE'S ARGUMENT TO THE CONTRARY IS AN
EFFORT TO TREAT APPELLANTS' SECOND AMENDMENT
RIGHTS AS SECOND-CLASS RIGHTS.......................................20

IV. CONCLUSION ...............................................................................25

# TABLE OF AUTHORITIES

<u>**Citations**</u>                                                                                  <u>Tab</u>

*A.H. by & through Hester v. French*,
 985 F.3d 165 (2d Cir. 2021)..............................................................................21

*Baird v. Bonta*,
 No. 23-15016, 2023 WL 576334 (9th Cir. Sept. 7, 2023) ..............................21

*Caetano v. Mass.*,
 577 U.S. 411 (2016) (Alito, J. concurring) ..........................................11, 16, 22

*Chestnut Hill Sound, Inc. v. Apple Inc.*,
 2015 U.S. Dist. LEXIS 150715 (D. Del. Nov. 6, 2015) ..................................22

*Del. State Sportsmen's Ass'n v. Garvin*,
 2020 Del. Super. LEXIS 2927 (Del. Super. 2020) ..................................passim

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ..................................................................................passim

*Fraser v. ATF*,
 3:22-cv-00410-REP (E.D.V.A., August 30, 2023) ..........................................21

*Hardaway v. Nigrelli*,
 2022 U.S. Dist. LEXIS 200813, 2022 WL 16646220
 (W.D.N.Y. Nov. 3, 2022)..................................................................................22

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
 49 F.3d 1551 (Fed. Cir. 1995)..........................................................................22

*Koons v. Reynolds*,
 2023 U.S. Dist. LEXIS 3293 (D.N.J. Jan. 9, 2023) ........................................21

*NAGR, et al. v. Grisham*,
 1:23-cv-00771-DHU-LF (D.N.M. September 13, 2023)..................................21

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 142 S. Ct. 2111 (2022) ..............................................................................passim

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
2021 U.S. S. Ct. Briefs, LEXIS 2793 ......................................................passim

*New York State Rifle & Pistol Ass'n, Inc. v. Corlett*,
2021 U.S. S. Ct. Briefs, LEXIS 361................................................................6

*Nat'l Ass'n for Gun Rights v. City of Naperville*,
143 S. Ct. 2489 (2023) (Order) .....................................................................23

*Nunn v. State*,
1 Ga. 243 (1846)..............................................................................................7

*S. Camden Citizens in Action v. New Jersey Dep't of Env't Prot.*,
274 F.3d 771 (3d Cir. 2001)...........................................................................18

*Spencer v. Nigrelli*,
2022 U.S. Dist. LEXIS 233341, 2022 WL 17985966
(W.D.N.Y. Dec. 29, 2022) ..............................................................................21

## Constitutional Provisions

U.S. Const. amend. II.....................................................................................passim

## Statutes

Ga. Code § 4413 (1861).........................................................................................5

Mass. Rev. Stat., ch. 134, §16 (1836)....................................................................8

1860 Terr. of N.M. Laws §§ 1-2 p. 94....................................................................5

## Other Authorities

David Kopel, *The legal history of bans on firearms and Bowie knives
before 1900* (Nov. 20, 2022) The Volokh Conspiracy (Nov. 20, 2022),
https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-
and-bowie-knives-before-1900/ .........................................................................7

129525972.3

iii

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* at 155
(2022) ...............................................................................................8

Stephen Halbrook, *Second Amendment Roundup: Upholding Oregon's
Magazine Ban* (July 25, 2023) The Volokh Conspiracy,
https://reason.com/volokh/2023/07/25/second-amendment-roundup-
upholding-oregons-magazine-ban/..................................................16

William English, 2021 *National Firearms Survey: Updated Analysis
Including Types of Firearms Owned* (May 13, 2022) Georgetown
McDonough School of Business Research Paper No. 4109494,
available at https://ssrn.com/abstract=4109494 or
http://dx.doi.org/10.2139/ssrn.4109494.............................12, 15, 16

## I.    INTRODUCTION

Appellants addressed the flaws of the State's self-professed experts, upon whom the district court's opinion relied, but the State would have this Court avoid the substantive issues to be decided and not address the merits of this appeal based on the State's mischaracterization of the record on appeal.

Appellants did not object to the district court's consideration of the State's misguided expert declarations for whatever weight they could bear—which Appellants argued was none. Nonetheless, the district court relied on the falsehoods presented in those declarations.

Appellants denounced before the district court the factual and legal conclusions in the flawed expert declarations the State and the district court rely on. (SA0915-0916, SA0938, SA0949). Appellants opposed in the district court the expert declarations based on the decisions of the Supreme Court of the United States in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (SA0911, SA0949).

The State's Regulatory Scheme banning arms in common use by law-abiding persons for lawful purposes cannot be consistent with the Nation's historical tradition of firearms regulation because, as the Supreme Court explained, if a firearm is in common use, then banning it is contrary to the Nation's historical tradition of firearms regulation. *Bruen*, 142 S. Ct. at 2128 (holding it is "'fairly supported by the

historical tradition of prohibiting the carrying of dangerous and unusual weapons'
that the Second Amendment protects the possession and use of weapons that are 'in
common use at the time.'"); *see also Heller*, 554 U.S. at 625 (holding a law, by
definition, cannot fit into the Nation's historical tradition of restricting "dangerous
and unusual" weapons if it bans "possession and use of weapons that are 'in common
use.'")

The district court, to its credit, did acknowledge that arms banned under the
Regulatory Scheme as so-called "assault rifles" and "large-capacity magazines" are
in "common use" because they are not "dangerous *and unusual*," (App. 20, 22-23),
but contrary to *Heller* and *Bruen*, still upheld the State's Regulatory Scheme.

As a result, the district court erred by refusing to follow Supreme Court
precedent holding that the government may not "prohibit…an entire class of 'arms'
that is overwhelmingly chosen by American society for [a] lawful purpose," *Heller*,
554 U.S. at 626, 628. Appellants renew their arguments about how the *Heller* and
*Bruen* decisions already rejected the debunked arguments that the district court
relied on for its holding.

**II.    APPELLANTS' ARGUMENTS IN THE DISTRICT COURT AND A THOROUGH REVIEW OF *HELLER* AND *BRUEN* DEMONSTRATE THEY DID NOT WAIVE ANY ARGUMENTS PRESENTED ON APPEAL**

    **1.    Appellants Have Consistently Objected to the Legal Conclusions Drawn from the State's Purported Analogues Because they Ignore *Heller* and *Bruen***

Appellants have consistently challenged the Regulatory Scheme on the basis that it bans an "entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose," and that the purported analogues the State suggests cannot justify the Regulatory Scheme. This is because *Heller* and *Bruen* did the historical review required to make this determination and held, as stated in Appellants' briefing in the district court, that there is no tradition of banning merely dangerous arms—just a tradition of banning "dangerous *and* unusual" arms. *See Bruen*, 142 S. Ct. at 2128 (emphasis added); *see also* (SA0913). Appellants reinforced this point at oral argument in the district court during an inquiry from Judge Andrews:

> THE COURT: … To the extent I get into historical regulation, I don't have to go out and do my own independent history. I can rely -- I can basically take whatever it is that the parties give me, which at this point is the Defendant has given me stuff, and you haven't. Right?
>
> MR. LEHMAN: Right.
>
> THE COURT: Okay. Thank you, Mr. Lehman. It's all been very helpful.

MR. LEHMAN: Just as a slight followup to answer your question, if you were to do that, you could essentially just, you know, reread *Bruen* for that purpose, because they undertook the entire task of going back through the historical record and in the context of banning arms determining, you know, how it should be valued.

(SA 0975:12-0976:5)

The district court and the State chose not to examine the historical review provided in the *Heller* and *Bruen* cases. The district court should have recognized that the parties who failed to convince the Supreme Court to uphold the regulatory schemes struck down in *Heller* and *Bruen* presented much of the same ill-suited "history and tradition" and impermissible interest-balancing arguments that the State uses and the district court adopted in this matter.

Reviewing the historical undertaking performed by the Supreme Court in the *Heller* and *Bruen* decisions is essential in this matter because the State's purported analogues and arguments are retreads of arguments and analogues that were rejected in *Heller* and *Bruen*. A prominent example the district court could have considered in order to realize the State is merely repackaging old, failed arguments and analogues is found in Justice Breyer's dissent in *Bruen*.

Justice Breyer, in vain, relied on arguments from the State of New York and its *amici*, based on the same inapplicable antebellum carry regulations governing bowie knives and dirk swords that the district court adopted in its opinion in this

matter. But the Supreme Court rejected those false analogues in *Bruen*, that Justice Breyer advanced as follows:

> For example, Georgia made it unlawful to carry, "unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence." Ga. Code §4413 (1861).

*Bruen*, 142 S. Ct. 2111, 2186 (2022) (Breyer, J., dissenting). Justice Breyer lost that argument.

The majority rejected these types of regulations, relied on by the State's experts and the district court because, unlike the Regulatory Scheme, they did not ban possession in the home or open carry.

Justice Breyer also cited territorial laws:

> And the Territory of New Mexico appears to have banned all carriage whatsoever of "any class of pistols whatever," as well as "bowie kni[ves,] . . . Arkansas toothpick[s], Spanish dagger[s], slung-shot[s], or any other deadly weapon." 1860 Terr. of N. M. Laws §§1-2, p. 94.

*Id.*

But the majority rejected the relevance of the laws of territories, in part because they were transitory regulations and because the territories had not yet been admitted to the Union. *See Bruen*, 142 S. Ct. at 2154-56.

129525972.3

5

The majority in *Bruen* addressed these sorts of irrelevant historical regulations,[1] albeit without itemizing the "bowie knife" or "slungshot" by name. The district court made these non-analogous concealed carry regulations central to its decision but did not acknowledge the key distinction that the Supreme Court explained as the reason those regulations are not analogous:

> *Statutory Prohibitions.* In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. But the antebellum state-court decisions upholding them evince a consensus view that States could not altogether prohibit the public carry of arms protected by the Second Amendment or state analogues.

*Bruen*, 142 S. Ct. at 2120.

The New Mexico Territory regulation quoted above was included in the declaration of the State's expert, Robert Spitzer, as part of his misguided compilation of regulations used to justify the Regulatory Scheme in this matter. (App. 509).

Spitzer also relied on a Georgia law restricting the rights of black Americans, which this court should not rely on due to that law's racist intent. (App. 474). The

---

[1] The State of New York's briefing and the amicus brief of Brady in support of the State of New York in *Bruen* failed to understand that the multitude of antebellum concealed carry restrictions they relied on did not ban possession in the home, nor did they ban both concealed carry and open carry. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 2021 U.S. S. Ct. Briefs, LEXIS 2793 *25-*37; *New York State Rifle & Pistol Ass'n, Inc. v. Corlett*, 2021 U.S. S. Ct. Briefs, LEXIS 361 *31.

129525972.3

district court nonetheless accepted these regulations as "relevantly similar," contrary to the historical survey already done in *Bruen*.[2]

The district court also failed to heed *Bruen's* caution against treating surety laws as analogous. Spitzer's hodgepodge of a compilation contained many such "restrictions," notwithstanding *Bruen's* determination that they are irrelevant in the context of a ban on common arms. In explaining why surety laws were misplaced in the context of modern, absolute bans of a long list of firearms, as in the Regulatory Scheme, the *Bruen* majority stated:

> *Surety Statutes*. In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.

*Bruen*, 142 S. Ct. at 2148.

---

[2] The State also does not acknowledge that the 1861 Georgia law followed the Georgia Supreme Court's decision in *Nunn v. State*, 1 Ga. 243 (1846), that struck down a far more wide-ranging 1837 Georgia ban on arms, including outright possession and sale, including bowie knives, as unconstitutional. In fact, Spitzer's declaration lists the 1837 Georgia law without reference to the *Nunn* decision, and despite the fact that the *Nunn* decision was cited favorably in *Heller*. *See* David Kopel, *The legal history of bans on firearms and Bowie knives before 1900*, The Volokh Conspiracy (Nov. 20, 2022), https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/.

One example cited by Spitzer and wrongly treated as analogous by the district court is a Massachusetts law from 1836. (App. 492). But, this exact law was addressed by the majority in *Bruen*:

> Contrary to respondents' position, these 'reasonable-cause laws' in no way represented the 'direct precursor' to the proper-cause requirement. While New York presumes that individuals have *no* public carry right without a showing of heightened need, the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836).

*Id.*

The *Bruen* majority cast even more doubt on the relevance, or analogous status, of such surety laws in concluding that there is little evidence they were ever actually enforced except when motivated by racism[3]:

> Besides, respondents offer little evidence that authorities ever enforced surety laws. The only recorded case that we know of involved a justice of the peace *declining* to require a surety, even when the complainant

---

[3] The racist history of gun control laws, highlighted in Appellants' briefing throughout this case, e.g., (App. 474, citing an 1860 Georgia law restricting the concealed carry rights of freed slaves, App. 496, citing a 1799 Mississippi law preventing "Negros or mulattos" from keeping or carrying any gun, powder, shot club or weapon), has not been a deterrent to the State or Spitzer. Spitzer's many citations to antebellum laws directed at denying the Second Amendment rights of freed slaves are abhorrent. In contrast to these racist laws, during the Civil Rights Movement of the 1960's, semiautomatic rifles helped black organizers survive racist violence. Mississippi Delta activist Hartman Turnbow halted a firebomb attack on his home with his semiautomatic rifle….One county over, activist Leola Blackman repelled Klansmen who set a cross afire in her yard, also using a semiautomatic rifle. Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* at 155 (2022).

alleged that the arms-bearer 'did threaten to beat, wou[n]d, mai[m], and kill' him. And one scholar who canvassed 19th-century newspapers—which routinely reported on local judicial matters—found only a handful of other examples in Massachusetts and the District of Columbia, all involving black defendants who may have been targeted for selective or pretextual enforcement. That is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry.

*Bruen*, 142 S. Ct. at 2149 (internal citations omitted).

The district court's adoption of the State's ill-fitting analogues in the context of the Regulatory Scheme should be stricken for more reasons: those ill-fitting analogues are less applicable than those presented and rejected in *Bruen*. In *Bruen*, banning carry of a firearm outside of the home was at issue. But the Regulatory Scheme goes further and seeks to "prohibit…an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose," and seeks to do so both outside and *inside* the home. *Heller*, 554 U.S. at 628.

Given *Heller*'s finding that the need for armed self-defense is "most acute" in the home, the State and the district court's adoption of already-failed analogues that ban possession of arms in the home is particularly wrongheaded. *Heller,* 554 U.S. at 628–29 ("The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to 'keep' and use for protection of

9

one's home and family,' would fail constitutional muster.") (internal citations omitted).

To be sure, the examples of the State's proposed analogues provided above are not cherry-picked examples that just so happen to have been directly addressed in *Bruen*. The State has not provided one single pre-20th Century outright ban of any arm. And the only post-20th Century example provided was the machine gun, which the Supreme Court has established does not change the analysis here.

Machine guns are automatic firearms. They are not semiautomatic. They are banned because they are "dangerous *and* unusual" and, therefore are not in common use by law-abiding citizens for lawful purposes.[4]

---

[4] The ban on machine guns, as automatic weapons, is not at issue and is not challenged in this appeal. Appellees go to great lengths to highlight the existence of "176,000 legal civilian-owned machine guns in the United States" in an exaggerated effort to warn of supposed implications on existing law of the already established common-use analysis in determining Second Amendment protection. Review of the history of *Heller* and *Bruen* is informative. At oral argument in *Heller*, Justice Scalia, author of the majority opinion, quite succinctly put this issue to rest:

> JUSTICE SCALIA: -- .....And I don't know -- I don't know that a lot of people have machine guns or armor-piercing bullets. I think that's quite unusual. But having a pistol is not unusual.

> MR. DELLINGER: The number of machine guns, I believe, is in excess of a hundred thousand that are out there now, that are –

> JUSTICE SCALIA: How many people in the country?

> MR. DELLINGER: Well, there are 300 million, but whether that's common or not, but the –

> JUSTICE SCALIA: I don't think it's common.

The State in another case unsuccessfully conflated banned machine guns with semiautomatic arms in common use—and was corrected by a Delaware court decision that the State did not appeal. The Appellees were rebuffed by the Delaware Superior Court which rightly recognized the outcome-determinative distinction between automatic and seimautomatic firearms, and rejected the State's arguments that they should be treated the same. *Del. State Sportsmen's Ass'n v. Garvin*, 2020 Del. Super. LEXIS 2927, *13-14 (Del. Super. 2020).

The State in offering, and the district court in accepting, these rejected arguments, have treated this case as if the historical analysis in *Heller* and *Bruen* never occurred. They have also substituted the careful analysis found in *Heller* and *Bruen* with a new and less-logical approach. This approach eschews the carefully defined contours of the Nation's historical tradition of protecting the pre-existing right to bear common arms and sloppily aggregates conditional regulations with little to no bearing on the right of the people to bear arms.

---

*See* Transcript of oral argument, *District of Columbia v. Heller*, 554 U.S. 570 (2008), March 18, 2008. (https://www.supremecourt.gov/pdfs/transcripts/2007/07-290.pdf)

Notably, whereas sales and possession of the common arms banned by the Regulatory Scheme have continued to skyrocket since *Heller*, the figures cited by the State regarding machine guns are effectively the same as those presented at oral argument in *Heller* in 2008. Regardless, the banned arms in common use at issue in this matter far exceed the machine guns the State references and the stun guns referenced in *Caetano v. Mass.*, 577 U.S. 411, 420 (2016) (Alito, J., concurring), so the State's point is a distraction from the issue to be decided.

129525972.3

## 2. Appellants Have Consistently Objected to the State and the District Court's "Relevantly Similar" Analysis Because it Ignores *Heller* and *Bruen*

The State has not carried its burden to identify "relevantly similar" analogues because it has not shown how the regulations on which it relies are "relevantly similar." In its briefing below, the State merely repeated one generic, conclusory sentence: "Throughout its history, this Nation has consistently regulated weapons." (SA0086). It did the same in its Opposition on appeal: "The district court properly found that throughout its history, this Nation has consistently regulated weapons." (Opp. p. 46). That misses the mark.

Contrary to *Heller's* and *Bruen's* holdings that the Nation's tradition does not support the prohibition of "an entire class of arms that is overwhelmingly chosen by American society for [a] lawful purpose,"[5] *Heller,* 554 U.S. at 628, the State has responded by simply stating that there are, and have been, some regulations on firearms. This is the equivalent of arguing that restrictions on jaywalking show a

---

[5] About 24.6 million individuals have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total). William English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022) Georgetown McDonough School of Business Research Paper No. 4109494, available at https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494. About 39 million individuals have owned magazines that hold over 10 rounds (up to 542 million such magazines in total). William English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), *supra*.

historical tradition that would justify widespread restrictions on freedom of movement without due process.

The district court made a slightly more comprehensive but still unpersuasive effort to address why the purported analogues are "relevantly similar." Its rationale, utilizing the declarations provided by the State that opined on the "suitability" of the banned common arms, ignores the holdings of *Heller* and *Bruen* just as the State's arguments do.

In addressing why these concealed carry and surety laws for seldom-used arms such as bowie knives and slungshots are "relevantly similar" to the Regulatory Scheme's ban on arms overwhelmingly chosen by Delawareans for self-defense and other lawful purposes, the district court determined that the analogues imposed "comparable burdens" to the Regulatory Scheme. The district court felt that both the analogues and the Regulatory Scheme imposed "slight" burdens on the right to self-defense on the basis of the State's unsupported argument that the arms banned by the Regulatory Scheme were "unnecessary" for self-defense. (App. 33). This is wrong on at least two accounts. First, the fundamental rights codified by the Second Amendment are not limited to self-defense. And second, the people get to choose what arms are suitable for self-defense. *Heller,* 554 U.S. at 628.

First, *Heller* made clear that self-defense is just one important part of citizens' Second Amendment right. *Heller*, 554 U.S. at 624 (holding that at the founding the

right was codified in order to articulate the right of citizens to bear arms for *lawful purposes like self-defense*). The district court and the State entirely missed this distinction.

Second, *Heller* left no doubt that the *right* to bear arms for a lawful purpose, including self-defense, is the right of the people to choose what is useful, and whatever reason they have for that choice is good enough:

> It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Heller*, 554 U.S. at 629.

*Heller* recognized that the people have the right to choose the arms that they use to defend themselves or for other lawful purposes. *Id*. But the State continues to make the same arguments on suitability that failed in *Bruen*. For example, in *Bruen* the Violence Policy Center argued that semiautomatic rifles were more suitable for self-defense than handguns in an amicus curiae brief in support of the State of New York:

> A number of the *amici* that have filed briefs in support of Petitioners tout the importance of "self-defense" and the purported value that carrying a concealed weapon has in furthering that interest. Such claims, however, fail to recognize the general ineffectiveness of handguns for self-defense purposes. Handguns are in fact the *least* effective firearm for self-defense for all but a small group of individuals, such as police officers, who are well trained and maintain their skills with regular and intensive practice. Many of the features that make handguns particularly lethal also render them less effective in situations requiring a gun owner to fend off an attacker. Numerous studies have confirmed that handgun owners who attempt to use a handgun for self-defense put their own safety and the safety of others in jeopardy.

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 2021 U.S. S. Ct. Briefs, LEXIS 2784 *27-*28. That argument carried no water in *Bruen*. It also failed in *Heller*. 554 U.S. at 629 ("whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.").[6] Likewise in this case the State cannot supplant the people's choices.

What's more, and while no specific reason for their choice of commonly used arms is necessary to justify that choice, in their district court pleadings, Appellants have enumerated many reasons why they choose to utilize the commonly used arms banned by the Regulatory Scheme for self-defense and other lawful purposes. For

---

[6] Of the 24.6 million individuals who have owned an AR-15 or similarly styled rifle that are largely banned by the Regulatory Scheme (up to 44 million such rifles in total), 61.9% said they did so for home defense and 34.6% said they did so for defense outside the home. William English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), *infra.*

instance, Appellant Madonna M. Nedza prefers the AR platform rifle with a collapsible buttstock for purposes of self-defense because it is light and easy to use, which is an important characteristic to her as she ages. (App. 75 at para. 60).

Given that there are over 40,000,000 semiautomatic rifles in circulation, Ms. Nedza is not alone in her choice. William English, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), *supra*; *see also Heller v. District of Columbia ("Heller II"),* 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (Semiautomatic rifles accounted for 40 percent of rifles sold in 2010; two million AR-15s, America's most popular rifle, were manufactured between 1986 and 2010) ; *see also Caetano v. Massachusetts*, 577 U.S. 411, 416-17 (2016) (Alito, J., concurring) ("semiautomatic pistols" are among "the weapons most commonly used today for self-defense."); *see Heller II*, 670 F.3d at 1269 (Kavanaugh, J., dissenting) ("[H]andguns—the vast majority of which today are semiautomatic—… have not traditionally been banned and are in common use by law-abiding citizens.")

The State's expert's arguments deserve the same fate that the Supreme Court has given them in the past—rejection.[7] The American people have overwhelmingly

---

[7] Stephen Halbrook, a widely recognized and prolific Second Amendment scholar, provides a thorough examination of the bias and mistakes of the State's expert, Robert Spitzer, in a case that the State relies on in its briefing. Stephen Halbrook, *Second Amendment Roundup: Upholding Oregon's Magazine Ban* (July 25, 2023)

chosen the banned firearms. They have the traditional right to make those choices. *Heller*, 554 U.S. at 628. And  it is "the traditions of the American people … that demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131.

3. **Appellants Have Consistently Objected to the State's and the District Court's Invocation of "Dramatic Technological Changes" and "Unprecedented Societal Concerns" Because it Ignores *Heller* and *Bruen***

In one final effort to ineffectively distinguish the instant matter from *Heller* and *Bruen*, the State claims that the Regulatory Scheme  combats a "dramatic technological change" and an "unprecedented societal concern." That argument is based on a misleading description of the "increased lethality" of the banned arms and the purported "increase in mass shootings" resulting from an indeterminate subset of the common banned arms that, in their telling, support the Regulatory Scheme. The same arguments were raised in *Bruen*. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 2021 U.S. S. Ct. Briefs LEXIS 2793 *16-*17 (Brady Center to Prevent Gun Violence Amicus Brief arguing mass shooting statistics.)

The    Volokh    Conspiracy,    https://reason.com/volokh/2023/07/25/second-amendment-roundup-upholding-oregons-magazine-ban/.

These arguments only found support in Justice Breyer's dissenting opinion. *Bruen*, 142 S. Ct. at 2163. They were rejected in *Bruen*.[8] and were specifically addressed in Justice Alito's concurrence:

> In light of what we have actually held, it is hard to see what legitimate purpose can possibly be served by most of the dissent's lengthy introductory section. Why, for example, does the dissent think it is relevant to recount the mass shootings that have occurred in recent years? Does the dissent think that laws like New York's prevent or deter such atrocities? Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home?

*Bruen*, 142 S. Ct. at 2157 (2022) (Alito, J., concurring); *see also S. Camden Citizens in Action v. New Jersey Dep't of Env't Prot.,* 274 F.3d 771, 786 (3d Cir. 2001) (Courts analyze the majority and dissenting opinions to see if the majority rejected the dissents view or not.)

The Violence Policy Center's amicus brief in *Heller* combined the same failed "mass shooting" and "increased lethality" arguments that the State is making here:

> Because handguns are designed to maximize lethality, it is not surprising that handguns cause death at a rate significantly higher than other generally available categories of firearms. The District's handgun ban benefits public safety by removing the class of weapon most likely to kill innocent people-yet another reason why banning this particular class of firearm is a reasonable restriction on any private constitutional right…

---

[8] The Regulatory Scheme was signed into law only one week after *Bruen* was published.

Handguns also are used in an extraordinary percentage of this country's well-publicized shootings, including the large majority of mass shootings. A review of 50 high-profile shootings over the past four decades revealed that from 1980 onward the bulk of such incidents (39) were mass shootings. A handgun was used in 74 percent of these mass shootings as the only or primary weapon. In 62 percent of these incidents, the handguns were purchased legally.

*District of Columbia v. Heller*, 554 U.S. 570 (2008) 1008 U.S. S. Ct. Briefs LEXIS 17*32-*34; *see also New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 2021 U.S. S. Ct. Briefs LEXIS 2784 *19-*28. *Heller* expressly acknowledged and expressly rejected that argument:

We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that the prohibition of handgun ownership is the solution…. But the enshrinement of the constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns….

554 U.S. at 636.  The State's argument must also fail here.

### III. APPELLANTS HAVE DEMONSTRATED IRREPARABLE HARM AND THE STATE'S ARGUMENT TO THE CONTRARY IS AN EFFORT TO TREAT APPELLANTS' SECOND AMENDMENT RIGHTS AS SECOND-CLASS RIGHTS

On the issue of irreparable harm, the State and the district court disregard *Heller* and *Bruen*. The district court denied the argument of Appellants on this point based upon an outdated view of the First Amendment's superiority to the Second Amendment that *Bruen* and *Heller* explicitly rejected. *Bruen,* 142 S. Ct. at 2130 ("This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms.") The district court also made its decision on the basis of the same flawed reasoning that it used to justify its impermissible interest-balancing, arguing that because, in its view, the people have no right to determine what commonly used arms are best for self-defense, there was no irreparable damage to Appellants for being deprived of their weapon of choice. (App. 35-36).

Not only does this reasoning fail to recognize that self-defense is but one of many lawful purposes the Second Amendment protects, it also again, fails to acknowledge *Bruen's* holding that "[t]he Second Amendment "is the very *product* of an interest balancing by the people" .... It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131.

Further, in weighing requests for injunctive relief post-*Bruen*, several other courts have found that Second Amendment deprivations are irreparable injuries. *See, e.g., Fraser v. ATF*, 3:22-cv-00410-REP (E.D.V.A., August 30, 2023) (granting nationwide injunction against under-21 handgun sales ban); *NAGR, et al. v. Grisham*, 1:23-cv-00771-DHU-LF (D.N.M. September 13, 2023) (granting TRO halting New Mexico Governor's emergency order restricting open or concealed possession of firearms and finding irreparable harm to gun owners). *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *3 (9th Cir. Sept. 7, 2023) (When a plaintiff shows that they are likely to succeed on the merits of a Second Amendment claim, "a 'court need not consider the other factors,'" because the injury is irreparable and "it is 'always in the public interest to prevent the violation of a party's constitutional rights.'") (citations omitted); *Koons v. Reynolds*, 2023 U.S. Dist. LEXIS 3293 (D.N.J. Jan. 9, 2023) (finding unconstitutional "sensitive places" legislation that violated Second Amendment constituted irreparable harm); *Spencer v. Nigrelli*, 2022 U.S. Dist. LEXIS 233341, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022) (finding pastor's inability to exercise right to carry firearm at place of worship to constitute irreparable harm) (citing *A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021) ("The denial of a constitutional violation ordinarily warrants a finding of irreparable harm, even when the violation persists for 'minimal periods'

of time.")); *Hardaway v. Nigrelli*, 2022 U.S. Dist. LEXIS 200813, 2022 WL 16646220, at *17 (W.D.N.Y. Nov. 3, 2022) (same).

If that was not enough, the district court's recommendation that some other arms would still be available for Appellants in the wake of its denial of the injunction ignores case law recognizing that the majority of commonly used arms are semi-automatic, and therefore banned by the State's Regulatory Scheme. *See Caetano v. Massachusetts*, 577 U.S. 411, 416-17 (2016) (Alito, J., concurring) ("semiautomatic pistols" are among "the weapons most commonly used today for self-defense."); *see Heller II*, 670 F.3d at (Kavanaugh, J., dissenting) ("[H]andguns—the vast majority of which today are semiautomatic—… have not traditionally been banned and are in common use by law-abiding citizens.")

The State's argument on appeal also bemoans a four-month period from the time the Regulatory Scheme passed before an injunction was sought, citing cases with no similarities to this matter. The State first relies upon *Chestnut Hill Sound, Inc. v. Apple Inc.*, 2015 U.S. Dist. LEXIS 150715, at *12 (D. Del. Nov. 6, 2015), a patent dispute in which the party seeking the injunction delayed for over three years from the date of alleged injury before moving for an injunction and in which additional factors weighed against the existence of irreparable harm. The *Chestnut Hill Sound, Inc.* decision itself relied upon *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995), also a patent case, that

involved both a 17-month delay in seeking an injunction and a determination from the Court that significant additional factors weighed against an injunction, such as evidence of the injunction seeker's inactivity in the market, its willingness to grant a license under its patent to the defendant in the matter, the absence of any indication that money damages would be unavailable to remedy any loss suffered, and the absence of any suggestion as to why relief pendente lite was needed. 49 F.3d at 1557.

The State also ignores that Appellants' motion for preliminary injunction was filed very shortly following the implementation of the State's coercive buy-back program.

The State, with less than full candor, cites the Supreme Court's denial, without opinion, of a request for an emergency stay in *Nat'l Ass'n for Gun Rights v. City of Naperville*, 143 S. Ct. 2489 (2023) (Order), to argue that the Supreme Court rejected the idea that deprivation of Second Amendment rights constitutes irreparable injury. Not so.

Rather, the State has no idea why that rare request for an emergency stay from the United States Supreme Court was denied because it was done without an evaluation of the merits of the case and without explanation. Neither the State nor this Court should guess about the Supreme Court's unstated reasoning.

In short, should this Court find that Appellants are likely to succeed on the merits, and have been deprived of their Second Amendment rights by virtue of this

unconstitutional Regulatory Scheme, this Court should also find that Appellants have suffered irreparable injury. The authoritative guidance that the United States Supreme Court has provided is that the right protected by the Second Amendment is not a second class right subject to different treatment than others guaranteed by the United States Constitution, such as those protected by the First Amendment.

## IV.   CONCLUSION

For the foregoing reasons, and those in Appellants' Opening Brief, Appellants respectfully request that: (i) this Court address the issues raised by Appellants in the district court that demonstrate the fatal flaws in the declarations relied on below that ignore *Heller* and *Bruen*; (ii) this Court find that the "relevantly similar" analysis of the district court does not comply with *Heller* or *Bruen*; (iii) this Court conclude that the district court's reliance on "dramatic technological changes" and "unprecedented societal concerns" was not faithful to the teachings in *Heller* or *Bruen*; and (iv) this Court recognize the sound precedent that supports the holding that irreparable harm is demonstrated when there has been a violation of the Second Amendment.

Therefore, Appellants respectfully request that this Honorable Court reverse the district court's denial of Appellants' Motion for Preliminary Injunction.

<div align="center">LEWIS BRISBOIS<br>BISGAARD & SMITH LLP</div>

By:   */s/ Francis G.X. Pileggi, Esquire*
Francis G.X. Pileggi, Esquire
Alexander D. MacMullan, Esquire
500 Delaware Avenue, Suite 700
Wilmington, Delaware 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com

*Attorneys for Plaintiffs Delaware State Sportsmen's Association, Inc., Bridgeville Rifle & Pistol Club, Ltd., Delaware Rifle and Pistol Club, Delaware Association of Federal Firearms Licensees, Madonna M. Nedza, Cecil Curtis Clements, James E. Hosfelt, Jr., Bruce C. Smith, Vickie Lynn Prickett, and Frank M. Nedza*

Dated:  September 20, 2023

## <u>CERTIFICATION OF COMPLIANCE WITH F.R.A.P. 32</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,912 words, as counted by Microsoft Word Version 2303, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2303 in 14-point Times New Roman font.

LEWIS BRISBOIS
BISGAARD & SMITH LLP


*/s/ Francis G.X. Pileggi, Esquire*
Francis G.X. Pileggi, Esquire

Dated: September 20, 2023.

## **CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEFS**

The undersigned certifies that the text of the brief transmitted to the court on this date is identical to the text of the hard copies of the Reply Brief of Appellants delivered to the Clerk.

> LEWIS BRISBOIS
>     BISGAARD & SMITH LLP
>
>
>   */s/ Francis G.X. Pileggi, Esquire*
> Francis G.X. Pileggi, Esquire

Dated: September 20, 2023

## CERTIFICATION OF VIRUS CHECK

The undersigned certifies that a virus check was performed by Sophos on the

Reply Brief of Appellants prior to transmitting it to the Clerk electronically.

LEWIS BRISBOIS
     BISGAARD & SMITH LLP


  */s/ Francis G.X. Pileggi, Esquire*
Francis G.X. Pileggi, Esquire

Dated: September 20, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Francis G.X. Pileggi, Esquire, certify that a true and correct copy of the Reply Brief of Appellants  was filed electronically using the Court's CM/ECF System. This System sent a Notice of Docket Activity to Appellee's Counsel, who is a Filing User.

<div style="margin-left: 40%;">

LEWIS BRISBOIS
   BISGAARD & SMITH LLP

*/s/ Francis G.X. Pileggi, Esquire*
Francis G.X. Pileggi, Esquire

</div>

Dated: September 20, 2023