1            IN THE UNITED STATES COURT OF APPEALS
                  FOR THE THIRD CIRCUIT
2
3
   DELAWARE STATE SPORTSMENS        ) Case Nos.  23-1633
4  ASSOCIATION, INC., ET AL.        )            23-1634
                                    )                  23-1641
5             Appellants,           )
                                    )
6  v.                               ) 1:40 p.m.
                                    )
7  DELAWARE DEPARTMENT OF           ) March 11, 2024
   SAFETY AND HOMELAND SECURITY,    )
8  ET AL.                           )
                                    )
9             Appellee.             )
10                    ON APPEAL FROM THE
                 UNITED STATES DISTRICT COURT
11                FOR THE DISTRICT OF DELAWARE
          HON. EVAN J. WALLACH, UNITED STATES DISTRICT JUDGE
12           CASE NOS. 23-1633, 23-1634, 23-1641
13
14               BEFORE APPELLATE PANEL:
15           HON. STEPHANOS BIBAS, Circuit Judge
        HON. TAMIKA MONTGOMERY-REEVES, Circuit Judge
16          HON. JANE RICHARDS ROTH, Circuit Judge
17
18  APPEARANCES (see next page)
19
20          Veritext National Court Reporting Company
                    1801 Market Street
21                    Suite 1800
                 Philadelphia PA 19103
22                  (888)777-6690
23
24
25

```
 1   APPEARANCES:
 2   For the Appellants:
 3             JOHN D. OHLENDORF, ESQ.
             COOPER & KIRK
 4             1523 New Hampshire Avenue NW
             Washington, DC 20036
 5
             ERIN E. MURPHY, ESQ.
 6             CLEMENT & MURPHY
             706 Duke Street
 7             Alexandria, VA 22314
 8   Liaison Counsel:
 9             MARIEL A. BROOKINS, ESQ.
             CLEMENT & MURPHY
10             706 Duke Street
             Alexandria, VA 22314
11
     For the Appellee:
12
             DAVID E. ROSS, ESQ.
13             ROSS ARONSTAM & MORITZ
             1313 N Market Street
14             Suite 1001
             Wilmington, DE 19801
15
             JEREMY FEIGENBAUM, ESQ.
16             OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
             25 Market Street
17             Richard J. Hughes Justice Complex
             P.O. Box 112
18             Trenton, NJ 08625
19
20
21
22
23
24
25   Transcribed By:  Bridget Hearne
```

1                    P R O C E E D I N G S

2          THE CLERK:  Judge Roth, can you hear and see us?

3          JUDGE ROTH:  Yes, I can.

4          THE CLERK:  Very well.  With thanks for the parties'

5    patience, the first case to be called this afternoon is

6    Delaware State Sportsmens Association, et al.; numbers 23-1633,

7    1634, and 1641.

8          Mr. Ohlendorf for Appellants Gray, et al.

9          MR. OHLENDORF:  Good afternoon, Your Honor.  May it

10   please the Court, John Ohlendorf for the Gray and Graham (ph.)

11   appellants.  With the Court's permission, I would like to

12   reserve two minutes of time for rebuttal.

13         THE CLERK:  Great.

14         MR. OHLENDORF:   Your Honor, under the supreme

15   court's decisions in Heller and Bruen, this is a

16   straightforward case.  As a matter of the Second Amendment's

17   plain text and this Court's decision in the ANJRPC case, the

18   firearms and magazines at issue plainly qualify as bearable

19   arms.  And under Bruen, that shifts the burden to Delaware to

20   justify its bans as consistent with historical tradition.

21         Now, in Heller, the supreme court already looked at

22   the history and determined that a flat ban on certain types of

23   arms is consistent with historical tradition only if those arms

24   are not in common use for lawful purposes.  But the district

25   court here held that Delaware's laws do ban arms in common use.

1    Indeed, the semi-automatic rifles banned by Delaware's law are

2    the second most popular firearm type on the market today and

3    the most popular rifle of all time.  That should have been the

4    end of the matter, and the district court's decision upholding

5    Delaware's bans anyway should be reversed.

6             JUDGE BIBAS:  Counsel, you have the burden of proof in

7    this proceeding, don't you?

8             MR. OHLENDORF:  We have the burden of proof, Judge

9    Bibas, on the initial Bruen text step.  I would submit that the

10   State has the burden on the second Bruen history inquiry,

11   even -- although the fact -- we're here on a preliminary

12   injunction.

13            JUDGE BIBAS:  Have the burden of proof on the

14   preliminary injunctive factors?

15            MR. OHLENDORF:  Well, under this Court's decision in

16   Reilly v. City of Harrisburg, the burden in a preliminary

17   injunction case tracks the burdens as they would lie at summary

18   judgment or trial.  And under Bruen, those burdens are

19   allocated such that we have the burden on the text step; they

20   have the burden on the history step.

21            JUDGE BIBAS:  Even if that's true as to the likelihood

22   of success on the merits, you have the burden on the other

23   injunctive factors?

24            MR. OHLENDORF:  That's correct, Judge Bibas.  That is

25   true for --

1          JUDGE BIBAS:  And you put in no evidence, apart from
2     some declarations here?

3          MR. OHLENDORF:  On the irreparable harm factor, Judge
4     Bibas?

5          JUDGE BIBAS:  On irreparable harm, on balance of
6     equities of public interest, all you put in were four
7     declarations?

8          MR. OHLENDORF:  Yes, Judge Bibas.  And our
9     declarations show that our plaintiffs wish to obtain these
10    firearms and magazines.

11         JUDGE BIBAS:  Plaintiffs who already have firearms,
12    three of whom already have some of the assault weapons, so
13    called; and a large capacity of magazines, so called.

14         MR. OHLENDORF:  I don't know that our -- all of our
15    plaintiffs have the rifles or pistols that are banned by
16    Delaware, but they certainly want to acquire them.

17         JUDGE BIBAS:  Okay.  But all of them aver that they
18    currently do have firearms?

19         MR. OHLENDORF:  They do have firearms.  I wouldn't
20    dispute that, Judge Bibas.

21         JUDGE BIBAS:  So how are we supposed to infer from
22    these declarations that they're suffering an irreparable
23    injury?

24         MR. OHLENDORF:  Because the Second --

25         JUDGE BIBAS:  The only way we could do that is if we

1 adopt a blanket rule that any depravation of a Second Amendment

2 right for any period of time automatically counts as

3 irreparable injury.

4     MR. OHLENDORF:  I mean, I don't know if I would cast

5 it in those absolute terms, Judge Bibas.  But I would say that

6 a law preventing someone from obtaining arms protected by the

7 Second Amendment to keep and to bear -- I mean, this is a

8 going-forward ban, so I don't know we can call it temporary.

9 But yes, that law we would submit to you is a, per se,

10 violation of the Second Amendment, and per se, irreparable

11 injury.  Just as this Court --

12     JUDGE MONTGOMERY-REEVES:  Well, the moment you satisfy

13 the likelihood of success prong -- and there really is no

14 irreparable harm prong, right?  That's what you're essentially

15 telling us?

16     MR. OHLENDORF:  I'm essentially saying, Judge

17 Montgomery-Reeves, that just as in the First Amendment context,

18 if someone says, I would like to speak, this law is preventing

19 me from speaking.  I've spoken in the past, maybe I can speak

20 in other ways.  But I want to say this, the law prevents me

21 from saying it, this Court need not proceed any further in

22 determining whether there is irreparable harm, no.  And that is

23 common across the constellation of constitutional rights.

24     JUDGE BIBAS:  It's common across the constellation of

25 constitutional right.  I could find -- I found a Fourth

1    Amendment case from half a century ago, and that was it.  So I

2    think that's an overstatement to say it's common across rights.

3    What, apart from First Amendment cases and that Fourth

4    Amendment case from 1973, applies such a conclusive

5    presumption?

6         MR. OHLENDORF:  Your Honor, I don't know about this

7    Court's case law.  Certainly, in other cases -- in other

8    courts, due process violations equal protection violations;

9    those would all qualify for this, per se.

10        JUDGE BIBAS:  Okay.  Why should we collapse the four

11   factors into likelihood of success on the merits?  What about

12   all that language about PIs being extraordinary remedies being

13   granted sparingly?  What about the history of equity?  And what

14   about eBay v. MercExchange which suggests that we're not

15   supposed to adopt presumptions like that in the equitable -- I

16   mean, that was a permanent, not a preliminary injunction.  But

17   it does suggest that we're not supposed to just jump to the

18   merits.

19        MR. OHLENDORF:  In the great bulk of cases, Judge

20   Bibas, that is correct.  But in cases involving -- I mean, all

21   of those objections you have just raised would apply equally in

22   a First Amendment case.  And yet, the settled precedent is, in

23   First Amendment cases, we presume a constitutional violation --

24        JUDGE BIBAS:  We can --

25        MR. OHLENDORF:  -- where there's likelihood of success.

1           JUDGE BIBAS:  We can presume.  We don't require the

2      district court to.  And a lot of First Amendment cases involve

3      some very time-sensitive -- either you're going to speak --

4      during this election, or the election will be passed.  But this

5      dispute wouldn't go away.  You could have gone ahead to your

6      trial in November '23, and you chose not to.  We would have had

7      a trial record by now.

8           MR. OHLENDORF:  I mean, this case, yes, it's not going

9      to go away.  But every second of every day that Delaware's law

10     is enforced, it is preventing my plaintiffs from exercising

11     their Second Amendment rights.

12          JUDGE MONTGOMERY-REEVES:  Focusing on your argument --

13     your likelihood of success argument, not delving into the

14     substance of it -- but it's a legal argument, right?

15          MR. OHLENDORF:  That's correct, Judge Montgomery-

16     Reeves.

17          JUDGE MONTGOMERY-REEVES:  So if we agree with you on

18     the irreparable harm, wouldn't that mean that there is no

19     discretion?  I mean, if it's a legal argument, the answer is

20     just, yes, we think -- yes, they're going to win; or no,

21     they're not.  I mean, there's no discretion for the Court on a

22     preliminary injunction, is there?

23          MR. OHLENDORF:  I think, Judge Reeves, that is -- the

24     Court has discretion to determine whether there's a likelihood

25     of success.  But if they determine there's a likelihood of

1   success, then it just follows from that determination.  And --

2   JUDGE BIBAS:  Then why do we have an abuse of

3   discretion standard of review?

4   MR. OHLENDORF:  Well, because -- I mean, many cases

5   involving requests for preliminary injunction, Judge Bibas,

6   don't involve constitutional rights or don't involve

7   constitutional rights that protect intangible interests like

8   this one.

9   JUDGE MONTGOMERY-REEVES:  So when it's a

10  constitutional right issue, then it's not discretionary.  Only

11  question is, answer the legal question, that's it.  Don't look

12  at the other prong.

13  MR. OHLENDORF:  I mean, the Court does have to

14  determine, of course, that the plaintiffs would like to

15  exercise their constitutional rights.  But yes, I mean, if the

16  plaintiffs can make that showing, which our declarations have

17  averred and have not been disputed, then no, I don't think

18  there is any discretion to conclude that the violation of

19  Second Amendment rights, just as in the First Amendment

20  context, does not constitute irreparable harm.

21  JUDGE MONTGOMERY-REEVES:  Let me ask you another

22  question.  So as I understand your argument, it's that Heller

23  decided that the government couldn't ban arms that are commonly

24  held for self-defense purposes.  But then Bruen went on and

25  devoted thirty-five pages in the United States Reporter and

1    more than twenty pages in the Supreme Court Reporter to

2    analyzing the history and tradition; whether or not the New

3    York law was consistent with the history and tradition.  If

4    Heller held the government can't ban arms that are commonly

5    held for self-defense, why did Bruen need to spend all that

6    time?

7         MR. OHLENDORF:  A very simple answer, Judge

8    Montgomery-Reeves.  Bruen did not involve a ban on possession

9    of arms.  Bruen involved a restriction on carrying firearms

10   outside the home.  It was disputed the extent to which that was

11   protected by the Second Amendment, the limits on the State's

12   ability to curtail that if it was protected under the Second

13   Amendment.  So yes, Bruen went through great lengths to

14   determine whether there was a historical tradition that would

15   allow greater infringements on the right to bear arms then

16   Heller countenanced of the right to keep them.  That question

17   wasn't resolved in Heller.  But it simply does not follow that

18   in a case involving an arms ban, a ban on certain types of

19   arms, that the Heller test does not apply.

20        JUDGE BIBAS:  Judge Roth, anything?

21        JUDGE ROTH:  I have nothing at this point.

22        JUDGE BIBAS:  All right.  Let's hear from Ms. Murphy,

23   and we'll get you back on rebuttal.

24        MS. MURPHY:  Good afternoon, Your Honor.  Erin

25   Murphy on behalf of the DSSA plaintiffs and Amicus - NSSF.  And

1    with the Court's permission, I'd like to reserve four minutes

2    for rebuttal.

3              JUDGE BIBAS:  Granted.

4              MS. MURPHY:  Thank you.

5              Millions of law-abiding Americans own semi-automatic

6    rifles, pistols, and shotguns that Delaware has newly banned;

7    and millions more own the magazines that Delaware has

8    forbidden.  Under the supreme court's decision in Bruen, that

9    forecloses the State's effort to prohibit them, because Bruen

10   teaches that our historical tradition is one of protecting the

11   right of the people to keep and bear arms that are in common

12   use for lawful purposes like self-defense.  The State's efforts

13   to resist that conclusion rest on arguments that are just

14   fundamentally incompatible with Bruen, including many of the

15   same arguments that Bruen itself considered and many of the same

16   historical laws that Bruen itself considered.

17             To the extent the State begins by suggesting and the

18   State -- or its amici suggests that the firearms or

19   magazines here don't qualify as arms at all, that answer -- the

20   answer to that question comes from Heller and Bruen, both of

21   which teach that arms constitute anything that is a bearable

22   arm that can be used for self-defense.  And there's just not

23   any argument to be made that a firearm ceases to be an arm

24   simply because it has features, like semi-automatic

25   functionality and a detachable magazine.

1           JUDGE ROTH:  Let me ask you a question.  Is to be used

2     in self-defense a integral part of any arm?  In other words,

3     are arms used in self-defense not simply arms used in any

4     legal -- for any legal purpose?

5           MS. MURPHY:  So for purposes of the threshold textual

6     inquiry, I think all that matters is that something is capable

7     of being used for self-defense.  It's a bearable arm.  It

8     doesn't matter if it's commonly used, if it's predominantly

9     used, if that's its best use; it just has to be something

10    that's capable of being used for self-defense.  And when we get

11    to the historical tradition test, which we absolutely agree

12    with what you just heard, that common use --

13          JUDGE ROTH:  That does not -- that does not agree with

14    the language of Bruen and Heller, does it?  Bruen talks about a

15    arm -- an arm commonly used in self-defense.  Don't we have to

16    consider that description as one integral description of what

17    we're dealing with, not just capable of being?

18          MS. MURPHY:  I don't think that's part of the

19    threshold textual inquiry because Bruen says that the

20    definition of the word "arms" simply includes any bearable

21    arms.  Now, you are absolutely correct that common use becomes

22    relevant, and we would say dispositive, when you're analyzing

23    the historical tradition aspect of the Second Amendment

24    analysis.  Once something is an arm, that just tells you it's

25    presumptively protected by the Second Amendment.  You still

1    have to then go on to answer the question of whether it's the

2    type of arm that, though qualifying as an arm, may be

3    restricted -- or here, banned -- consistent with the Second

4    Amendment.  And what Bruen and Heller teach is that whatever

5    else the States can do in terms of regulation, they cannot ban

6    arms that are in common use today for lawful purposes like

7    self-defense.  So we agree that when you get to historical

8    tradition, you have to look --

9             JUDGE ROTH:  Again, you're sliding off my question,

10   which is, which are used for lawful purposes like self-

11   defense, as opposed to which are used for self-defense.  I

12   think the distinction between those two is very important.

13            MS. MURPHY:  As I read Heller and Bruen, they say

14   lawful purposes like self-defense, including self-defense.  So

15   I don't think it's the only one, but I'm happy to take self-

16   defense as the one we need to prove because I think it's

17   easily, easily satisfied here, even setting aside the fact that

18   this is actually the State's burden of proof, not ours.

19   Because the types of arms and magazines that we're talking

20   about are commonly held.  They're owned by millions of

21   Americans -- millions of law-abiding Americans.  And the most

22   common reason that law-abiding Americans identify for owning

23   them is for self-defense and/or using them at things like

24   shooting ranges, where they are honing their skills.

25            JUDGE ROTH:  Are they in fact being used for self-

1  defense?  I understand from some of the reading I've done that

2  the percentage of times that these automatic weapons are used

3  for self-defense is miniscule compared to the other -- like,

4  for instance, handguns -- the other weapons that are used in

5  self-defense.  The fact that it's -- an atom bomb is capable of

6  being used in self-defense, but no one would use it.  And I

7  think that -- I feel that it is necessary, not just that they

8  are capable of being used in self-defense, but they actually

9  are being used in self-defense.  And I'm not sure about these

10  automatic assault weapons, whether they are being used in self-

11  defense.

12       MS. MURPHY:  Well, just to be clear, we're only

13  talking about semi-automatic arms here.  But I think it all

14  depends on what you mean by the term "use".  The State wants to

15  cabin it to how many times do I fire a particular arm or fire a

16  particular amount of rounds at a would-be attacker.  And that

17  is not a conception of use that's consistent even with the text

18  of the Second Amendment.  The Second Amendment protects a right

19  to "keep" and "bear" arms for lawful purposes, which the supreme

20  court has explained means both possessing them in your home and

21  wearing them at -- to be ready -- armed and ready for

22  confrontation.  So if somebody uses their firearm within the

23  contemplation of the text of the Second Amendment, anytime they

24  keep it at home for the purpose of self-defense or carry it

25  outside the home for purpose of self-defense.

1          And indeed, if you took the State's conception and

2    asked how often is a particular arm actually fired for self-

3    defense, I'm not sure we'd end up with any firearm protected by

4    the Second Amendment, because fortunately, most people very

5    rarely have to fire any type of firearm at would-be attackers;

6    they instead keep them and hone their skills with them at

7    places like shooting ranges and fortunately very rarely have to

8    actually fire them.  So I don't think that that's the right way

9    to think about the analysis.  If you look back at Heller,

10   Heller found that handguns satisfy the common-use test because

11   they are, "typically possessed for lawful purposes like self-

12   defense".

13          So I do think the right inquiry is to ask about

14   possession, about what people keep and carry for self-defense.

15   And here, again, we don't believe it's our burden.  We believe

16   it's the State's burden to prove common use.  But even thinking

17   it was our burden, the district court concluded that we'd

18   satisfied it as to all of the, so called, assault long guns

19   that are prohibited by the statute.

20          JUDGE BIBAS:  But you don't disagree that as to the

21   injunctive factors, setting aside the possibility of the second

22   half of merits, that you bear the burdens here?

23          MS. MURPHY:  We certainly bear the burdens.  But I --

24   if you look at --

25          JUDGE BIBAS:  How have you satisfied those burdens, as

1    I asked your friend on your side?

2         MS. MURPHY:  Sure.  I mean, we've satisfied them under

3    this Court's precedent, K.A. v. Pocono Mountain School

4    District, which says, "enforcement of an unconstitutional law

5    vindicates no public interest", and that laws that deprive

6    people of constitutional rights cause virtually per se

7    irreparable harm.  That is the law of this circuit as to

8    individual rights under the First Amendment.  And I can't

9    really understand any reason why it would be different as to

10   the Second Amendment.  I mean, people aren't -- don't have to

11   come in and show that they have zero First Amendments outlets

12   left.

13        JUDGE BIBAS:  But that approach basically collapses

14   everything into likelihood of success on the merits.

15        MS. MURPHY:  And I think when it comes to a law that

16   violates constitutional rights, violates individual

17   constitutional rights, that's basically correct.  I mean, it's

18   not that you don't have to satisfy the other two facts; it's

19   just that, absent an extraordinarily rare set of circumstances,

20   they're always going to be satisfied.  Because the constitution

21   has already done the public interest balancing and said, the

22   public interest lies in favor of protecting individual

23   constitutional rights.  That is, after all, why they're in the

24   constitution, to say, we're not going to allow for laws that

25   infringe upon these rights, even when it seems like they're in

1    the public interest.  And so I think it actually is just kind

2    of at odds with the whole notion of a Bill of Rights to think

3    that you could have --

4         JUDGE BIBAS:  Except that equity is as old as that, and

5    equity has that history.  And while there's a Second Amendment

6    interest here, but there's also a Seventh Amendment interest in

7    having jury trials remain available, at least in cases with

8    retrospective relief.

9         MS. MURPHY:  Sure.  And I mean, I suppose I would

10   just -- I thought about this and tried to look in preparing for

11   this argument.  I just, I can't find any law where a court has

12   ever said, yes, this law is unconstitutional, but we think it,

13   nonetheless, under the balance of equities should stand.  I

14   mean, that just doesn't happen.  Once a law is

15   unconstitutional, that necessarily means that it is causing

16   irreparable harm in preventing someone from exercising their

17   constitutional rights.  And it is not in the public interest to

18   have laws that violate constitutional rights.  And so --

19         JUDGE MONTGOMERY-REEVES:  Does it matter that we're in

20   a preliminary injunction context?

21         MS. MURPHY:  No.  I think what matters in a

22   preliminary injunction context is simply that the first piece

23   of the analysis is, of course, a likelihood of harm, so it's

24   likelihood of success.  So it's actually a little bit easier to

25   me than it is in the ultimate injunctive context.  But I do

1    think --

2         JUDGE MONTGOMERY-REEVES:  Why would that weaken the

3    need to show an irreparable harm?

4         MS. MURPHY:  I don't think it does weaken.  I think

5    the three remaining factors apply the same way, whether you're

6    in a preliminary or a permanent injunctive context.  And the

7    fact that you can really never say in the permanent injunctive

8    context that you hadn't satisfied the three remaining factors,

9    and that a court was going to leave an unconstitutional law on

10   the books or apply an unconstitutional law to somebody because

11   it had determined that it doesn't really harm them or doesn't

12   really serve the public interest to vindicate their

13   constitutional rights, I think that's pretty unthinkable in the

14   context of a permanent injunction.  And I don't know why the

15   analysis would be radically different just because it's a

16   preliminary injunction.  So it's not that they don't apply.  I

17   mean, all factors apply.  It's just --

18        JUDGE BIBAS:  Let's say that there's a twenty percent

19   chance that you're right on the merits.  You're saying that no

20   balancing needs to happen?

21        MS. MURPHY:  No, no, no.

22        JUDGE BIBAS:  That because there are harms on the

23   other side if it turns out that it's -- you don't win on the

24   merits.

25        MS. MURPHY:  If we're only twenty percent right on the

1    merits, you have a balance to draw between how strong our

2    likelihood of success is --

3              JUDGE BIBAS:  Right.

4              MS. MURPHY:  -- and the remaining factors.  But that's

5    just a matter of -- and I think if you really look at the kind

6    of rare First Amendment cases, where courts have said they're

7    leaving some room for the possibility that it's not a per se

8    satisfied, they're really cases where they're doubting whether

9    you actually have a particularly strong likelihood of success

10   on the merits.  I mean, the one --

11             JUDGE BIBAS:  When you read Winter v. NRDC --

12             MS. MURPHY:  Yes.

13             JUDGE BIBAS:  Granted, it's a statutory case, but the

14   court doesn't say, oh, this is just because it's just a

15   statutory right.  It's like, well, factors two, three, and

16   four, so we don't need to reach factor one.

17             MS. MURPHY:  I think it makes all the difference in

18   the world that Winter is a statutory case.  And I really do

19   think that if you look, you will have a very hard time finding

20   any cases where the supreme court or this court has said, yes,

21   we're pretty sure your constitutional rights, your individual

22   fundamental rights are being violated.  But too bad for you

23   because it's in the public interest to violate them.

24             JUDGE BIBAS:  We also have not established that

25   outside the First Amendment context.  And the question is what

1    to do with it, all First Amendment or some, but do we expand

2    the treatment of First Amendment rights, which might be

3    characterized as exceptional, to every other provision?  And

4    so many things can be recharacterized as due process

5    issues under Section 1983.  You're inviting us to basically

6    allow all those 1983 claimants, if they raise a constitutional

7    right, to get an injunction right away.

8              MS. MURPHY:  I think that this would be the wrong

9    context in which to stop.  Because one thing we know is the

10   supreme court has said quite emphatically that the Second

11   Amendment is not a second-class right.  It has said that --

12             JUDGE BIBAS:  It's substantive protections, yes.

13             MS. MURPHY:  And it said that, and it has specifically

14   invoked First Amendment law in the context of explaining Second

15   Amendment law.  It talked about First Amendment law again in

16   Bruen in terms of talking about the historical approach.  It

17   talked about it in McDonald in terms of implying this is a real

18   meaningful fundamental right.  So it seems to me it would be

19   pretty problematic.  You can worry about the other cases when

20   they come.  But boy, to start here as saying, yeah, we're going

21   to treat this one differently seems pretty at odds with what

22   the court has said.

23             JUDGE BIBAS:  Okay.  Well, in Bruen, it's gone back to

24   history.  And it's said we're not supposed to apply the tiers

25   of scrutiny.

1          MS. MURPHY:  That's right.

2          JUDGE BIBAS:  Even though tiers of scrutiny persist in

3    some areas of First Amendment law.

4          MS. MURPHY:  They do.

5          JUDGE BIBAS:  You're not asking us to go and borrow

6    the First Amendment tiers of scrutiny and apply them.

7          MS. MURPHY:  Absolutely not.  But the Court

8    specifically looked to First Amendment jurisprudence when

9    explaining that it actually does do historical tradition in the

10   First Amendment context as well.  Particularly, in more recent

11   cases, like there they were invoking United States v. Stevens.

12   Which I think is actually instructive in that -- I mean, one of

13   the differences -- one of the biggest differences between First

14   Amendment and Second Amendment cases is, when it comes to First

15   Amendment cases, we have a lot of issues that have already been

16   resolved by the courts.  But when the court confronted in

17   Stevens an argument that a new category of speech was not

18   protected by the Second -- the First Amendment, there the

19   depictions of animal cruelty.  Once the court decided that

20   that, like, is at least a form of speech --

21          JUDGE BIBAS:  Right.

22          MS. MURPHY:  -- the burden shifted one hundred percent

23   to the Government, and it had to justify it by looking at

24   historical tradition.  So the court drew from that and said,

25   this really is the way we've done a lot of things in a lot of

1   other contexts and exactly how we should be doing it here in

2   the Second Amendment context, too.

3          JUDGE BIBAS:  Judge Roth, anything else?

4          JUDGE ROTH:  Nothing further.

5          JUDGE BIBAS:  All right.  We'll get you back on

6   rebuttal.

7          Mr. Ross, I guess, is going first.

8          MR. ROSS:  Thank you, Your Honor.  David Ross, Ross

9   Aronstam & Moritz on behalf of Defendants Appellees.

10         The district court's exercise of its discretion not to

11  preliminarily enjoin the statute banning guns whose only

12  difference from machine guns, according to the undisputed

13  record below, is the lack of fully automatic fire, can be

14  affirmed for three independent reasons.  First, the Court can

15  affirm the district court's finding that the plaintiffs failed

16  to establish the irreparable harm necessary to obtain a

17  preliminary injunction.  Second, the Court can reject the only

18  argument the plaintiffs made below, which is that assault

19  weapons and large capacity magazines are so common that

20  historical regulations are "immaterial", as they argued at page

21  11 of their reply brief below, and as they also argued to the

22  district court in oral argument.  And third, the Court can

23  affirm under various aspects of the full Bruen analysis.

24         Today, I will focus on the irreparable harm factors,

25  the sole argument that plaintiff presented below, and Bruen's

1  historical analysis.  My friend from New Jersey will focus on

2  the meaning of "in common use" and will explain why, as we

3  argued below, that provides an additional basis on which to

4  affirm the decision of the district court.

5        The undisputed record below is that the guns at issue

6  here share core performance characteristics with machine guns.

7        JUDGE BIBAS:  Let's talk about what your friend on the

8  other side pressed with some force, the First Amendment analogy

9  here.  So is the fact that they -- they're alleging that they

10  want to exercise Second Amendment rights mean that we shouldn't

11  be doing an independent, irreparable harm analysis?  That

12  ultimately, we need to focus on the merits.  And then if they

13  win on the merits or have a likelihood of success on the

14  merits, that's enough because in First Amendment contexts,

15  we've allowed that.

16        MR. ROSS:  We do not believe that even if they were

17  likely to prevail on the merits, which the district court did

18  not find, that that would be enough to establish preliminary

19  harm.  We don't believe that it all collapses.  Even in the

20  First Amendment context, a violation is not, per se, remedied

21  by a preliminary injunction.  It's true in other contexts as

22  well, including, for example, the equal protection context,

23  Construction (sic) Association of Western Pennsylvania v.

24  Kreps.  And if you look at the cases that they cite in the

25  First Amendment context, what you see is that there were

1  different interests that could not be remedied absent a

2  preliminary injunction.  So for example, in Ayers, what you had

3  was someone who wanted to send invitations to a Christmas

4  party.  And obviously, if that was delayed, there would be no

5  ability to remedy that.  In Lewis, the court noted that it was

6  focused on a potential remedy if the plaintiff prevailed, and

7  there, there would be no way for an individual to express

8  themselves -- their wearing long hair -- without a risk of

9  their constitutional rights being deprived.  Here, we have

10  specific factual findings by the district court.  As Your Honor

11  noted, several of these plaintiffs already own assault weapons.

12  They all own guns.  And critically, the district court found

13  with respect to the irreparable harm factor, with respect to

14  the core purpose of the Second Amendment, one's right to armed

15  self-defense.  There are numerous other avenues available for a

16  plaintiff to exercise that right.

17      JUDGE BIBAS:  But that doesn't mean that their Second

18  Amendment rights couldn't be being infringed, right?  Just

19  because they have some guns doesn't mean that they don't have a

20  right to have other guns.

21      MR. ROSS:  No, it doesn't mean that there couldn't be

22  some infringement.  The court found it to be a very limited

23  infringement, at best.  And when one is weighing the factors

24  for purposes of a preliminary injunction, the degree of

25  infringement is a relevant consideration.

1          JUDGE BIBAS:  But how do we weigh the balance of

2     equities here?  And is it, does the public interest collapse

3     into it?  Because there's -- you argued below and you argue

4     that there's a public safety interest here.  But these

5     defendants -- these plaintiffs here, they want to have the

6     firearms for lawful purposes, including self-defense.  So how

7     do we weigh those?  The district court -- what does our

8     deference to the district court's weighing look like,

9     especially since the district court didn't really express it in

10    those terms?

11         MR. ROSS:  Well, I think how one -- the Court would

12    undertake that analysis is to actually look at the factual

13    record that was presented.  And in this case, you have a

14    factual record where the sole extent of the evidence that was

15    presented by the plaintiffs is four declarations, which

16    established that some of them already own assault weapons; they

17    all own guns.  And as the district court specifically found,

18    the types of weapons that they would like to purchase are

19    neither useful for, nor in fact, based upon the undisputed

20    record evidence before it, actually utilized in self-defense

21    situations.  It was on the basis of those -- and of course

22    there are numerous alternatives available.  So it was on the

23    basis of all of that that the court was able to balance -- I

24    should add one more thing.  I apologize.  The Court also had

25    below it and considered the devastating potential effects of

1  having these weapons out there.  It had the declaration of Lucy

2  Allen with respect to the use of these weapons in mass

3  shootings.  It --

4      JUDGE BIBAS:  Okay.  But in Bruen, the Court did say,

5  look, once the Second Amendment has struck a balance, it's not

6  for courts to balance again.  Is that different because we're

7  in the preliminary injunctive context?  Because when it comes

8  to the scope of the right, we're not supposed to be balancing.

9      MR. ROSS:  No.  Bruen has struck a balance with

10  respect to the nature of the underlying inquiry.  We don't read

11  Bruen as suggesting that all -- the remainder of the

12  preliminary injunction inquiry collapses, and it simply becomes

13  a question of likelihood of success on the merits.

14  Particularly, as we noted, we're at the preliminary injunction

15  stage, not at the permanent injunction stage.

16      JUDGE MONTGOMERY-REEVES:  Your friends on the other

17  side said, well, that shouldn't make a difference.  The

18  irreparable harm analysis is the same in the preliminary

19  injunction and the permanent injunction stage.  What's your

20  response to that?

21      MR. ROSS:  Well, the -- once a plaintiff has

22  established that there is in fact a constitutional violation,

23  then, obviously, I think how the Court thinks about it has to

24  account for that.  But what we are talking about here is a

25  preliminary finding on a limited record.  And therefore, I

1  think the analysis is different at the preliminary injunction

2  stage than it would be at the final injunction stage.

3      JUDGE MONTGOMERY-REEVES:  And then just thinking a

4  little bit more about irreparable harm and what that looks like

5  in a case like this.  If your friends on the other side had put

6  evidence in of that, like, what additional facts would we need

7  to see?  What additional facts would have needed to be offered

8  below to establish irreparable harm in a case like this?

9      MR. ROSS:  Sure.  So the plaintiffs could have

10 attempted -- they did not, but they could have attempted to

11 rebut the evidence that we presented with respect to both the

12 suitability of the weapons at issue for self-defense and their

13 actual use.  The Court had undisputed evidence in the

14 Yurgealitis Declaration that these weapons are not well suited

15 for self-defense.  It had undisputed record evidence from Lucy

16 Allen that these weapons are not in fact used for self-defense.

17 They could have attempted -- we wanted an evidentiary hearing.

18 The plaintiffs did not want that.  They could have attempted to

19 cross-examine them, to take issue with it, or to put in their

20 own experts on these points.  They chose to do none of that.

21      As I indicated, the weapons that are issue at (sic)

22 here share core performance features with machine guns.  They

23 have, as Yurgealitis said in his declaration, identical

24 performance capabilities and characteristics.  The only

25 difference between these weapons and machine guns is the lack

1    of fully automatic fire.  As the Seventh Circuit said in the

2    Bevis opinion, the AR-15 is "almost the same gun as the M-16

3    machine gun."  Because they share common performance

4    capabilities and characteristics like machine guns, they are

5    designed to maximize lethality.  They can shoot through the

6    vests of law enforcement officers.  They can penetrate three-

7    eights-inch hardened steel, and when they are used, they cause

8    gruesome injuries.  It is therefore not surprising, as Lucy

9    Allen said in her declaration, that when these are used in mass

10   shootings, the number of fatalities and injuries increase

11   significantly.

12        Now, the supreme court has said in Heller that you can

13   ban machine guns.  And it talked about them as M-16s and the

14   like.  Justice Scalia said it would be startling to suggest

15   otherwise, and he went on to explain why it would be startling.

16   He did not talk about the number of machine guns.  In the very

17   same sentence, he said the reason that that would be startling

18   is because machine guns are useful in warfare.  And I would

19   note that with respect to the sole performance difference, the

20   lack of fully automatic fire, the undisputed record evidence

21   below from the Yurgealitis Declaration is that semi-automatic

22   fire is in fact the preferred method of fire for the Army in

23   combat situations.  And so these weapons, given that limited

24   difference, fall clearly within the "and the like" that the

25   supreme court was referring to when it said "M-16s and the

1    like" in Heller.

2           Now, with respect to the sole argument that the

3    plaintiffs presented below, they initially acknowledged in

4    their opening papers that Bruen required a historical inquiry.

5    In response to what the district called the defendant's robust

6    historical record, including affidavits from five experts,

7    including -- sorry, a declaration from five experts, including

8    Professor Spitzer, who talked about the historical tradition of

9    regulation.  The plaintiffs elected not to present any

10   evidence.  They pivoted on reply, abandoned that, and said that

11   because these guns are common, the historical tradition becomes

12   immaterial.  Plaintiffs had it right in their opening brief and

13   wrong in their reply.  Bruen teaches that the Second Amendment

14   protects only the carrying of weapons that are those --

15           JUDGE ROTH:  Let me get back to that point.  If this

16   case should proceed beyond the argument today, are the

17   plaintiffs still precluded from introducing any additional

18   evidence?

19           MR. ROSS:  They're not, Judge Roth.  This was solely

20   for purposes of the preliminary injunction.  Judge Andrews

21   specifically found that the findings that he was making were

22   applicable only with respect to the preliminary injunction.

23           So with respect to Bruen, we see in the structure that

24   Bruen contemplates that the in common-use analysis is part of

25   the textual inquiry.  It notes in Section 3-A of the opinion

1    that it was undisputed that the guns were in common use.  It
2    then went in Section 3-B to undertake the historical analysis.
3    Now, consistent with the plain language of the supreme court,
4    when it said that the Second Amendment protected the weapons
5    that are in common use, that only gets you to the, then -- the
6    constitutional inquiry.  So for example, in Heffner v. Murphy,
7    this court said -- a commercial speech case -- "the First
8    Amendment protects commercial speech".  It then went on to
9    consider the restrictions with respect to commercial speech and
10   found that some of those were valid, even though it was
11   protected speech.  And I would note critically, with respect to
12   the only argument that the plaintiffs presented below, that
13   even Judge Brennan, in his dissent in the Bevis case in the
14   Seventh Circuit at page 1211, rejected the idea that
15   commonality alone would foreclose the historical inquiry.  He
16   said it is not an on-off switch; that it does not bar the
17   government from regulating; and that even with respect to
18   popular weapons, the --
19           JUDGE ROTH:  Does "common use" include the additional
20   language for common use for self-defense?  In other words, in
21   considering common use, are we thinking about common use for
22   any legal purpose, or are we thinking -- are we required to
23   think about common use for self-defense?
24           MR. ROSS:  As we argued below to Judge Andrews, we
25   believe that in common use requires that the weapons be

1   actually used for self-defense.  And I understand that my

2   friend from New Jersey is going to have that as the focus of

3   his argument.  We have focused in our appeal on why even taking

4   Judge Andrews' -- he disagreed with that.  But why even taking

5   that construct, we would still prevail.

6        I would like to take a moment to discuss briefly two

7   critical factual findings with respect to the Second Amendment

8   inquiry, which is the finding that there is both unprecedented

9   societal concerns and dramatic technological changes.  Those

10   are factual findings subject to clear mistake, having presented

11   no evidence on them below.  The plaintiffs --

12        JUDGE BIBAS:  This is a very odd area, where there are

13   trial-type procedures and things, but at the same time, should

14   we be treating these, as your friends on the other side

15   suggest, as legislative facts?  Things where they ask us to

16   look at the records of other cases and declarations in other

17   cases?

18        MR. ROSS:  No, Your Honor.  We do not believe these

19   are legislative facts.  In fact, the very fact that they are

20   citing expert declarations that the plaintiffs in other cases

21   chose to submit to those courts, but that for whatever reason,

22   these plaintiffs chose not to submit here, is precisely

23   evidence that these are adjudicative facts.  It's exactly what

24   Bruen teaches in footnote 6, that this is for trial courts to

25   deal with on the record that is presented before them.  And the

1   factual findings with respect to unprecedented societal concern

2   and dramatic technical change are critical because it goes to

3   how the Court undertakes its analogical reasoning.

4          We know from Bruen that in no circumstances does the

5   Government need to find either a dead ringer or a historical

6   twin.  And we also know that in light of those factual

7   findings, you need to take an even more nuanced approach to

8   your examination of analogs and find something that is only

9   relevantly similar.  And the declaration of Professor

10  Spitzer -- which talks about the long historical tradition that

11  starts even before the founding of the nation, comes throughout

12  time into the 20th century -- it includes the 1934 Act, fits

13  well within that.  And we see this pattern of regulation

14  throughout history, as Professor Spitzer noted.  I mean, even

15  if we were to look, for example, in the founding era, we see

16  that Tennessee, Alabama, and Georgia in 1837 all passed laws

17  which made it either illegal to sell or imposed massive taxes,

18  the equivalent of thousands of dollars of taxes today, on Bowie

19  knives.  The Tennessee statute was entitled, an act to suppress

20  the sale and use of Bowie knives.  Alabama passed an act to

21  suppress the use of Bowie knives; Georgia did the same thing.

22         So we see numerous tradition -- numerous analogues

23  throughout history, instances in which, in response to the

24  concerns of violence, the threat to public safety, the risk of

25  disparate use and criminality -- we see numerous instances in

1    which governments reacted in a variety of ways.  The statutes

2    that were passed here are entirely consistent with that.

3    They're consistent with the founding era of statute, they're

4    consistent with the 1934 act, and they should be affirmed on

5    that basis.

6              JUDGE BIBAS:  Thank you.

7              MR. ROSS:  Thank you, Your Honor.

8              Mr. Feigenbaum, take your time.  Whenever you're

9    ready.

10             MR. FEIGENBAUM:   May it please the Court.  Fifteen

11   states, representing almost forty percent of the U.S.

12   population, restrict assault weapons or LCMs, just as the

13   federal government did for ten years.  As Delaware has

14   explained this afternoon, there are at least three different

15   ways to affirm, and I will address each in turn, starting with

16   Judge Roth's questions about common use, turning to Judge

17   Montgomery-Reeves' questions about the history, and closing on

18   Judge Bibas' questions about irreparable harm.

19             Judge Roth, to your questions on common use, we have

20   two primary observations to make.  The first is that common use

21   is not and cannot be the exclusive criterion for Second

22   Amendment analysis.  And second is that appellants' circulation

23   test is the wrong way to think about common use.  On the

24   former, we believe that common use is part of the step one of

25   the Bruen analysis, where plaintiffs bear the burden.  And the

1  reason is twofold, both from the precedent and from the

2  evidence of original public meaning.

3         On the precedent, Bruen itself uses step-one language

4  to talk about the common use inquiry.  So at pages 2143 and

5  2144 of Bruen, it talks about arms in common use for self-

6  defense being the ones that are protected -- the ones that get

7  Second Amendment protection.  But whether something gets the

8  constitutional protection is the language of the original scope

9  of the right.  The text as originally understood.  You then

10 engage in an analogical inquiry based on the statutory history

11 to determine whether the particular restriction on that arm

12 falls inside or outside the historical tradition.  And so when

13 you're talking about the step-one analysis, what gets

14 protection, you're using exactly the kind of language like

15 "arms in common use".  And we know that it can't be step two

16 because neither Heller nor Bruen actually analyzed any state

17 statutes in engaging in the inquiry to decide whether a

18 particular arm is in common use or not as the appropriate test.

19 Instead, what they did is look at the usual sources of original

20 public meaning to understand the words that appear in the text,

21 and then they proceeded to actually engage with the analysis in

22 Bruen, dealing with the public carry right; in Heller, dealing

23 with the restriction on handguns, something that we don't see

24 going on in the way that plaintiffs would have this Court do

25 the analysis.

1    And I think the Seventh Circuit's decision in Bevis is
2    particularly helpful on this score. The Seventh Circuit's
3    decision specifically walks through the relevant original
4    public-meaning evidence. So the 1689 English Bill of Rights,
5    the state constitutions at the time, Blackstone, all of which
6    show that the specific Second Amendment right to bear arms was
7    about arms that facilitate armed self-defense. And as we have
8    undisputed record evidence here, that doesn't include assault
9    weapons; that doesn't include large capacity magazines.

10    Judge Roth, to your other questions on common use, I
11    have two points. What is the right test, and what is the right
12    denominator? Meaning, are you looking at all lawful possible
13    purposes or are you looking at self-defense, specifically? In
14    terms of what the proper test is, we don't understand how a
15    circulation or a tallying up of the number of arms in the
16    market could possibly be the appropriate test for four reasons.

17    First, I'm not aware of any constitutional right that
18    turns on looking at how many items exist in the marketplace and
19    give it constitutional protection based on a question like
20    that. Second, a circulation test, as both Bevis and Ocean
21    State Tactical most recently made clear, is inherently
22    circular. We know the test is circular because whether or not
23    something gets constitutional protection would turn on how many
24    exist in the market; and how many exist in the market would
25    turn on whether and when it was regulated. So the reason

1    machine guns are not as widespread in the market today -- Bevis

2    footnote 7 makes this clear -- is because they got restricted

3    first with registration requirements in 1934, and then with a

4    prohibition in 1986.  And so we know the reason we don't even

5    see more machine guns in circulation today is because they were

6    restricted.  But a law, as Judge Easterbrook put most

7    memorably, I would say, in Friedman -- a law can't be the

8    source of its own constitutional validity.  But that's the way

9    that their arrangement would ultimately work.  Third, the

10   approach that they take is incompatible with the agreement

11   everyone has that you can restrict machine guns.  Heller says

12   it would be startling that machine guns would get

13   constitutional protection.  This court in Palmetto said that

14   machine guns do not get constitutional protection.  And as a

15   result, we know that it can't just be a circulation test,

16   because we have 176,000 machine guns in civilian circulation

17   right now, an undisputed record finding the district court

18   made.  And again, there's no record evidence in this case at

19   the PI stage that would undermine that.  And then finally, we

20   also think a circulation test is inconsistent with Heller and

21   Bruen themselves.  Heller does not count how many handguns are

22   in circulation.  It talks about the features of a handgun that

23   make it useful for self-defense.  Palmetto, the Third Circuit's

24   decision, does not count the number of machine guns in

25   circulation.  It talks about the features that are useful in

1  warfare that aren't useful for self-defense.  Bruen does not

2  ever count up the number of weapons in public carry in deciding

3  the scope of the public carry right.  And Miller itself doesn't

4  count the number of short-barrel shotguns in circulation.  So

5  we think the test doesn't work.

6       One final point on common use to Judge Roth's question

7  about what the denominator is:  So the question about whether

8  it can include other lawful purposes, like collecting, or

9  target shooting, or hunting, or what have you, I'm not sure is

10  squarely presented in this case for two reasons.  First,

11  plaintiffs have not built a record at the preliminary

12  injunction stage that they actually want to use any of these

13  arms for purposes other than self-defense.  They haven't shown

14  a record of why they would want to use them for hunting.

15  Instead, the undisputed record evidence in this case from the

16  Yurgealitis Declaration shows that assault weapons and large

17  capacity magazines are not, in fact, useful for hunting. So

18  whatever the denominator is, I'm not sure it really matters

19  under a proper analysis in this case.  And I'm not sure it's

20  going to matter in the paradigmatic case either, because your

21  prototypical hunting rifle is going to be useful in self-

22  defense, in sharp contrast to the large capacity magazine or

23  the assault weapon.

24       But if this Court does reach that Second Amendment

25  question, we do think that the denominator is the self-defense

1   right.  Bruen says that, in engaging with historical

2   evidence -- to Judge Montgomery-Reeves' question -- you look at

3   the comparability of the burden on self-defense.  And so it

4   doesn't really make sense that common use would turn on

5   something like hunting or collecting, but the historical

6   inquiry would turn on something like self-defense.  And the

7   Bevis decision from the Seventh Circuit does a particularly

8   good job of situating the right in its original public meaning

9   and showing the original public meaning specifically yoked the

10  right to the self-defense right.  So that's everything I wanted

11  to say on the common use point.

12          Turning quickly to Judge Montgomery-Reeves' question

13  about the history, making sure I leave a minute or two for

14  irreparable harm at the end.  Two points to make here, building

15  on, I think, really helpful opinions, both from the Seventh

16  Circuit and the First Circuit; again the Bevis case and the

17  Ocean State Tactical case.  We have a historical tradition in

18  this country of regulating arms once they enter the civilian

19  market and once they become widespread enough that they need to

20  get restricted.  So the undisputed record evidence that we have

21  in this case dealing with the Bowie knives specifically

22  addresses to your question, Judge Montgomery-Reeves, exactly

23  how our historical tradition works.  It's not a circulation

24  test.  It's not the idea that once something enters the market,

25  you lose the ability to restrict it.  Instead, it's that once

1    something enters the market, you have reason to want to

2    restrict it, and legislatures do restrict it.  So forty-two

3    states had various restrictions on Bowie knives, including

4    multiple restrictions that outright prohibited both manufacture

5    and sale.  Forty-three states restricted slung shots, again,

6    including a number of them that restricted manufacture or sale.

7    So whether it's carry or manufacture or sale or even possession

8    outright, they all reflect a national and long-standing

9    historical tradition of flexibility, of different states having

10   different responses to shared public safety problems, because

11   that is a part of the historical tradition we've always seen.

12   Not every state regulates in the same way.  Alaska, New Jersey,

13   and Delaware, and other states may have very different

14   approaches to some of these public safety questions, but our

15   historical tradition has always embraced that, going back to

16   the 19th century, the 18th century, and before.

17           Now, Judge Bibas, with the two minutes remaining, I do

18   want to talk about the irreparable harm questions that you

19   asked today and make two points.  First, what we heard today at

20   the podium is that plaintiffs have embraced fully the idea that

21   constitutional harm must always be per se irreparable harm

22   because they've built no record that they're suffering any

23   irreparable harm that goes beyond that.  This isn't a surprise.

24   In the appellants' opening briefs, they also stake their case

25   entirely on the idea constitutional harm is per se irreparable

1  harm.  I don't think that can be quite right, partially because

2  this court has said that's not quite right in cases like Hohe

3  v. Casey and Anderson v. Davila.  I think it also can't be

4  right in large part because of Winter.

5       I understand that my friends on the other side are

6  trying to draw a distinction between statutory and

7  constitutional.  I'm not quite sure I understood the way they

8  were doing it.  The whole reason that agencies can't act beyond

9  the authority granted to them by statutes is our constitutional

10  understanding that the executive has to stay in the lanes the

11  legislature has provided.  So if the Army, in the case of

12  Winter, is violating NEPA, is going beyond what environmental

13  requirements would have them do, they are violating the

14  separation of powers, as I think my friends on the other side

15  would agree, because executive agents can't flout congressional

16  statutes.  And when you have that situation, you have Winter.

17  But Winter was very clear that the military exercises were

18  allowed to proceed without simply saying, merely because you

19  have a likelihood of success on the merits, we'll draw a line

20  then and collapse the entire inquiry.

21       I think it's especially important when we're thinking

22  about disrupting the status quo.  Both this court and the

23  Supreme Court have long made clear that disruptions on the

24  status quo require a little more attention, a little more

25  support at the preliminary injunction stage, especially when

1    you have, say, delays from the other party.  Which I'm not

2    saying about this case specifically, but it's something we see

3    all the time in constitutional litigation.  And I do think a

4    contrary rule would have significant problems, not just for the

5    parties, but for judicial economy, because it's going to

6    require courts to collapse PI inquiries into a single

7    likelihood of success factor every time.  And when it does the

8    likelihood of success on a limited record, this case is a

9    perfect example.  There is no record from the plaintiffs

10   dealing with some of these historical questions, these

11   technical questions, et cetera.  I do think that's a real risk

12   for courts, not just for parties.

13            And if I might go about twenty seconds over to answer

14   your question about Lewis, Judge Bibas.

15            JUDGE BIBAS:  Yes.

16            MR. FEIGENBAUM:  So I think you're asking about Lewis

17   v. Kugler.  And I just want to note in footnote 12 in that

18   opinion, the court was specifically talking as well about how

19   where as in this case it is alleged that First Amendment rights

20   have been chilled as a result of government action, a

21   presumption of irreparable harm is manifest.  So it's not even

22   clear that Lewis was fully disaggregating Fourth Amendment from

23   First Amendment, as opposed to perceiving some risk of chill in

24   that case from the behavior of the police that was being

25   challenged.  So it's not even obvious that Lewis alone -- and I

1    spot you that it's also fifty years ago in a one-off case --

2    stands for the proposition that all constitutional cases are

3    going to collapse into a single likelihood of success analysis.

4         So given Winter; given what we see in elections cases

5    like Purcell, which are also often constitutional, but

6    nevertheless, do not collapse into a likelihood of success; and

7    given that Lewis I don't think stands for that proposition, if

8    all plaintiffs are resting on is the idea that constitutional

9    harm is always irreparable harm per se, I just don't think

10   they've made their case.

11        JUDGE BIBAS:  Thank you.

12        MR. FEIGENBAUM:  Thank you.

13        JUDGE BIBAS:  Mr. Ohlendorf, rebuttal?

14        MR. OHLENDORF:  Thank you, Your Honor.  It's just a

15   few quick points.  First, on the irreparable harm and the

16   injunction factors.  I think even my friend on the other side

17   couldn't swallow the pill that a permanent injunction upon

18   finding an actual constitutional violation, a court could

19   decline to enter a permanent injunction of the violation

20   because it concluded that the other equitable factors didn't

21   favor that type of relief.

22        JUDGE BIBAS:  Sometimes a declaratory judgment

23   suffices and courts don't grant an injunction in that

24   situation.

25        MR. OHLENDORF:  Judge Bibas, I just can't conceive of

1   a rule that a First Amendment or Second Amendment violation --

2   a court would not enjoin an actual violation of one of those

3   constitutional rights because it concluded, it's just not

4   important enough; there's not enough tangible -- there's not

5   enough tangible harm here.

6         JUDGE BIBAS: All right. Well, what about your

7   friends skillfully alluding to your four-month delay in seeking

8   this relief?

9         MR. OHLENDORF: Judge Bibas, I mean, number one, all

10   of the delay cases they cited did not involve constitutional

11   rights. They involved patent disputes or monetary disputes of

12   that kind. And they also involved much, much longer delays. I

13   mean, in one of the cases was a three-year delay; and another

14   one, I think, was thirteen months. So I think that just

15   doesn't factor into the analysis at all.

16         On common use, Your Honor, if I may, plainly, that is

17   part of the tradition prong under Bruen, not the text prong. I

18   mean, I would love to hear -- I have yet to hear and I didn't

19   hear from my friends on the other side this morning what word

20   in the Second Amendment common use comes from as a matter of the

21   plain text or what Bruen called an analysis of the bare

22   text. I mean, I have yet to heard an answer to that. But we

23   do know from Heller where it does come from; it comes from two

24   historical traditions. The tradition that the militia would

25   come into militia service bearing the arms typically in common

1    use, and the tradition that, conversely, governments could ban

2    the carrying of dangerous and unusual arms.  Those clearly are

3    historical analyses under Bruen's second test, not under its

4    textual test.  And Bruen itself says this.  It says, we drew

5    the common use standard from the historical tradition.

6            Finally, on history and tradition, if I may, Judge

7    Bibas, very quickly, just two points.  First, if this Court

8    does decide to look beyond common use, the historical analysis

9    has to be limited to the founding era.  That's what a panel of

10   this court held in the Lara case.  That's binding here, unless

11   the Court decides to take it en banc.  I haven't heard -- the

12   great bulk of the founding era laws they've cited below are

13   laws that apply to slaves, specifically.  I don't think those

14   can conceivably carry its burden.  This morning, my friend

15   mentioned three laws from the 1830s.  I think 1837 is too late.

16   I also would note, one of those was struck down by the Georgia

17   Supreme Court in Nunn as contrary to the Second Amendment.  So

18   I think plainly that does not suffice to bear the State's

19   burden either.

20           JUDGE BIBAS:  Okay.  I thank you, and you're entitled

21   to some rest, because we're no longer in the morning; we're in

22   the afternoon now.

23           Ms. Murphy?

24           MS. MURPHY:  Thank you.  If I can just supplement a

25   couple of points Mr. Ohlendorf made and then add a couple more.

1   Just the one other thing I would add on the injunctive relief

2   factors is, it's not just that I think it's right as a matter

3   of comparison to other constitutional rights.  And what you

4   heard basically this morning is, this isn't causing any harm.

5   It's not a big deal, because we're pretty confident you can

6   defend yourself with something else.  And if there's one thing

7   that Heller already addressed squarely, it was that question.

8   Heller said, and I quote, it is no answer to say that it's

9   permissible to ban the possession of handguns so long as the

10   possession of other firearms, like long guns, is allowed.  And

11   then it went on to say, it doesn't matter.  We hypothesize some

12   reasons why people might prefer something -- one type of

13   firearm to another.  But at the end of that paragraph, the

14   court says, whatever the reason, handguns are the most popular

15   weapon chosen for self-defense in the home, so a complete

16   prohibition is invalid.  So I don't think it's open to the

17   State to come in now and say, you know, it's all well and good

18   that you would like to have a semi-automatic rifle, but we

19   think you can do well enough with a revolver or whatever it is

20   that they think is permissible.

21         On the common use test, I would just point you -- Mr.

22   Feigenbaum pointed specifically to page 2143 of Bruen.  I'd

23   invite you to go read that paragraph, because before the

24   court uses the words "in common use", it specifically says,

25   drawing from this historical tradition, we explained in Heller

1　that the Second Amendment protects the carrying of weapons that

2　are in common use. And if you look earlier at page 2128 of

3　Bruen, the Court again says, we found it fairly supported by

4　the historical tradition of prohibiting the carrying of

5　dangerous and unusual weapons; that the Second Amendment

6　protects the possession of weapons that are in common use at

7　the time. So it's quite clear that the Court is drawing us to

8　the common use test, not from the word "arms", which of course

9　says nothing about common use, but from the historical

10　tradition of prohibiting dangerous and unusual weapons.

11　　　　　Now, that gets to the argument you heard about how,

12　well, yeah, the court may have said that lots of times, but

13　they couldn't possibly have meant it because it's a bad test

14　and it's circular and it doesn't work. That just rests on a

15　misunderstanding of the test. Because what the State continues

16　to overlook is, it has to be dangerous and unusual in order for

17　an arm to be banned. Which means if a state comes in and just

18　bans something because it's new on the market, but what it's

19　banning is not materially different at all from things that are

20　already on the market, it's not abnormally dangerous in some

21　way that differentiates from other arms, then it's satisfied

22　the abnormally, unusually dangerous component.

23　　　　　So this whole idea of circularity is just built on a

24　false premise. And I think you see that if you look back to

25　machine guns. Everybody always wants to say, oh, machine guns

1    were -- that just proves that this is all circular because the

2    only reason they're not common is because they were banned.  In

3    fact, they were banned because they weren't common.  They came

4    onto the market around 1921.  And there were thousands of

5    them available -- tens of thousands of them available.  If you

6    look to the declaration of the State's own expert, Professor

7    Spitzer explains nobody really wanted them.  There wasn't a big

8    rush to go buy these.  Instead, there was a big rush to ban

9    them.  By 1925, states started banning them.  Thirty-two states

10   had banned them by 1934, when the federal legislation came

11   along.  So what we saw is the reaction of Americans all across

12   the country was, we actually do think this is something new and

13   different that requires different treatment.  And that's

14   particularly notable given that by the time these submachine

15   guns, bearable automatic firearms, come onto the market in the

16   1920s, semi-automatic rifles like the ones we're talking about

17   here today had been on the market for more than thirty years,

18   and nobody was prohibiting them.  And even in the 1920s, when

19   the states -- a vast majority of the states started banning

20   these automatic weapons, they recognized the difference between

21   the two.  And only a handful of states impose any restrictions

22   on semi-automatics.  And if you study those restrictions and

23   what even Professor Spitzer had to say about them, you will

24   find that no more than at absolute most five had any kind of

25   ban on semi-automatic technology, and all but the District of

1   Columbia's was repealed or amended within a few decades.

2        JUDGE ROTH:  But if it's only recently in the last

3   twenty years that semi-automatic weapons have been used by

4   people in mass shootings who want to infect as much damage and

5   death as possible very quickly so that the use that has upset

6   people today was not a use that was recognized or was not a use

7   that was in actual use fifty years ago.  So don't we have to

8   consider -- don't we have to consider the present use or the

9   change of use of these weapons, not just the fact that they

10  originally appeared on the market shortly after World War I?

11       MS. MURPHY:  If that were the typical means for which

12  they were being used, I'd be with you.  But when less than one-

13  tenth of one percent, and probably even less than that, of

14  these firearms are being used by somebody for that purpose, and

15  the vast, vast, vast majority of people in this country of

16  people who own those weapons own them for lawful purposes like

17  self-defense, then Heller and Bruen teach that you cannot ban

18  them from the possession of law-abiding citizens because the

19  Second Amendment --

20       JUDGE ROTH:  You are saying, forget the fact that it's

21  only very few cases where they're used for these terrible

22  purposes; move onto something else.  There are people who are

23  concerned that they are used for these terrible purposes,

24  miniscule as it may be, is something that is needed to protect

25  all of us from those circumstances arising in our own life?

1          MS. MURPHY:  I very, very much appreciate the concern,

2     which is a concern that all of us share, Judge Roth.  But the

3     problem is that Heller considered very similar, indeed, some of

4     the same concerns.  There were amici there who made the same

5     arguments, that handguns should be prohibited because handguns

6     are the overwhelmingly common use of firearms in mass

7     shootings.  And what the Supreme Court said is, we will take

8     all of that as a given.  We are not going to dispute that the

9     problems you're talking about are real, but the Second

10    Amendment already struck the balance in favor of protecting the

11    rights of the law-abiding citizens to protect themselves

12    against the people who would use arms to cause them and their

13    loved ones harm.

14          JUDGE BIBAS:  Thank you, Counsel.

15          MS. MURPHY:  Thank you, Your Honor.

16          JUDGE BIBAS:  The case is submitted.  We'd like to ask

17    both sides to work together to produce a transcript and split

18    the cost.  And let's go off the record for a moment so we can

19    greet counsel at sidebar before our next case.

20          (Whereupon these proceedings were concluded at 2:42 PM)

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Bridget Hearne, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

     *Bridget Hearne*
8    _____

9    Bridget Hearne

10

11   eScribers

12   7227 North 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  March 19, 2024

16

17

18

19

20

21

22

23

24

25

| & | | | |
|---|---|---|---|
| **&** 2:3,6,9,13 22:9 | 47:10 | **8** | 21:9,12 25:12 25:20 31:1 34:16,21 37:12 47:12 |
| **0** | **1973** 7:4 | **85020** 50:13 | **add** 25:24 44:25 45:1 |
| **08625** 2:18 | **19801** 2:14 | **888** 1:22 | **additional** 23:3 27:6,7 29:17 30:19 |
| **1** | **1983** 20:5,6 | **a** | **address** 33:15 |
| **1001** 2:14 | **1986** 36:4 | **abandoned** 29:10 | **addressed** 45:7 |
| **11** 1:7 22:21 | **19th** 39:16 | **abiding** 11:5 13:21,22 48:18 49:11 | **addresses** 38:22 |
| **112** 2:17 | **1:40** 1:6 | **ability** 10:12 24:5 38:25 | **adjudicative** 31:23 |
| **12** 41:17 | **2** | **able** 25:23 | **adopt** 6:1 7:15 |
| **1211** 30:14 | **20036** 2:4 | **abnormally** 46:20,22 | **affidavits** 29:6 |
| **1313** 2:13 | **2024** 1:7 50:15 | **absent** 16:19 24:1 | **affirm** 22:15,23 23:4 33:15 |
| **15** 28:2 | **207** 50:12 | **absolute** 6:5 47:24 | **affirmed** 22:14 33:4 |
| **1523** 2:4 | **20th** 32:12 | **absolutely** 12:11,21 21:7 | **afternoon** 3:5,9 10:24 33:14 44:22 |
| **16** 28:2 | **2128** 46:2 | **abuse** 9:2 | **agencies** 40:8 |
| **1634** 3:7 | **2143** 34:4 45:22 | **account** 26:24 | **agents** 40:15 |
| **1641** 3:7 | **2144** 34:5 | **accurate** 50:5 | **ago** 7:1 42:1 48:7 |
| **1689** 35:4 | **22314** 2:7,10 | **acknowledged** 29:3 | **agree** 8:17 12:11,13 13:7 40:15 |
| **16s** 28:13,25 | **23** 8:6 | **acquire** 5:16 | |
| **16th** 50:12 | **23-1633** 1:3,12 3:6 | **act** 32:12,19,20 33:4 40:8 | **agreement** 36:10 |
| **176,000** 36:16 | **23-1634** 1:4,12 | **action** 41:20 | **ahead** 8:5 |
| **1800** 1:21 | **23-1641** 1:4,12 | **actual** 27:13 42:18 43:2 48:7 | |
| **1801** 1:20 | **25** 2:16 | | |
| **1830s** 44:15 | **2:42** 49:20 | **actually** 13:18 14:8 15:2,8 17:1,24 19:9 | |
| **1837** 32:16 44:15 | **3** | | |
| **18th** 39:16 | **3** 29:25 30:2 | | |
| **19** 50:15 | **6** | | |
| **19103** 1:21 | **6** 31:24 | | |
| **1920s** 47:16,18 | **7** | | |
| **1921** 47:4 | **7** 36:2 | | |
| **1925** 47:9 | **706** 2:6,10 | | |
| **1934** 32:12 33:4 36:3 | **7227** 50:12 | | |
| | **777-6690** 1:22 | | |

al 1:4,8 3:6,8
alabama 32:16
  32:20
alaska 39:12
alexandria 2:7
  2:10
alleged 41:19
alleging 23:9
allen 26:2
  27:16 28:9
allocated 4:19
allow 10:15
  16:24 20:6
allowed 23:15
  40:18 45:10
alluding 43:7
alternatives
  25:22
amended 48:1
amendment 6:1
  6:7,10,17 7:1,3
  7:4,22,23 8:2
  8:11 9:19,19
  10:11,13 12:23
  12:25 13:4
  14:18,18,23
  15:4 16:8,10
  17:5,6 19:6,25
  20:1,2,11,14,15
  20:15 21:3,6,8
  21:10,14,14,15
  21:18 22:2
  23:8,10,14,20
  23:25 24:14,18
  26:5 29:13

30:4,8 31:7
33:22 34:7
35:6 37:24
41:19,22,23
43:1,1,20
44:17 46:1,5
48:19 49:10
amendment's
  3:16
amendments
  16:11
americans 11:5
  13:21,21,22
  47:11
amici 11:18
  49:4
amicus 10:25
amount 14:16
analogical 32:3
  34:10
analogs 32:8
analogues
  32:22
analogy 23:8
analyses 44:3
analysis 12:24
  15:9 17:23
  18:15 22:23
  23:1,11 25:12
  26:18 27:1
  29:24 30:2
  33:22,25 34:13
  34:21,25 37:19
  42:3 43:15,21
  44:8

analyzed 34:16
analyzing 10:2
  12:22
anderson 40:3
andrews 29:20
  30:24 31:4
animal 21:19
anjrpc 3:17
answer 8:19
  9:11 10:7
  11:19,20 13:1
  41:13 43:22
  45:8
anytime 14:23
anyway 4:5
apart 5:1 7:3
apologize 25:24
appeal 1:10
  31:3
appeals 1:1
appear 34:20
appearances
  1:18 2:1
appeared 48:10
appellants 1:5
  2:2 3:8,11
  33:22 39:24
appellate 1:14
appellee 1:9
  2:11
appellees 22:9
applicable
  29:22
applies 7:4

apply 7:21
  10:19 18:5,10
  18:16,17 20:24
  21:6 44:13
appreciate 49:1
approach
  16:13 20:16
  32:7 36:10
approaches
  39:14
appropriate
  34:18 35:16
ar 28:2
area 31:12
areas 21:3
argue 25:3
argued 22:20
  22:21 23:3
  25:3 30:24
argument 8:12
  8:13,14,19
  9:22 11:23
  17:11 21:17
  22:18,22,25
  29:2,16 30:12
  31:3 46:11
arguments
  11:13,15 49:5
arising 48:25
arm 11:22,23
  12:2,7,15,15,24
  13:2,2 14:15
  15:2 34:11,18
  46:17

**armed** 14:21
24:14 35:7
**arms** 3:19,23
3:23,25 6:6
9:23 10:4,9,15
10:18,19 11:11
11:19,21 12:3
12:3,20,21
13:6,19 14:13
14:19 34:5,15
35:6,7,15
37:13 38:18
43:25 44:2
46:8,21 49:12
**army** 28:22
40:11
**aronstam** 2:13
22:9
**arrangement**
36:9
**aside** 13:17
15:21
**asked** 15:2 16:1
39:19
**asking** 21:5
41:16
**aspect** 12:23
**aspects** 22:23
**assault** 5:12
14:10 15:18
22:18 24:11
25:16 33:12
35:8 37:16,23
**association** 1:4
3:6 23:23

**atom** 14:5
**attacker** 14:16
**attackers** 15:5
**attempted**
27:10,10,17,18
**attention** 40:24
**attorney** 2:16
**authority** 40:9
**automatic** 4:1
11:5,24 14:2
14:10,13 22:13
28:1,20,21
45:18 47:15,16
47:20,25 48:3
**automatically**
6:2
**automatics**
47:22
**available** 17:7
24:15 25:22
47:5,5
**avenue** 2:4
**avenues** 24:15
**aver** 5:17
**averred** 9:17
**aware** 35:17
**ayers** 24:2
**az** 50:13

**b**

**b** 30:2
**back** 10:23
15:9 20:23
22:5 29:15
39:15 46:24

**bad** 19:22
46:13
**balance** 5:5
17:13 19:1
25:1,23 26:5,6
26:9 49:10
**balancing**
16:21 18:20
26:8
**ban** 3:22,25 6:8
9:23 10:4,8,18
10:18 13:5
28:13 44:1
45:9 47:8,25
48:17
**banc** 44:11
**banned** 4:1
5:15 11:6 13:3
46:17 47:2,3
47:10
**banning** 22:11
46:19 47:9,19
**bans** 3:20 4:5
46:18
**bar** 30:16
**bare** 43:21
**barrel** 37:4
**based** 25:19
34:10 35:19
**basically** 16:13
16:17 20:5
45:4
**basis** 23:3
25:21,23 33:5

**bear** 6:7 10:15
11:11 14:19
15:22,23 33:25
35:6 44:18
**bearable** 3:18
11:21 12:7,20
47:15
**bearing** 43:25
**begins** 11:17
**behalf** 10:25
22:9
**behavior** 41:24
**believe** 15:15
15:15 23:16,19
30:25 31:18
33:24
**best** 12:9 24:23
**bevis** 28:2
30:13 35:1,20
36:1 38:7,16
**beyond** 29:16
39:23 40:8,12
44:8
**bibas** 1:15 4:6
4:9,13,21,24
5:1,4,5,8,11,17
5:20,21,25 6:5
6:24 7:10,20
7:24 8:1 9:2,5
10:20,22 11:3
15:20,25 16:13
17:4 18:18,22
19:3,11,13,24
20:12,23 21:2
21:5,21 22:3,5

23:7 24:17
25:1 26:4
31:12 33:6,18
39:17 41:14,15
42:11,13,22,25
43:6,9 44:7,20
49:14,16
**big** 45:5 47:7,8
**biggest** 21:13
**bill** 17:2 35:4
**binding** 44:10
**bit** 17:24 27:4
**blackstone**
35:5
**blanket** 6:1
**bomb** 14:5
**books** 18:10
**borrow** 21:5
**bowie** 32:18,20
32:21 38:21
39:3
**box** 2:17
**boy** 20:20
**brennan** 30:13
**bridget** 2:25
50:4,9
**brief** 22:21
29:12
**briefly** 31:6
**briefs** 39:24
**brookins** 2:9
**bruen** 3:15,19
4:9,10,18 9:24
10:5,8,9,13
11:8,9,14,15,16

11:20 12:14,14
12:19 13:4,13
20:16,23 22:23
26:4,9,11 29:4
29:13,23,24
31:24 32:4
33:25 34:3,5
34:16,22 36:21
37:1 38:1
43:17,21 44:4
45:22 46:3
48:17
**bruen's** 22:25
44:3
**building** 38:14
**built** 37:11
39:22 46:23
**bulk** 7:19 44:12
**burden** 3:19
4:6,8,10,13,16
4:19,20,22
13:18 15:15,16
15:17 21:22
33:25 38:3
44:14,19
**burdens** 4:17
4:18 15:22,23
15:25
**buy** 47:8

**c**

**c** 3:1 50:2,2
**cabin** 14:15
**call** 6:8
**called** 3:5 5:13
5:13 15:18

29:5 43:21
**capabilities**
27:24 28:4
**capable** 12:6,10
12:17 14:5,8
**capacity** 5:13
22:19 35:9
37:17,22
**carry** 14:24
15:14 34:22
37:2,3 39:7
44:14
**carrying** 10:9
29:14 44:2
46:1,4
**case** 1:3,12 3:5
3:16,17 4:17
7:1,4,7,22 8:8
10:18 19:13,18
25:13 27:5,8
29:16 30:7,13
36:18 37:10,15
37:19,20 38:16
38:17,21 39:24
40:11 41:2,8
41:19,24 42:1
42:10 44:10
49:16,19
**cases** 7:3,7,19
7:20,23 8:2 9:4
17:7 19:6,8,20
20:19 21:11,14
21:15 23:24
31:16,17,20
40:2 42:2,4

43:10,13 48:21
**casey** 40:3
**cast** 6:4
**category** 21:17
**cause** 16:6 28:7
49:12
**causing** 17:15
45:4
**ceases** 11:23
**century** 7:1
32:12 39:16,16
**certain** 3:22
10:18
**certainly** 5:16
7:7 15:23
**certify** 50:4
**cetera** 41:11
**challenged**
41:25
**chance** 18:19
**change** 32:2
48:9
**changes** 31:9
**characteristics**
23:6 27:24
28:4
**characterized**
20:3
**chill** 41:23
**chilled** 41:20
**chose** 8:6 27:20
31:21,22
**chosen** 45:15
**christmas** 24:3

circuit 1:1,15
1:15,16 16:7
28:1 30:14
38:7,16,16
circuit's 35:1,2
36:23
circular 35:22
35:22 46:14
47:1
circularity
46:23
circulation
33:22 35:15,20
36:5,15,16,20
36:22,25 37:4
38:23
circumstances
16:19 32:4
48:25
cite 23:24
cited 43:10
44:12
citing 31:20
citizens 48:18
49:11
city 4:16
civilian 36:16
38:18
claimants 20:6
class 20:11
clear 14:12
31:10 35:21
36:2 40:17,23
41:22 46:7

clearly 28:24
44:2
clement 2:6,9
clerk 3:2,4,13
closing 33:17
collapse 7:10
25:2 40:20
41:6 42:3,6
collapses 16:13
23:19 26:12
collecting 37:8
38:5
columbia's
48:1
combat 28:23
come 16:11
20:20 43:23,25
45:17 47:15
comes 11:20
16:15 21:14
26:7 32:11
43:20,23 46:17
commercial
30:7,8,9
common 3:24
3:25 6:23,24
7:2 11:11
12:12,21 13:6
13:22 15:10,16
22:19 23:2
28:3 29:11,24
30:1,5,19,20,21
30:21,23,25
33:16,19,20,23
33:24 34:4,5

34:15,18 35:10
37:6 38:4,11
43:16,20,25
44:5,8 45:21
45:24 46:2,6,8
46:9 47:2,3
49:6
commonality
30:15
commonly 9:23
10:4 12:8,15
13:20
company 1:20
comparability
38:3
compared 14:3
comparison
45:3
complete 45:15
complex 2:17
component
46:22
conceivably
44:14
conceive 42:25
conception
14:17 15:1
concern 32:1
49:1,2
concerned
48:23
concerns 31:9
32:24 49:4
conclude 9:18

concluded
15:17 42:20
43:3 49:20
conclusion
11:13
conclusive 7:4
confident 45:5
confrontation
14:22
confronted
21:16
congressional
40:15
consider 12:16
30:9 48:8,8
consideration
24:25
considered
11:15,16 25:25
49:3
considering
30:21
consistent 3:20
3:23 10:3 13:3
14:17 30:3
33:2,3,4
constellation
6:23,24
constitute 9:20
11:21
constitution
16:20,24
constitutional
6:23,25 7:23
9:6,7,10,15

16:6,16,17,23
17:17,18 18:13
19:21 20:6
24:9 26:22
30:6 34:8
35:17,19,23
36:8,13,14
39:21,25 40:7
40:9 41:3 42:2
42:5,8,18 43:3
43:10 45:3
**constitutions**
35:5
**construct** 31:5
**construction**
23:23
**contemplates**
29:24
**contemplation**
14:23
**context** 6:17
9:20 17:20,22
17:25 18:6,8
18:14 19:25
20:9,14 21:10
22:2 23:20,22
23:25 26:7
**contexts** 22:1
23:14,21
**continues**
46:15
**contrary** 41:4
44:17
**contrast** 37:22

**conversely** 44:1
**cooper** 2:3
**core** 23:6 24:14
27:22
**correct** 4:24
7:20 8:15
12:21 16:17
**cost** 49:18
**counsel** 2:8 4:6
49:14,19
**count** 36:21,24
37:2,4
**countenanced**
10:16
**country** 38:18
47:12 48:15
**counts** 6:2
**couple** 44:25,25
**course** 9:14
17:23 25:21
46:8
**court** 1:1,10,20
3:10,21,25
6:11,21 8:2,21
8:24 9:13 10:1
14:20 15:17
17:11 18:9
19:14,20,20
20:10,22 21:7
21:16,19,24
22:14,17,22,22
23:4,17 24:5
24:10,12,22
25:7,9,11,17,23
25:24 26:4,23

27:13 28:12,25
30:3,7 32:3
33:10 34:24
36:13,17 37:24
40:2,22,23
41:18 42:18
43:2 44:7,10
44:11,17 45:14
45:24 46:3,7
46:12 49:7
**court's** 3:11,15
3:17 4:4,15 7:7
11:1,8 16:3
22:10,15 25:8
**courts** 7:8 19:6
21:16 26:6
31:21,24 41:6
41:12 42:23
**criminality**
32:25
**criterion** 33:21
**critical** 31:7
32:2
**critically** 24:12
30:11
**cross** 27:19
**cruelty** 21:19
**currently** 5:18
**curtail** 10:12

**d**

**d** 2:3 3:1
**damage** 48:4
**dangerous** 44:2
46:5,10,16,20
46:22

**date** 50:15
**david** 2:12 22:8
**davila** 40:3
**day** 8:9
**dc** 2:4
**de** 2:14
**dead** 32:5
**deal** 31:25 45:5
**dealing** 12:17
34:22,22 38:21
41:10
**death** 48:5
**decades** 48:1
**decide** 34:17
44:8
**decided** 9:23
21:19
**decides** 44:11
**deciding** 37:2
**decision** 3:17
4:4,15 11:8
23:4 35:1,3
36:24 38:7
**decisions** 3:15
**declaration**
26:1 27:14,23
28:9,21 29:7
32:9 37:16
47:6
**declarations**
5:2,7,9,22 9:16
25:15 31:16,20
**declaratory**
42:22

decline 42:19
defend 45:6
defendant's 29:5
defendants 22:9 25:5
defense 9:24
10:5 11:12,22
12:2,3,7,10,15
13:7,11,11,14
13:14,16,23
14:1,3,5,6,8,9
14:11,24,25
15:3,12,14
24:15 25:6,20
27:12,15,16
30:20,23 31:1
34:6 35:7,13
36:23 37:1,13
37:22,25 38:3
38:6,10 45:15
48:17
deference 25:8
definition 12:20
degree 24:24
delaware 1:3,7
1:11 3:6,19
5:16 11:6,7
33:13 39:13
delaware's 3:25 4:1,5 8:9
delay 43:7,10 43:13

delayed 24:4
delays 41:1 43:12
delving 8:13
denominator 35:12 37:7,18 37:25
department 1:7
depends 14:14
depictions 21:19
depravation 6:1
deprivated 24:9
deprive 16:5
description 12:16,16
designed 28:5
detachable 11:25
determination 9:1
determine 8:24 8:25 9:14 10:14 34:11
determined 3:22 18:11
determining 6:22
devastating 25:25
devoted 9:25
difference 19:17 22:12

26:17 27:25
28:19,24 47:20
differences 21:13,13
different 16:9
18:15 24:1
26:6 27:1
33:14 39:9,10
39:13 46:19
47:13,13
differentiates 46:21
differently 20:21
disaggregating 41:22
disagree 15:20
disagreed 31:4
discretion 8:19
8:21,24 9:3,18
22:10
discretionary 9:10
discuss 31:6
disparate 32:25
dispositive 12:22
dispute 5:20 8:5 49:8
disputed 9:17 10:10
disputes 43:11 43:11
disrupting 40:22

disruptions 40:23
dissent 30:13
distinction 13:12 40:6
district 1:10,11
1:11 3:24 4:4
8:2 15:17 16:4
22:10,15,22
23:4,17 24:10
24:12 25:7,8,9
25:17 29:5
36:17 47:25
doing 22:1
23:11 40:8
dollars 32:18
doubting 19:8
dramatic 31:9 32:2
draw 19:1 40:6 40:19
drawing 45:25 46:7
drew 21:24 44:4
dssa 10:25
due 7:8 20:4
duke 2:6,10

**e**

e 2:5,12 3:1,1 50:2
earlier 46:2
easier 17:24
easily 13:17,17

easterbrook 36:6
ebay 7:14
economy 41:5
effects 25:25
effort 11:9
efforts 11:12
eights 28:7
either 8:3 32:5
  32:17 37:20
  44:19
elected 29:9
election 8:4,4
elections 42:4
embraced
  39:15,20
emphatically
  20:10
en 44:11
enforced 8:10
enforcement
  16:4 28:6
engage 34:10
  34:21
engaging 34:17
  38:1
english 35:4
enjoin 22:11
  43:2
enter 38:18
  42:19
enters 38:24
  39:1
entire 40:20

entirely 33:2
  39:25
entitled 32:19
  44:20
environmental
  40:12
equal 7:8 23:22
equally 7:21
equitable 7:15
  42:20
equities 5:6
  17:13 25:2
equity 7:13
  17:4,5
equivalent
  32:18
era 32:15 33:3
  44:9,12
erin 2:5 10:24
escribers 50:11
especially 25:9
  40:21,25
esq 2:3,5,9,12
  2:15
essentially 6:14
  6:16
establish 22:16
  23:18 27:8
established
  19:24 25:16
  26:22
et 1:4,8 3:6,8
  41:11
evan 1:11

everybody
  46:25
evidence 5:1
  25:14,20 27:6
  27:11,13,15
  28:20 29:10,18
  31:11,23 34:2
  35:4,8 36:18
  37:15 38:2,20
evidentiary
  27:17
exactly 22:1
  31:23 34:14
  38:22
examination
  32:8
examine 27:19
example 23:22
  24:2 30:6
  32:15 41:9
except 17:4
exceptional
  20:3
exclusive 33:21
executive 40:10
  40:15
exercise 9:15
  22:10 23:10
  24:16
exercises 40:17
exercising 8:10
  17:16
exist 35:18,24
  35:24

expand 20:1
expert 31:20
  47:6
experts 27:20
  29:6,7
explain 23:2
  28:15
explained
  14:20 33:14
  45:25
explaining
  20:14 21:9
explains 47:7
express 24:7
  25:9
extent 10:10
  11:17 25:14
extraordinarily
  16:19
extraordinary
  7:12

f

f 50:2
facilitate 35:7
fact 4:11 13:17
  13:25 14:5
  18:7 23:9
  25:19 26:22
  27:16 28:22
  31:19,19 37:17
  47:3 48:9,20
factor 5:3
  19:16 24:13
  41:7 43:15

**factors** 4:14,23
7:11 15:21
18:5,8,17 19:4
19:15 22:24
24:23 42:16,20
45:2
**facts** 16:18
27:6,7 31:15
31:19,23
**factual** 24:10
25:12,14 31:7
31:10 32:1,6
**failed** 22:15
**fairly** 46:3
**fall** 28:24
**falls** 34:12
**false** 46:24
**fatalities** 28:10
**favor** 16:22
42:21 49:10
**features** 11:24
27:22 36:22,25
**federal** 33:13
47:10
**feel** 14:7
**feigenbaum**
2:15 33:8,10
41:16 42:12
45:22
**fifteen** 33:10
**fifty** 42:1 48:7
**final** 27:2 37:6
**finally** 36:19
44:6

**find** 6:25 17:11
23:18 32:5,8
47:24
**finding** 19:19
22:15 26:25
31:8 36:17
42:18
**findings** 24:10
29:21 31:7,10
32:1,7
**fire** 14:15,15
15:5,8 22:13
28:1,20,22,22
**firearm** 4:2
11:23 14:22
15:3,5 45:13
**firearms** 3:18
5:10,11,18,19
10:9 11:18
25:6 45:10
47:15 48:14
49:6
**fired** 15:2
**first** 3:5 6:17
7:3,22,23 8:2
9:19 16:8,11
17:22 19:6,25
20:1,2,14,15
21:3,6,8,10,13
21:14,18 22:7
22:14 23:8,14
23:20,25 30:7
33:20 35:17
36:3 37:10
38:16 39:19

41:19,23 42:15
43:1 44:7
**fits** 32:12
**five** 9:25 29:6,7
47:24
**flat** 3:22
**flexibility** 39:9
**flout** 40:15
**focus** 22:24
23:1,12 31:2
**focused** 24:6
31:3
**focusing** 8:12
**follow** 10:17
**follows** 9:1
**footnote** 31:24
36:2 41:17
**forbidden** 11:8
**force** 23:8
**foreclose** 30:15
**forecloses** 11:9
**foregoing** 50:4
**forget** 48:20
**form** 21:20
**former** 33:24
**fortunately**
15:4,7
**forty** 33:11
39:2,5
**forward** 6:8
**found** 6:25
15:10 24:12,22
25:17 29:21
30:10 46:3

**founding** 32:11
32:15 33:3
44:9,12
**four** 5:6 7:10
11:1 19:16
25:15 35:16
43:7
**fourth** 6:25 7:3
41:22
**friedman** 36:7
**friend** 16:1
23:1,7 31:2
42:16 44:14
**friends** 26:16
27:5 31:14
40:5,14 43:7
43:19
**full** 22:23
**fully** 22:13 28:1
28:20 39:20
41:22
**functionality**
11:25
**fundamental**
19:22 20:18
**fundamentally**
11:14
**further** 6:21
22:4

**g**

**g** 3:1
**general** 2:16
**georgia** 32:16
32:21 44:16

give 35:19
given 28:23
  42:4,4,7 47:14
  49:8
go 8:5,9 13:1
  21:5 41:13
  45:23 47:8
  49:18
goes 32:2 39:23
going 6:8 8:3,8
  8:20 16:20,24
  18:9 20:20
  22:7 31:2
  34:24 37:20,21
  39:15 40:12
  41:5 42:3 49:8
good 3:9 10:24
  38:8 45:17
government
  9:23 10:4
  21:23 30:17
  32:5 33:13
  41:20
governments
  33:1 44:1
graham 3:10
grant 42:23
granted 7:13
  11:3 19:13
  40:9
gray 3:8,10
great 3:13 7:19
  10:13 44:12
greater 10:15

greet 49:19
gruesome 28:8
guess 22:7
gun 28:2,3
guns 15:18
  22:11,12 23:5
  23:6 24:12,19
  24:20 25:17
  27:22,25 28:4
  28:13,16,18
  29:11 30:1
  36:1,5,11,12,14
  36:16,24 45:10
  46:25,25 47:15

**h**

hair 24:8
half 7:1 15:22
hampshire 2:4
handful 47:21
handgun 36:22
handguns 14:4
  15:10 34:23
  36:21 45:9,14
  49:5,5
happen 17:14
  18:20
happy 13:15
hard 19:19
hardened 28:7
harm 5:3,5
  6:14,22 8:18
  9:20 16:7
  17:16,23 18:3
  18:11 22:16,24
  23:11,19 24:13

  26:18 27:4,8
  33:18 38:14
  39:18,21,21,23
  39:25 40:1
  41:21 42:9,9
  42:15 43:5
  45:4 49:13
harms 18:22
harrisburg
  4:16
hear 3:2 10:22
  43:18,18,19
heard 12:12
  39:19 43:22
  44:11 45:4
  46:11
hearing 27:17
hearne 2:25
  50:4,9
heffner 30:6
held 3:25 9:24
  10:4,5 13:20
  44:10
heller 3:15,21
  9:22 10:4,16
  10:17,19 11:20
  12:14 13:4,13
  15:9,10 28:12
  29:1 34:16,22
  36:11,20,21
  43:23 45:7,8
  45:25 48:17
  49:3
helpful 35:2
  38:15

historical 3:20
  3:23 10:14
  11:10,16 12:11
  12:23 13:7
  20:16 21:9,24
  22:20 23:1
  29:4,6,8,11
  30:2,15 32:5
  32:10 34:12
  38:1,5,17,23
  39:9,11,15
  41:10 43:24
  44:3,5,8 45:25
  46:4,9
history 3:22
  4:10,20 7:13
  10:2,3 17:5
  20:24 32:14,23
  33:17 34:10
  38:13 44:6
hohe 40:2
home 10:10
  14:20,24,25
  45:15
homeland 1:7
hon 1:11,15,15
  1:16
hone 15:6
honing 13:24
honor 3:9,14
  7:6 10:24 22:8
  24:10 31:18
  33:7 42:14
  43:16 49:15

hughes 2:17
hundred 21:22
hunting 37:9
  37:14,17,21
  38:5
hypothesize
  45:11

## i

idea 30:14
  38:24 39:20,25
  42:8 46:23
identical 27:23
identify 13:22
illegal 32:17
immaterial
  22:20 29:12
implying 20:17
important
  13:12 40:21
  43:4
impose 47:21
imposed 32:17
inch 28:7
include 30:19
  35:8,9 37:8
includes 12:20
  32:12
including 11:14
  13:14 23:22
  25:6 29:6,7,7
  39:3,6
incompatible
  11:14 36:10
inconsistent
  36:20

increase 28:10
independent
  22:14 23:11
indicated 27:21
individual 16:8
  16:16,22 19:21
  24:7
infect 48:4
infer 5:21
infringe 16:25
infringed 24:18
infringement
  24:22,23,25
infringements
  10:15
inherently
  35:21
initial 4:9
initially 29:3
injunction 4:12
  4:17 7:16 8:22
  9:5 17:20,22
  18:14,16 20:7
  22:17 23:21
  24:2,24 26:12
  26:14,15,19,19
  27:1,2 29:20
  29:22 37:12
  40:25 42:16,17
  42:19,23
injunctive 4:14
  4:23 15:21
  17:25 18:6,7
  26:7 45:1

injuries 28:8,10
injury 5:23 6:3
  6:11
inquiries 41:6
inquiry 4:10
  12:6,19 15:13
  26:10,12 29:4
  29:25 30:6,15
  31:8 34:4,10
  34:17 38:6
  40:20
inside 34:12
instance 14:4
instances 32:23
  32:25
instructive
  21:12
intangible 9:7
integral 12:2
  12:16
interest 5:6
  16:5,21,22
  17:1,6,6,17
  18:12 19:23
  25:2,4
interests 9:7
  24:1
introducing
  29:17
invalid 45:16
invitations 24:3
invite 45:23
inviting 20:5
invoked 20:14

invoking 21:11
involve 8:2 9:6
  9:6 10:8 43:10
involved 10:9
  43:11,12
involving 7:20
  9:5 10:18
irreparable 5:3
  5:5,22 6:3,10
  6:14,22 8:18
  9:20 16:7
  17:16 18:3
  22:16,24 23:11
  24:13 26:18
  27:4,8 33:18
  38:14 39:18,21
  39:23,25 41:21
  42:9,15
issue 3:18 9:10
  23:5 27:12,19
  27:21
issues 20:5
  21:15
items 35:18

## j

j 1:11 2:17
jane 1:16
jeremy 2:15
jersey 2:16
  23:1 31:2
  39:12
job 38:8
john 2:3 3:10
judge 1:11,15
  1:15,16 3:2,3

4:6,8,13,21,24
5:1,3,5,8,11,17
5:20,21,25 6:5
6:12,16,24
7:10,19,24 8:1
8:12,15,17,23
9:2,5,9,21 10:7
10:20,20,21,22
11:3 12:1,13
13:9,25 15:20
15:25 16:13
17:4,19 18:2
18:18,22 19:3
19:11,13,24
20:12,23 21:2
21:5,21 22:3,3
22:4,5 23:7
24:17 25:1
26:4,16 27:3
29:15,19,20
30:13,19,24
31:4,12 33:6
33:16,16,18,19
35:10 36:6
37:6 38:2,12
38:22 39:17
41:14,15 42:11
42:13,22,25
43:6,9 44:6,20
48:2,20 49:2
49:14,16
**judgment** 4:18
42:22
**judicial** 41:5

**jump** 7:17
**jurisprudence**
21:8
**jury** 17:7
**justice** 2:17
28:14
**justify** 3:20
21:23

**k**

**k.a.** 16:3
**keep** 6:7 10:16
11:11 14:19,24
15:6,14
**kind** 17:1 19:5
34:14 43:12
47:24
**kirk** 2:3
**knives** 32:19,20
32:21 38:21
39:3
**know** 5:14 6:4
6:8 7:6 18:14
20:9 32:4,6
34:15 35:22
36:4,15 43:23
45:17
**kreps** 23:24
**kugler** 41:17

**l**

**lack** 22:13
27:25 28:20
**lanes** 40:10
**language** 7:12
12:14 30:3,20

34:3,8,14
**lara** 44:10
**large** 5:13
22:19 35:9
37:16,22 40:4
**late** 44:15
**law** 4:1 6:6,9
6:18,20 7:7 8:9
10:3 11:5
13:21,22 16:4
16:7,15 17:11
17:12,14 18:9
18:10 20:14,15
20:15 21:3
28:6 36:6,7
48:18 49:11
**lawful** 3:24
11:12 13:6,10
13:14 14:19
15:11 25:6
35:12 37:8
48:16
**laws** 3:25 11:16
16:5,24 17:18
32:16 44:12,13
44:15
**lcms** 33:12
**leave** 18:9
38:13
**leaving** 19:7
**left** 16:12
**legal** 8:14,19
9:11 12:4,4
30:22

**legislation**
47:10
**legislative**
31:15,19
**legislature**
40:11
**legislatures**
39:2
**lengths** 10:13
**lethality** 28:5
**lewis** 24:5
41:14,16,22,25
42:7
**liaison** 2:8
**lie** 4:17
**lies** 16:22
**life** 48:25
**light** 32:6
**likelihood** 4:21
6:13 7:11,25
8:13,24,25
16:14 17:23,24
19:2,9 23:13
26:13 40:19
41:7,8 42:3,6
**likely** 23:17
**limited** 24:22
26:25 28:23
41:8 44:9
**limits** 10:11
**line** 40:19
**litigation** 41:3
**little** 17:24 27:4
40:24,24

**long** 15:18 24:8
  32:10 39:8
  40:23 45:9,10
**longer** 43:12
  44:21
**look** 9:11 13:8
  15:9,24 17:10
  19:5,19 23:24
  25:8,12 26:5
  31:16 32:15
  34:19 38:2
  44:8 46:2,24
  47:6
**looked** 3:21
  21:8
**looking** 21:23
  35:12,13,18
**looks** 27:4
**lose** 38:25
**lot** 8:2 21:15,25
  21:25
**lots** 46:12
**love** 43:18
**loved** 49:13
**lucy** 26:1 27:15
  28:8

**m**

**m** 28:2,13,25
**machine** 22:12
  23:6 27:22,25
  28:3,4,13,16,18
  36:1,5,11,12,14
  36:16,24 46:25
  46:25

**made** 11:23
  22:18 32:17
  35:21 36:18
  40:23 42:10
  44:25 49:4
**magazine**
  11:25 37:22
**magazines** 3:18
  5:10,13 11:7
  11:19 13:19
  22:19 35:9
  37:17
**majority** 47:19
  48:15
**make** 9:16
  26:17 33:20
  36:23 38:4,14
  39:19
**makes** 19:17
  36:2
**making** 29:21
  38:13
**manifest** 41:21
**manufacture**
  39:4,6,7
**march** 1:7
  50:15
**mariel** 2:9
**market** 1:20
  2:13,16 4:2
  35:16,24,24
  36:1 38:19,24
  39:1 46:18,20
  47:4,15,17
  48:10

**marketplace**
  35:18
**mass** 26:2 28:9
  48:4 49:6
**massive** 32:17
**materially**
  46:19
**matter** 3:16 4:4
  12:8 17:19
  19:5 37:20
  43:20 45:2,11
**matters** 12:6
  17:21 37:18
**maximize** 28:5
**mcdonald**
  20:17
**mean** 6:4,7
  7:16,20 8:8,18
  8:19,21 9:4,13
  9:15 14:14
  16:2,10,17
  17:9,14 18:17
  19:10 21:12
  23:10 24:17,19
  24:21 32:14
  43:9,13,18,22
**meaning** 23:2
  34:2,20 35:4
  35:12 38:8,9
**meaningful**
  20:18
**means** 14:20
  17:15 46:17
  48:11

**meant** 46:13
**memorably**
  36:7
**mentioned**
  44:15
**mercexchange**
  7:14
**merely** 40:18
**merits** 4:22
  7:11,18 15:22
  16:14 18:19,24
  19:1,10 23:12
  23:13,14,17
  26:13 40:19
**method** 28:22
**military** 40:17
**militia** 43:24,25
**miller** 37:3
**millions** 11:5,7
  13:20,21
**miniscule** 14:3
  48:24
**minute** 38:13
**minutes** 3:12
  11:1 39:17
**mistake** 31:10
**misunderstan...**
  46:15
**moment** 6:12
  31:6 49:18
**monetary**
  43:11
**montgomery**
  1:15 6:12,17
  8:12,15,17 9:9

9:21 10:8 17:19 18:2 26:16 27:3 33:17 38:2,12 38:22
**month** 43:7
**months** 43:14
**moritz** 2:13 22:9
**morning** 43:19 44:14,21 45:4
**mountain** 16:3
**move** 48:22
**multiple** 39:4
**murphy** 2:5,6,9 10:22,24,25 11:4 12:5,18 13:13 14:12 15:23 16:2,15 17:9,21 18:4 18:21,25 19:4 19:12,17 20:8 20:13 21:1,4,7 21:22 30:6 44:23,24 48:11 49:1,15

**n**

**n** 2:13 3:1 50:2
**nation** 32:11
**national** 1:20 39:8
**nature** 26:10
**necessarily** 17:15

**necessary** 14:7 22:16
**need** 6:21 10:5 13:16 18:3 19:16 23:12 27:6 32:5,7 38:19
**needed** 27:7 48:24
**needs** 18:20
**neither** 25:19 34:16
**nepa** 40:12
**never** 18:7
**nevertheless** 42:6
**new** 2:4,16 10:2 21:17 23:1 31:2 39:12 46:18 47:12
**newly** 11:6
**nj** 2:18
**north** 50:12
**nos** 1:3,12
**notable** 47:14
**note** 28:19 30:11 41:17 44:16
**noted** 24:5,11 26:14 32:14
**notes** 29:25
**notion** 17:2
**november** 8:6
**nrdc** 19:11

**nssf** 10:25
**nuanced** 32:7
**number** 28:10 28:16 35:15 36:24 37:2,4 39:6 43:9
**numbers** 3:6
**numerous** 24:15 25:22 32:22,22,25
**nunn** 44:17
**nw** 2:4

**o**

**o** 3:1 50:2
**objections** 7:21
**observations** 33:20
**obtain** 5:9 22:16
**obtaining** 6:6
**obvious** 41:25
**obviously** 24:4 26:23
**ocean** 35:20 38:17
**odd** 31:12
**odds** 17:2 20:21
**offered** 27:7
**office** 2:16
**officers** 28:6
**oh** 19:14 46:25
**ohlendorf** 2:3 3:8,9,10,14 4:8 4:15,24 5:3,8

5:14,19,24 6:4 6:16 7:6,19,25 8:8,15,23 9:4 9:13 10:7 42:13,14,25 43:9 44:25
**okay** 5:17 7:10 20:23 26:4 44:20
**old** 17:4
**once** 12:24 17:14 21:19 26:5,21 38:18 38:19,24,25
**one's** 24:14
**ones** 34:6,6 47:16 49:13
**open** 45:16
**opening** 29:4 29:12 39:24
**opinion** 28:2 29:25 41:18
**opinions** 38:15
**opposed** 13:11 41:23
**oral** 22:22
**order** 46:16
**original** 34:2,8 34:19 35:3 38:8,9
**originally** 34:9 48:10
**outlets** 16:11
**outright** 39:4,8

| | | | |
|---|---|---|---|
| **outside** 10:10 14:25 19:25 34:12 | 39:11 40:4 43:17 | **perfect** 41:9 | 22:15,18 24:11 25:5,15 27:9 |
| **overlook** 46:16 | **partially** 40:1 | **performance** 23:6 27:22,24 | 27:18 29:3,9 |
| **overstatement** 7:2 | **particular** 14:15,16 15:2 | 28:3,19 | 29:12,17 30:12 |
| **overwhelmin...** 49:6 | 34:11,18 | **period** 6:2 | 31:11,20,22 |
| **own** 11:5,7 | **particularly** 19:9 21:10 | **permanent** 7:16 18:6,7,14 | 33:25 34:24 |
| 24:11,12 25:16 | 26:14 35:2 | 26:15,19 42:17 | 37:11 39:20 |
| 25:17 27:20 | 38:7 47:14 | 42:19 | 41:9 42:8 |
| 36:8 47:6 | **parties** 3:4 41:5 | **permissible** 45:9,20 | **please** 3:10 33:10 |
| 48:16,16,25 | 41:12 | **permission** 3:11 11:1 | **pm** 49:20 |
| **owned** 13:20 | **party** 24:4 41:1 | **persist** 21:2 | **pocono** 16:3 |
| **owning** 13:22 | **passed** 8:4 32:16,20 33:2 | **ph** 3:10 | **podium** 39:20 |
| **p** | **past** 6:19 | **philadelphia** 1:21 | **point** 10:21 29:15 37:6 |
| **p** 3:1 | **patent** 43:11 | **phoenix** 50:13 | 38:11 45:21 |
| **p.m.** 1:6 | **patience** 3:5 | **pi** 36:19 41:6 | **pointed** 45:22 |
| **p.o.** 2:17 | **pattern** 32:13 | **piece** 17:22 | **points** 27:20 35:11 38:14 |
| **pa** 1:21 | **penetrate** 28:6 | **pill** 42:17 | 39:19 42:15 |
| **page** 1:18 22:20 30:14 | **pennsylvania** 23:23 | **pis** 7:12 | 44:7,25 |
| 45:22 46:2 | **people** 11:11 15:4,14 16:6 | **pistols** 5:15 11:6 | **police** 41:24 |
| **pages** 9:25 10:1 34:4 | 16:10 45:12 | **pivoted** 29:10 | **popular** 4:2,3 30:18 45:14 |
| **palmetto** 36:13 36:23 | 48:4,6,15,16,22 49:12 | **places** 15:7 | **population** 33:12 |
| **panel** 1:14 44:9 | **perceiving** 41:23 | **plain** 3:17 30:3 43:21 | **possessed** 15:11 |
| **papers** 29:4 | **percent** 18:18 18:25 21:22 | **plainly** 3:18 43:16 44:18 | **possessing** 14:20 |
| **paradigmatic** 37:20 | 33:11 48:13 | **plaintiff** 22:25 24:6,16 26:21 | **possession** 10:8 15:14 39:7 |
| **paragraph** 45:13,23 | **percentage** 14:2 | **plaintiffs** 5:9 5:11,15 8:10 | 45:9,10 46:6 48:18 |
| **part** 12:2,18 29:24 33:24 | | 9:14,16 10:25 | |

**possibility** 15:21 19:7
**possible** 35:12 48:5
**possibly** 35:16 46:13
**potential** 24:6 25:25
**powers** 40:14
**precedent** 7:22 16:3 34:1,3
**precisely** 31:22
**precluded** 29:17
**predominantly** 12:8
**prefer** 45:12
**preferred** 28:22
**preliminarily** 22:11
**preliminary** 4:11,14,16 7:16 8:22 9:5 17:20,22 18:6 18:16 22:17 23:18,21 24:2 24:24 26:7,12 26:14,18,25 27:1 29:20,22 37:11 40:25
**premise** 46:24
**preparing** 17:10

**present** 29:9 48:8
**presented** 22:25 25:13,15 27:11 29:3 30:12 31:10,25 37:10
**pressed** 23:8
**presume** 7:23 8:1
**presumption** 7:5 41:21
**presumptions** 7:15
**presumptively** 12:25
**pretty** 18:13 19:21 20:19,21 45:5
**prevail** 23:17 31:5
**prevailed** 24:6
**preventing** 6:6 6:18 8:10 17:16
**prevents** 6:20
**primary** 33:20
**probably** 48:13
**problem** 49:3
**problematic** 20:19
**problems** 39:10 41:4 49:9
**procedures** 31:13

**proceed** 6:21 29:16 40:18
**proceeded** 34:21
**proceeding** 4:7
**proceedings** 49:20 50:5
**process** 7:8 20:4
**produce** 49:17
**professor** 29:8 32:9,14 47:6 47:23
**prohibit** 11:9
**prohibited** 15:19 39:4 49:5
**prohibiting** 46:4,10 47:18
**prohibition** 36:4 45:16
**prong** 6:13,14 9:12 43:17,17
**proof** 4:6,8,13 13:18
**proper** 35:14 37:19
**proposition** 42:2,7
**protect** 9:7 48:24 49:11
**protected** 6:6 10:11,12 12:25 15:3 21:18 30:4,11 34:6

**protecting** 11:10 16:22 49:10
**protection** 7:8 23:22 34:7,8 34:14 35:19,23 36:13,14
**protections** 20:12
**protects** 14:18 29:14 30:8 46:1,6
**prototypical** 37:21
**prove** 13:16 15:16
**proves** 47:1
**provided** 40:11
**provides** 23:3
**provision** 20:3
**public** 5:6 16:5 16:21,22 17:1 17:17 18:12 19:23 25:2,4 32:24 34:2,20 34:22 35:4 37:2,3 38:8,9 39:10,14
**purcell** 42:5
**purchase** 25:18
**purpose** 12:4 14:24,25 24:14 30:22 48:14
**purposes** 3:24 9:24 11:12

12:5 13:6,10
13:14 14:19
15:11 24:24
25:6 29:20
35:13 37:8,13
48:16,22,23
**put** 5:1,6 27:5
27:19 36:6

**q**

**qualify** 3:18
7:9 11:19
**qualifying** 13:2
**question** 9:11
9:11,22 10:16
11:20 12:1
13:1,9 19:25
26:13 35:19
37:6,7,25 38:2
38:12,22 41:14
45:7
**questions** 33:16
33:17,18,19
35:10 39:14,18
41:10,11
**quick** 42:15
**quickly** 38:12
44:7 48:5
**quite** 20:10
40:1,2,7 46:7
**quo** 40:22,24
**quote** 45:8

**r**

**r** 3:1 50:2

**radically** 18:15
**raise** 20:6
**raised** 7:21
**ranges** 13:24
15:7
**rare** 16:19 19:6
**rarely** 15:5,7
**reach** 19:16
37:24
**reacted** 33:1
**reaction** 47:11
**read** 13:13
19:11 26:10
45:23
**reading** 14:1
**ready** 14:21,21
33:9
**real** 20:17
41:11 49:9
**really** 6:13 16:9
18:7,11,12
19:5,8,18
21:25 25:9
37:18 38:4,15
47:7
**reason** 13:22
16:9 28:17
31:21 34:1
35:25 36:4
39:1 40:8
45:14 47:2
**reasoning** 32:3
**reasons** 22:14
35:16 37:10
45:12

**rebut** 27:11
**rebuttal** 3:12
10:23 11:2
22:6 42:13
**recent** 21:10
**recently** 35:21
48:2
**recharacterized**
20:4
**recognized**
47:20 48:6
**record** 8:7
22:13 23:5
25:13,14,20
26:25 27:15
28:20 29:6
31:25 35:8
36:17,18 37:11
37:14,15 38:20
39:22 41:8,9
49:18 50:5
**records** 31:16
**reeves** 1:15
6:12,17 8:12
8:16,17,23 9:9
9:21 10:8
17:19 18:2
26:16 27:3
33:17 38:2,12
38:22
**referring** 28:25
**reflect** 39:8
**registration**
36:3

**regulated**
35:25
**regulates** 39:12
**regulating**
30:17 38:18
**regulation** 13:5
29:9 32:13
**regulations**
22:20
**reilly** 4:16
**reject** 22:17
**rejected** 30:14
**relevant** 12:22
24:25 35:3
**relevantly** 32:9
**relief** 17:8
42:21 43:8
45:1
**remain** 17:7
**remainder**
26:11
**remaining** 18:5
18:8 19:4
39:17
**remedied** 23:20
24:1
**remedies** 7:12
**remedy** 24:5,6
**repealed** 48:1
**reply** 22:21
29:10,13
**reporter** 9:25
10:1
**reporting** 1:20

**representing**
33:11
**requests** 9:5
**require** 8:1
40:24 41:6
**required** 29:4
30:22
**requirements**
36:3 40:13
**requires** 30:25
47:13
**reserve** 3:12
11:1
**resist** 11:13
**resolved** 10:17
21:16
**respect** 24:13
24:13 26:2,10
27:11 28:19
29:2,22,23
30:9,11,17
31:7 32:1
**response** 26:20
29:5 32:23
**responses**
39:10
**rest** 11:13
44:21
**resting** 42:8
**restrict** 33:12
36:11 38:25
39:2,2
**restricted** 13:3
36:2,6 38:20
39:5,6

**restriction** 10:9
34:11,23
**restrictions**
30:9 39:3,4
47:21,22
**rests** 46:14
**result** 36:15
41:20
**retrospective**
17:8
**reversed** 4:5
**review** 9:3
**revolver** 45:19
**richard** 2:17
**richards** 1:16
**rifle** 4:3 37:21
45:18
**rifles** 4:1 5:15
11:6 47:16
**right** 6:2,14,25
8:14 9:10
10:15,16,22
11:11 14:18
15:8,13 18:19
18:25 19:3,15
20:7,7,11,18
21:1,21 22:5
24:14,16,18,20
26:8 29:12
34:9,22 35:6
35:11,11,17
36:17 37:3
38:1,8,10,10
40:1,2,4 43:6
45:2

**rights** 6:23 7:2
8:11 9:6,7,15
9:19 16:6,8,16
16:17,23,25
17:2,17,18
18:13 19:21,22
20:2 23:10
24:9,18 35:4
41:19 43:3,11
45:3 49:11
**ringer** 32:5
**risk** 24:8 32:24
41:11,23
**robust** 29:5
**room** 19:7
**ross** 2:12,13
22:7,8,8,8
23:16 24:21
25:11 26:9,21
27:9 29:19
30:24 31:18
33:7
**roth** 1:16 3:2,3
10:20,21 12:1
12:13 13:9,25
22:3,4 29:15
29:19 30:19
33:19 35:10
48:2,20 49:2
**roth's** 33:16
37:6
**rounds** 14:16
**rule** 6:1 41:4
43:1

**rush** 47:8,8

**s**

**s** 3:1
**safety** 1:7 25:4
32:24 39:10,14
**sale** 32:20 39:5
39:6,7
**satisfied** 13:17
15:18,25 16:2
16:20 18:8
19:8 46:21
**satisfy** 6:12
15:10 16:18
**saw** 47:11
**saying** 6:16,21
18:19 20:20
40:18 41:2
48:20
**says** 6:18 12:19
16:4 36:11
38:1 44:4,4
45:14,24 46:3
46:9
**scalia** 28:14
**school** 16:3
**scope** 26:8 34:8
37:3
**score** 35:2
**scrutiny** 20:25
21:2,6
**se** 6:9,10 7:9
16:6 19:7
23:20 39:21,25
42:9

**second** 3:16 4:2
4:10 5:24 6:1,7
6:10 8:9,11
9:19 10:11,12
12:23,25 13:3
14:18,18,23
15:4,21 16:10
17:5 20:10,11
20:14 21:14,18
22:2,17 23:10
24:14,17 26:5
29:13 30:4
31:7 33:21,22
34:7 35:6,20
37:24 43:1,20
44:3,17 46:1,5
48:19 49:9
**seconds** 41:13
**section** 20:5
29:25 30:2
**security** 1:7
**see** 1:18 3:2
23:25 27:7
29:23 32:13,15
32:22,25 34:23
36:5 41:2 42:4
46:24
**seeking** 43:7
**seems** 16:25
20:18,21
**seen** 39:11
**self** 9:24 10:5
11:12,22 12:2
12:3,7,10,15
13:7,10,11,14

13:14,15,23,25
14:3,5,6,8,9,10
14:24,25 15:2
15:11,14 24:15
25:6,20 27:12
27:15,16 30:20
30:23 31:1
34:5 35:7,13
36:23 37:1,13
37:21,25 38:3
38:6,10 45:15
48:17
**sell** 32:17
**semi** 4:1 11:5
11:24 14:13
28:21 45:18
47:16,22,25
48:3
**send** 24:3
**sense** 38:4
**sensitive** 8:3
**sentence** 28:17
**separation**
40:14
**serve** 18:12
**service** 43:25
**set** 16:19
**setting** 13:17
15:21
**settled** 7:22
**seventh** 17:6
28:1 30:14
35:1,2 38:7,15
**several** 24:11

**share** 23:6
27:22 28:3
49:2
**shared** 39:10
**sharp** 37:22
**shifted** 21:22
**shifts** 3:19
**shoot** 28:5
**shooting** 13:24
15:7 37:9
**shootings** 26:3
28:10 48:4
49:7
**short** 37:4
**shortly** 48:10
**shotguns** 11:6
37:4
**shots** 39:5
**show** 5:9 16:11
18:3 35:6
**showing** 9:16
38:9
**shown** 37:13
**shows** 37:16
**sic** 23:23 27:21
**side** 16:1 18:23
23:8 26:17
27:5 31:14
40:5,14 42:16
43:19
**sidebar** 49:19
**sides** 49:17
**significant** 41:4
**significantly**
28:11

**similar** 32:9
49:3
**simple** 10:7
**simply** 10:17
11:24 12:3,20
17:22 26:12
40:18
**single** 41:6 42:3
**situating** 38:8
**situation** 40:16
42:24
**situations**
25:21 28:23
**skillfully** 43:7
**skills** 13:24
15:6
**slaves** 44:13
**sliding** 13:9
**slung** 39:5
**societal** 31:9
32:1
**sole** 22:25
25:14 28:19
29:2
**solely** 29:19
**somebody**
14:22 18:10
48:14
**sorry** 29:7
**source** 36:8
**sources** 34:19
**sparingly** 7:13
**speak** 6:18,19
8:3

speaking  6:19
specific  24:10
  35:6
specifically
  20:13 21:8
  25:17 29:21
  35:3,13 38:9
  38:21 41:2,18
  44:13 45:22,24
speech  21:17
  21:20 30:7,8,9
  30:11
spend  10:5
spitzer  29:8
  32:10,14 47:7
  47:23
split  49:17
spoken  6:19
sportsmens  1:3
  3:6
spot  42:1
squarely  37:10
  45:7
stage  26:15,15
  26:19 27:2,2
  36:19 37:12
  40:25
stake  39:24
stand  17:13
standard  9:3
  44:5
standing  39:8
stands  42:2,7
start  20:20

started  47:9,19
starting  33:15
startling  28:14
  28:15,17 36:12
starts  32:11
state  1:3 3:6
  4:10 11:17,18
  14:14 34:16
  35:5,21 38:17
  39:12 45:17
  46:15,17
state's  10:11
  11:9,12 13:18
  15:1,16 44:18
  47:6
states  1:1,10,11
  9:25 13:5
  21:11 33:11
  39:3,5,9,13
  47:9,9,19,19,21
status  40:22,24
statute  15:19
  22:11 32:19
  33:3
statutes  33:1
  34:17 40:9,16
statutory  19:13
  19:15,18 34:10
  40:6
stay  40:10
steel  28:7
step  4:9,19,20
  33:24 34:3,13
  34:15

stephanos  1:15
stevens  21:11
  21:17
stop  20:9
straightforward
  3:16
street  1:20 2:6
  2:10,13,16
  50:12
strong  19:1,9
struck  26:5,9
  44:16 49:10
structure  29:23
study  47:22
subject  31:10
submachine
  47:14
submit  4:9 6:9
  31:21,22
submitted
  49:16
substance  8:14
substantive
  20:12
success  4:22
  6:13 7:11,25
  8:13,25 9:1
  16:14 17:24
  19:2,9 23:13
  26:13 40:19
  41:7,8 42:3,6
suffering  5:22
  39:22
suffice  44:18

suffices  42:23
suggest  7:17
  28:14 31:15
suggesting
  11:17 26:11
suggests  7:14
  11:18
suitability
  27:12
suite  1:21 2:14
  50:12
suited  27:14
summary  4:17
supplement
  44:24
support  40:25
supported  46:3
suppose  17:9
supposed  5:21
  7:15,17 20:24
  26:8
suppress  32:19
  32:21
supreme  3:14
  3:21 10:1 11:8
  14:19 19:20
  20:10 28:12,25
  30:3 40:23
  44:17 49:7
sure  14:9 15:3
  16:2 17:9
  19:21 27:9
  37:9,18,19
  38:13 40:7

surprise 39:23
surprising 28:8
swallow 42:17
switch 30:16

**t**

t 50:2,2
tactical 35:21
  38:17
take 13:15
  27:19 31:6
  32:7 33:8
  36:10 44:11
  49:7
talk 23:7 28:16
  34:4 39:18
talked 20:15,17
  28:13 29:8
talking 13:19
  14:13 20:16
  26:24 34:13
  41:18 47:16
  49:9
talks 12:14
  32:10 34:5
  36:22,25
tallying 35:15
tamika 1:15
tangible 43:4,5
target 37:9
taxes 32:17,18
teach 11:21
  13:4 48:17
teaches 11:10
  29:13 31:24

technical 32:2
  41:11
technological
  31:9
technology
  47:25
telling 6:15
tells 12:24
temporary 6:8
ten 33:13
tennessee 32:16
  32:19
tens 47:5
tenth 48:13
term 14:14
terms 6:5 13:5
  20:16,17 25:10
  35:14
terrible 48:21
  48:23
test 10:19
  12:11 15:10
  33:23 34:18
  35:11,14,16,20
  35:22 36:15,20
  37:5 38:24
  44:3,4 45:21
  46:8,13,15
text 3:17 4:9,19
  14:17,23 34:9
  34:20 43:17,21
  43:22
textual 12:5,19
  29:25 44:4

thank 11:4 22:8
  33:6,7 42:11
  42:12,14 44:20
  44:24 49:14,15
thanks 3:4
thing 20:9
  25:24 32:21
  45:1,6
things 13:23
  20:4 21:25
  31:13,15 46:19
think 7:2 8:20
  8:23 9:17 12:6
  12:18 13:12,15
  13:16 14:7,13
  15:8,9,13
  16:15 17:1,2
  17:12,21 18:1
  18:4,4,13 19:5
  19:17,19 20:8
  21:12 25:11
  26:23 27:1
  30:23 33:23
  35:1 36:20
  37:5,25 38:15
  40:1,3,14,21
  41:3,11,16
  42:7,9,16
  43:14,14 44:13
  44:15,18 45:2
  45:16,19,20
  46:24 47:12
thinking 15:16
  27:3 30:21,22
  40:21

thinks 26:23
third 1:1 22:22
  36:9,23
thirteen 43:14
thirty 9:25 47:9
  47:17
thought 17:10
thousands
  32:18 47:4,5
threat 32:24
three 5:12 18:5
  18:8 19:15
  22:14 28:6
  33:14 39:5
  43:13 44:15
threshold 12:5
  12:19
tiers 20:24 21:2
  21:6
time 3:12 4:3
  6:2 8:3 10:6
  19:19 31:13
  32:12 33:8
  35:5 41:3,7
  46:7 47:14
times 14:2,15
  46:12
today 4:2 13:6
  22:24 29:16
  32:18 36:1,5
  39:19,19 47:17
  48:6
together 49:17
took 15:1

tracks  4:17
tradition  3:20
  3:23 10:2,3,14
  11:10 12:11,23
  13:8 21:9,24
  29:8,11 32:10
  32:22 34:12
  38:17,23 39:9
  39:11,15 43:17
  43:24 44:1,5,6
  45:25 46:4,10
traditions
  43:24
transcribed
  2:25
transcript
  49:17 50:4
treat  20:21
treating  31:14
treatment  20:2
  47:13
trenton  2:18
trial  4:18 8:6,7
  31:13,24
trials  17:7
tried  17:10
true  4:21,25
  23:21 50:5
trying  40:6
turn  33:15
  35:23,25 38:4
  38:6
turning  33:16
  38:12

turns  18:23
  35:18
twenty  10:1
  18:18,25 41:13
  48:3
twin  32:6
two  3:12 13:12
  16:18 19:15
  31:6 33:20
  34:15 35:11
  37:10 38:13,14
  39:2,17,19
  43:23 44:7
  47:9,21
twofold  34:1
type  4:2 13:2
  15:5 31:13
  42:21 45:12
types  3:22
  10:18 13:19
  25:18
typical  48:11
typically  15:11
  43:25

**u**

u.s.  33:11
ultimate  17:25
ultimately
  23:12 36:9
unconstitutio...
  16:4 17:12,15
  18:9,10
under  3:14,19
  4:15,18 10:12
  11:8 16:2,8

  17:13 20:5
  22:23 37:19
  43:17 44:3,3
underlying
  26:10
undermine
  36:19
understand
  9:22 14:1 16:9
  31:1 34:20
  35:14 40:5
understanding
  40:10
understood
  34:9 40:7
undertake
  25:12 30:2
undertakes
  32:3
undisputed
  22:12 23:5
  25:19 27:13,15
  28:20 30:1
  35:8 36:17
  37:15 38:20
united  1:1,10
  1:11 9:25
  21:11
unprecedented
  31:8 32:1
unthinkable
  18:13
unusual  44:2
  46:5,10,16

unusually
  46:22
upholding  4:4
upset  48:5
use  3:24,25
  11:12 12:9,12
  12:21 13:6
  14:6,14,17
  15:10,16 23:2
  26:2 27:13
  29:24 30:1,5
  30:19,20,21,21
  30:23,25 32:20
  32:21,25 33:16
  33:19,20,23,24
  34:4,5,15,18
  35:10 37:6,12
  37:14 38:4,11
  43:16,20 44:1
  44:5,8 45:21
  45:24 46:2,6,8
  46:9 48:5,6,6,7
  48:8,9 49:6,12
used  11:22 12:1
  12:3,3,7,8,9,10
  12:15 13:10,11
  13:25 14:2,4,6
  14:8,9,10
  27:16 28:7,9
  31:1 48:3,12
  48:14,21,23
useful  25:19
  28:18 36:23,25
  37:1,17,21

**uses** 14:22 34:3
  45:24
**using** 13:23
  34:14
**usual** 34:19
**utilized** 25:20

**v**

**v** 1:6 4:16 7:14
  16:3 19:11
  21:11 23:23
  30:6 40:3,3
  41:17
**va** 2:7,10
**valid** 30:10
**validity** 36:8
**variety** 33:1
**various** 22:23
  39:3
**vast** 47:19
  48:15,15,15
**veritext** 1:20
**vests** 28:6
**vindicate** 18:12
**vindicates** 16:5
**violate** 17:18
  19:23
**violated** 19:22
**violates** 16:16
  16:16
**violating** 40:12
  40:13
**violation** 6:10
  7:23 9:18
  23:20 26:22
  42:18,19 43:1

  43:2
**violations** 7:8,8
**violence** 32:24
**virtually** 16:6

**w**

**walks** 35:3
**wallach** 1:11
**want** 5:16 6:20
  23:10 25:5
  27:18 37:12,14
  39:1,18 41:17
  48:4
**wanted** 24:3
  27:17 38:10
  47:7
**wants** 14:14
  46:25
**war** 48:10
**warfare** 28:18
  37:1
**washington** 2:4
**way** 5:25 15:8
  18:5 21:25
  24:7 33:23
  34:24 36:8
  39:12 40:7
  46:21
**ways** 6:20 33:1
  33:15
**we've** 16:2
  21:25 23:15
  39:11
**weaken** 18:2,4
**weapon** 37:23
  45:15

**weapons** 5:12
  14:2,4,10
  22:19 24:11
  25:16,18 26:1
  26:2 27:12,14
  27:16,21,25
  28:23 29:14
  30:4,18,25
  33:12 35:9
  37:2,16 46:1,5
  46:6,10 47:20
  48:3,9,16
**wearing** 14:21
  24:8
**weigh** 25:1,7
**weighing** 24:23
  25:8
**went** 9:24
  10:13 28:15
  30:2,8 45:11
**western** 23:23
**widespread**
  36:1 38:19
**wilmington**
  2:14
**win** 8:20 18:23
  23:13
**winter** 19:11
  19:18 40:4,12
  40:16,17 42:4
**wish** 5:9
**word** 12:20
  43:19 46:8
**words** 12:2
  30:20 34:20

  45:24
**work** 36:9 37:5
  46:14 49:17
**works** 38:23
**world** 19:18
  48:10
**worry** 20:19
**wrong** 20:8
  29:13 33:23

**y**

**yeah** 20:20
  46:12
**year** 43:13
**years** 33:13
  42:1 47:17
  48:3,7
**yoked** 38:9
**york** 10:3
**yurgealitis**
  27:14,23 28:21
  37:16

**z**

**zero** 16:11